# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| **MAYO CLINIC, a Minnesota Corporation, on its own behalf and as successor in interest to Mayo Foundation,**<br><br>        **Plaintiff,**<br><br>    v.<br><br>**UNITED STATES OF AMERICA,**<br><br>        **Defendant.** | Civil File No.: |

## COMPLAINT

Plaintiff Mayo Clinic, on its own behalf and as successor in interest to Mayo Foundation, by and through its attorneys, and for its Complaint against defendant, United States of America ("Defendant"), alleges as follows:

## NATURE OF CLAIM

1.      Mayo Clinic brings this action for a refund of $11,501,621 together with statutory interest as provided by law, in federal income taxes erroneously assessed and collected for tax years 2003, 2005-2007 and 2010-2012.  The crux of this dispute is whether Mayo Clinic, a tax-exempt entity which operates five world-renowned schools enrolling thousands of students with tens of thousands of graduates, that is accredited by multiple education agencies, is an educational organization under the Internal Revenue Code of 1986, as amended (the "Code") because it also makes patient care available as a necessary and integral part of its educational activities.

2.      Defendant, through its agent the Internal Revenue Service ("IRS"), erroneously found that Mayo Clinic is not a "qualified organization" described in section 514(c)(9)(C) of the Code because the IRS concluded that Mayo Clinic was not an "educational organization"

1

described in section 170(b)(1)(A)(ii) of the Code, a type of qualified organization. The IRS further concluded that Mayo Clinic is required to treat certain debt-financed income as unrelated business taxable income. In so finding, Defendant did not apply the language of section 170(b)(1)(A)(ii), which describes "an educational organization which normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are regularly carried on." 26 U.S.C. § 170(b)(1)(A)(ii). Instead, the IRS incorrectly relied on a Treasury regulation that purports to create a "primary function" test for an educational organization, and ignored the statutory test in section 170(b)(1)(A)(ii).

3. There is substantial authority for finding that Mayo Clinic satisfies the statutory test for an educational organization. The court in *U.S. v. Mayo Foundation for Education and Research et al.,* held that Mayo Foundation, a predecessor to Mayo Clinic, was a "school" for purposes of the exemption from FICA tax under section 3121(b)(10) of the Code. 282 F. Supp. 2d 997 (D. MN 2003). In so holding, the court applied a standard similar to the section 170(b)(1)(A)(ii) standard for an educational organization and relied on facts that are present in this case, including the fact that the "principal classroom for the [Mayo] residents must be the clinical [patient care] setting." *Id* at 1012.

4. Alternatively, even if a primary function test applies, Mayo Clinic meets such a test based on all of the facts and circumstances. "Primary" is not solely a quantitative test, though quantitative measures show that Mayo Clinic has no greater priority than education. "Primary" is also a qualitative test, and education is clearly of first importance based on qualitative factors, including the distinguished history of Mayo Clinic's educational programs and its integration of patient care into educational activities.

5. As a second alternative, Defendant's failure to treat the Mayo Clinic as an educational organization while allowing similarly situated entities to claim such status results in impermissible disparate treatment.

**PARTIES**

6. Mayo Clinic, EIN: 41-1937751 ("Mayo Clinic 1"), formerly known as Mayo Foundation, had its principal place of business at 200 First Street SW, Rochester, Minnesota, 55905. Mayo Clinic 1 was the parent corporation of the highly integrated set of corporations and other entities that comprised the Mayo organization during tax years 2003 and 2005-2007. Mayo Clinic 1 is a Minnesota nonprofit corporation and a tax exempt organization described in section 501(c)(3) of the Code.

7. Mayo Clinic, EIN: 41-6011702 ("Mayo Clinic 2" or "Plaintiff"), formerly known as Mayo Clinic Rochester, is the successor by merger of Mayo Clinic 1 into its wholly-owned subsidiary, Mayo Clinic Rochester, on January 1, 2010. Mayo Clinic 2 has its principal place of business at 200 First Street SW, Rochester, Minnesota, 55905 and was the parent corporation of the highly integrated set of corporations and other entities that comprised the Mayo organization during tax years 2010-2012. Mayo Clinic 2 is a Minnesota nonprofit corporation and a tax exempt organization described in section 501(c)(3) of the Code. As the surviving entity and successor of the merger with Mayo Clinic 1, Mayo Clinic 2 is the taxpayer for refund purposes for tax years 2003 and 2005-2007 and thus is the Plaintiff for all tax years at issue in this case.

8. Defendant is the United States of America named pursuant to 26 U.S.C. § 7422(f)(1). The actions complained of herein were taken by Defendant through its officials or agencies, including the IRS.

**JURISDICTION AND VENUE**

9. This Court has jurisdiction over this suit pursuant to 28 U.S.C. § 1346(a)(1),

because this is a civil action against the United States for the recovery of an internal revenue tax that was erroneously assessed and collected, and pursuant to 26 U.S.C. § 7422, because Plaintiff previously filed a claim for refund with the IRS consistent with the law and regulations relating to the same.

10. Venue is proper in this Court under 28 U.S.C. § 1402(a)(2), which authorizes a corporation bringing a cause of action for a refund under section 1346(a)(1) to prosecute the action in the judicial district where the corporation's principal place of business or principal office is located. Plaintiff's principal place of business or principal office is located in Rochester, Minnesota, making venue in this Court appropriate.

## FACTUAL BACKGROUND

11. From the time of its creation in the early 1900s, the Mayo organization's primary objective has been to service humanity through integrated clinical practice, medical education and academic-scientific research.

12. In taxable years 2003 and 2005-2007, Mayo Clinic 1 operated the Mayo Clinic College of Medicine, comprised of five distinct medical institutions: (1) Mayo Graduate School; (2) Mayo School of Graduate Medical Education (known as far back as the 1970s as the "largest graduate school of medicine in the world"); (3) Mayo Medical School; (4) Mayo School of Health Sciences; and (5) Mayo School of Continuing Medical Education (collectively, the "Schools"). Each of the Schools was operated as a program or division of Mayo Clinic 1 and was not separately incorporated.

13. Mayo Clinic 1 also acted as the parent corporation for the Mayo organization. In this capacity, it performed administrative functions such as coordination of system-wide activities, overall system-wide medical education and medical research planning, system-wide accounting and reporting, and similar administrative tasks. Mayo Clinic 1 did not directly

operate the clinics and hospitals that provided patient care and extensive programs in medical education and research. Those functions were instead provided by its wholly-owned subsidiary, Mayo Clinic Rochester.

14. The medical facilities that make up the Mayo organization include Rochester Methodist Hospital, Saint Mary's Hospital, Mayo Clinic Arizona and Mayo Clinic Jacksonville/Florida and a number of regional health care provider organizations located in cities and towns within a 200 mile radius of Rochester, Minnesota.

15. On January 1, 2010, Mayo Clinic 1 merged into Mayo Clinic Rochester. The resulting organization, Mayo Clinic 2, has since 2010 conducted the patient care functions formerly conducted separately by Mayo Clinic Rochester. In taxable years 2010-2012 and through the present, the Schools continued to reside in the parent entity, Mayo Clinic 2.

**PROCEDURAL BACKGROUND GIVING RISE TO REFUND CLAIM**

16. On August 4, 2009 (and as revised on November 11, 2009), after opening an audit of Mayo Clinic 1, the IRS issued a Notice Of Proposed Adjustment for tax years 2005 and 2006. The IRS asserted that Mayo Clinic 1 owed unrelated business income tax on certain income it received from partnerships because Mayo Clinic 1 was not a qualified organization for purposes of the exclusion from unrelated business taxable income derived from certain real property, pursuant to section 514(c)(9)(C) of the Code.

17. On February 26, 2010, the IRS indicated that it would seek technical advice in connection with Plaintiff's status as an educational organization under section 170(b)(1)(A)(ii) of the Code, and thus, a qualified organization under section 514(c)(9)(C). In response, on March 31, 2010, Plaintiff submitted a letter and information to the IRS in compliance with Rev. Proc. 2010-5, 2010-1 I.R.B. 165. In its Technical Advice Memorandum ("TAM"), dated November

18, 2013, the IRS concluded that Mayo Clinic 1 was not a qualified organization because its primary function was not the presentation of formal instruction for students.

18.     At the IRS's request on April 1, 2014, the IRS and Plaintiff agreed to extend the statute of limitations period for tax years 2005 through 2007 until June 30, 2015, and later agreed to extend the statute of limitations for tax years 2010 through 2011 until December 31, 2015. Plaintiff filed its claims for refund for tax years 2005-07 and 2010-2011 before the date that is six months after the expiration of the statute of limitations for each such year as extended by Form 872, and such claims are thus timely pursuant to section 6511(c)(1) of the Code. Plaintiff also filed its claims for refund for tax years 2005-2007 before the date that is two years after payment of tax and interest for those years, and such claims are thus timely pursuant to section 6511(a) of the Code. Plaintiff filed its claim for refund for tax year 2012 before the date that is three years after the return was timely filed in 2013.

19.     The refund claim filed with respect to the 2003 tax year results solely from a net operating loss carry back arising from a loss sustained in the 2005 tax year, and the statute of limitations for such loss year remains open as described above. Therefore, the 2003 refund claim is also timely filed pursuant to section 6511(d)(2)(A) of the Code.

20.     On October 16, 2014, pursuant to its Form 4549, the IRS assessed Plaintiff for tax liability related to unrelated debt-financed income for tax years 2005-2007. Plaintiff timely paid this tax liability, plus interest, to the IRS within the applicable statutory period. On February 13, 2015, pursuant to its Form 4549, the IRS assessed Plaintiff for tax liability related to unrelated debt-financed income for tax years 2011-2012. Plaintiff timely paid this tax liability, plus interest, to the IRS within the applicable statutory period. For tax years 2003, 2005 and 2010, within the applicable statutory period, Plaintiff also made an over payment of certain amounts

and/or had carry forward and carry back treatment of certain payments and/or treatment of certain net operating losses or a combination of the foregoing, which was caused by the above-referenced IRS assessments.

21. On December 29, 2015, Plaintiff filed Form 990-Ts with the IRS for tax years 2003, 2005-2007, 2010-2012 and claimed a refund in the amounts set forth below.

| Taxable Year | Company (EIN) | Refund Requested |
| --- | --- | --- |
| 2003 | Mayo Clinic 1 (41-1937751) | $31,365 |
| 2005 | Mayo Clinic 1 (41-1937751) | $837,111 |
| 2006 | Mayo Clinic 1 (41-1937751) | $9,390,781 |
| 2007 | Mayo Clinic 1 (41-1937751) | $439,193 |
| 2010 | Mayo Clinic 2 (41-6011702) | $51,395 |
| 2011 | Mayo Clinic 2 (41-6011702) | $597,235 |
| 2012 | Mayo Clinic 2 (41-6011702) | $154,541 |

22. By its notices dated May 16, 2016 and August 3, 2016, the IRS disallowed Plaintiff's refund claim for each tax year at issue. On August 12, 2016, Mayo submitted to the IRS a Form 2297, Waiver of Statutory Notification of Claim Disallowance, waiving the requirement that the IRS notices be sent by certified or registered mail.

**APPLICABLE LEGAL AND FACTUAL PRINCIPLES SUPPORTING REFUND CLAIM**

23. Mayo Clinic 1 or Mayo Clinic 2, as applicable, was a partner in a number of partnerships that generated income. Certain income received by tax-exempt entities through a partnership, including certain unrelated debt-financed income, constitutes gross income from an unrelated trade or business. Income is unrelated debt-financed income if it is derived from real property financed in whole or in part with acquisition indebtedness. Section 514(c)(9)(A) of the

Code provides, however, that acquisition indebtedness does not include indebtedness incurred by a qualified organization, as defined in section 514(c)(9)(C).

24.     Mayo Clinic 1 and Mayo Clinic 2 are both qualified organizations within the meaning of section 514(c)(9)(C) because they are educational organizations. Specifically, section 514(c)(9)(C) provides that a qualified organization is "an organization described in section 170(b)(1)(A)(ii) and its affiliated support organizations described in section 509(a)(3)." Section 170(b)(1)(A)(ii) describes an educational organization which "normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are regularly carried on."

**Mayo Clinic 1 and Mayo Clinic 2 Are Educational Organizations Meeting All the Criteria Set Forth in Section 170(b)(1)(A)(ii) of the Code**.

25.     The United States District Court for the District of Minnesota found that the Mayo Foundation, a predecessor to Mayo Clinic 1 and Mayo Clinic 2, was a school, college or university for purposes of the exemption from FICA tax under section 3121(b)(10) of the Code. *Mayo Foundation*, 282 F. Supp. 2d 997 (D. MN 2003). The Mayo Foundation operated the same five educational institutions that Mayo Clinic 1 and Mayo Clinic 2 operated during the tax years at issue in this case. The clinics and hospitals associated with the Mayo Foundation are the same clinics and hospitals that are associated with Mayo Clinic 1 and Mayo Clinic 2.

26.     Plaintiff's educational activities are conducted by the Mayo Clinic College of Medicine's five world-renowned Schools. Each of these distinct institutions maintains a regular faculty and curriculum and has a regularly enrolled body of students in attendance at its various locations where academic activities are regularly carried on.

27.     Other than the Mayo School of Continuing Medical Education, the schools within the Mayo Clinic College of Medicine enroll over 3,800 students for graduate, post-graduate, and

other medical education. The Mayo School of Continuing Medical Education does not enroll students in a degree-granting program, but instead provides ongoing continuing medical education to over 100,000 health care professionals.

28. The Schools utilize cutting-edge classrooms and one of the world's largest medical libraries to provide students with formal instruction the satisfactory completion of which results in M.D. and Ph.D. degrees, certificates in medical residency and continuing medical education programs. Schools within the Mayo Clinic College of Medicine are accredited by the Accreditation Council for Graduate Medical Education (ACGME), Higher Learning Commission (HLC), Liaison Committee on Medical Education (LCME), and the Accreditation Council for Continuing Medical Education (ACCME).

29. The vast majority of the full-time physicians on the staff of Plaintiff's clinics and hospitals are also faculty of one or more of Plaintiff's Schools. All medical staff physicians, and thus, all faculty are employed and paid by Plaintiff.

30. For its part, the IRS has acknowledged that the Mayo organization is an educational organization. In a private letter ruling dated February 24, 1969, the IRS concluded that, following the merger of Mayo Clinic (which, at the time, was an unincorporated association of physicians and surgeons) and Mayo Foundation (the predecessor to Mayo Clinic 1 and Mayo Clinic 2), the surviving entity would retain section 501(c)(3) status. In that ruling, the IRS stated that the operation of the "Clinic will contribute importantly to [the Mayo Foundation's] educational and scientific research purposes."

**The IRS's Use of a Primary Function Test Is Contrary to the Plain Meaning of the Statute which Has No Primary Function Test for Defining Qualified Organizations.**

31. The statutory definition, and corresponding test, for an educational organization is clearly and unambiguously set forth in section 170(b)(1)(A)(ii). *See Consumer Prod. Safety*

*Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108 (1980) ("[T]he starting point for interpreting a statute is the language of the statute itself.  Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.")

32. In its TAM, the IRS erroneously applied a primary function test that does not appear in the statute in finding that Mayo Clinic 1 was not an educational organization, but rather acted as a parent company of a healthcare system as its primary purpose and function.  The primary function test is described in Treas. Reg. section 1.170A-9(c)(1), which provides that an educational organization must have as its primary function the presentation of formal instruction.  Indeed, where Congress intended a primary or principal purpose test to apply for purposes of the categories of organizations described in section 170(b)(1)(A), it wrote one explicitly into the statute.  For instance, section 170(b)(1)(A)(iii), the paragraph immediately following section 170(b)(1)(A)(ii), contains a principal purpose test for hospitals.  No such test is mentioned in the statutory definition of an educational organization under section 170(b)(1)(A)(ii) or in section 501(c)(9)(C)(i) and thus, no such test applies in this case.

**Alternatively, Mayo Clinic 1 and Mayo Clinic 2 Satisfy a Primary Function Test for the Presentation of Formal Instruction Because Education Is of First Importance.**

33. Even if Defendant was correct in applying a primary function test under Treas. Reg. section 1.170A-9(c)(1), Mayo Clinic 1 and Mayo Clinic 2 meet such a test based on the facts and circumstances.

34. The Supreme Court's decision in *Malat v. Riddell*, 383 U.S. 569 (1966), explains what primary or primarily means in the context of a specific tax provision (section 1221). Specifically, the Court wrote that "[w]e hold that, as used in § 1221(1), 'primarily' means 'of first importance' or 'principally.'"  "Primary" should have the same meaning in the context of

section 170(b)(1)(A)(ii).

35. From a qualitative standpoint, the history of the Mayo organization, its corporate purposes, operations, and integration of all patient care with medical education, show that education is of first importance, and patient care is integral to that education.

36. The Mayo organization has been providing graduate medical education since 1915. The combined numbers of graduates from the Mayo Clinic College of Medicine number in the tens of thousands.

37. The Articles of Incorporation for Mayo Clinic 1 and Mayo Clinic 2 provide that their purposes include, *inter alia*, "to perform a public trust to support, aid and advance the study and investigation of human ailments and injuries and the causes, prevention, relief and cure thereof, and the study and investigation of problems of hygiene, health and public welfare and the promotion of medical, surgical, and scientific learning, skill, education and investigation, to conduct the practice of medicine and surgery and allied services, to provide medical, surgical nursing, and hospital services and to establish, operate and/or coordinate clinics, medical and surgical centers, hospitals and similar facilities, to assist and conduct or coordinate the conduct of programs of medical education and medical research and to offer programs of graduate and undergraduate education and instructions in all fields of medicine…."

38. The preamble to the Bylaws states that the Mayo organization's founders, the Mayo brothers, thought of giving Mayo Clinic to a medical school or university to serve their purposes of promoting medical education, research, investigation and public health, but instead created a nonprofit corporation to which they transferred the Mayo Clinic assets.

39. On the Forms 990 filed with the IRS annually, Mayo Clinic 1 and Mayo Clinic 2 reported that they each were an educational organization in the tax years at issue.

40. Patient care is integral to a medical education. As the *Mayo Foundation* court put it, "[t]he quality of a graduate medical education program depends directly on the breadth and quality of patient care pursued at clinical institutions. Put another way, a substantial and diverse patient base, together with the pursuit of high quality care by staff physicians and other members of the patient care team, is necessary for providing appropriate training to residents. Actual care in the service of patients is inherent in the educational process. It really cannot be separated from that." 282 F. Supp. 2d at 1012. *See also Mayo Foundation v. Commissioner of Revenue*, 236 N.W.2d 767, 774 (MN 1975) ("patient care at the Mayo Clinic is inextricably interwoven with the educational and research functions of the Mayo entities.") Thus, under a qualitative test, education is primary to Mayo Clinic 1 and Mayo Clinic 2.

41. Quantitative measures also show that Mayo Clinic 1 and Mayo Clinic 2 have no greater priority than education. Because medical students and medical residents are part of the team caring for every patient, and because medical students and medical residents can only learn effectively through patient care, the quantitative measures associated with teaching in a clinical setting (and the administrative services integral and related to those activities) must be combined with and included in any quantitative measure associated with educational activities.

42. In *Mayo Foundation*, the court found that the predecessor to Mayo Clinic 1 and Mayo Clinic 2 satisfied a primary purpose test. The court stated that "[e]ven if a primary purpose test applied, the [Mayo] Foundation would satisfy that test. The Foundation is a 501(c)(3) non-profit institution having as its charitable purposes medical education and scientific research. The Foundation operates five medical schools and … spends more on medical education and research than it receives from patient care." *Id*. at 1013 n. 30.

**As a Second Alternative, by Refusing To Treat Mayo Clinic 1 and Mayo Clinic 2 as Educational Organizations Described in Section 170(b)(1)(A)(ii), the Defendant Has Engaged in Impermissible Disparate Treatment**.

43. The IRS must apply the law consistently and treat similarly situated organizations alike. Based on information and belief, the IRS has allowed similarly situated entities to claim status as educational organizations under section 170(b)(1)(A)(ii) of the Code. Every organization described in section 170(b)(1)(A)(ii) of the Code is automatically also a qualified organization as defined in section 509(c)(9)(C).

44. The IRS refusal to treat Mayo Clinic 1 and Mayo Clinic 2 as educational organizations, and thus qualified organizations within the meaning of section 509(c)(9)(C), while similarly situated entities are recognized as having that status is a violation of the law and entitles Plaintiff to a refund for all tax years at issue.

## COUNT ONE-2003

45. Plaintiff incorporates and re-alleges paragraphs 1 through 44 as if set forth fully herein.

46. On or before November 15, 2004, Plaintiff timely filed a Form 990-T, Exempt Organization Business Income Tax Return for the tax year ended December 31, 2003.

47. Plaintiff timely paid to the IRS taxes reported on its Form 990-T for the tax year ending December 31, 2003.

48. Plaintiff timely filed a Second Amended Form 990-T requesting a refund of $31,365 for tax year ending December 31, 2003. (*See* Exhibit A, attached hereto).

49. By notices dated May 16, 2016 and August 3, 2016, the IRS disallowed the claim in full. (*See* Exhibit B, attached hereto).

50. As a result of the IRS's failure to allow its claim for refund, Plaintiff has overpaid income taxes for the 2003 tax year, in the amount of $31,365. Plaintiff is entitled to a refund and

interest as allowed by law.

## COUNT TWO-2005

51. Plaintiff incorporates and re-alleges paragraphs 1 through 44 as if set forth fully herein.

52. On or before November 15, 2006, Plaintiff timely filed a Form 990-T, Exempt Organization Business Income Tax Return for the tax year ending December 31, 2005.

53. Plaintiff timely paid to the IRS taxes reported on its Form 990-T for the tax year ending December 31, 2005.

54. Plaintiff timely filed a Second Amended Form 990-T requesting a refund of $837,111 for tax year ending December 31, 2005. (*See* Exhibit C, attached hereto).

55. By notices dated May 16, 2016 and August 3, 2016, the IRS disallowed the claim in full. (*See* Exhibit B, attached hereto).

56. As a result of the IRS's failure to allow its claim for refund, Plaintiff has overpaid income taxes for the 2005 tax year, in the amount of $837,111. Plaintiff is entitled to a refund and interest as allowed by law.

## COUNT THREE-2006

57. Plaintiff incorporates and re-alleges paragraphs 1 through 44 as if set forth fully herein.

58. On or before November 15, 2007, Plaintiff timely filed a Form 990-T, Exempt Organization Business Income Tax Return for the tax year ending December 31, 2006.

59. Plaintiff timely paid to the IRS taxes reported on its Form 990-T for the tax year ending December 31, 2006.

60. Plaintiff timely filed a Second Amended Form 990-T requesting a refund of $9,390,781 for tax year ending December 31, 2006. (*See* Exhibit D, attached hereto).

61. By notices dated May 16, 2016 and August 3, 2016, the IRS disallowed the claim in full. (*See* Exhibit B, attached hereto).

62. As a result of the IRS's failure to allow its claim for refund, Plaintiff has overpaid income taxes for the 2006 tax year, in the amount of $9,390,781. Plaintiff is entitled to a refund and interest as allowed by law.

## COUNT FOUR-2007

63. Plaintiff incorporates and re-alleges paragraphs 1 through 44 as if set forth fully herein.

64. On or before October 15, 2008, Plaintiff timely filed a Form 990-T, Exempt Organization Business Income Tax Return for the tax year ending December 31, 2007.

65. Plaintiff timely paid to the IRS taxes reported on its Form 990-T for the tax year ending December 31, 2007.

66. Plaintiff timely filed a Second Amended Form 990-T requesting a refund of $439,193 for tax year ending December 31, 2007. (*See* Exhibit E, attached hereto).

67. By notices dated May 16, 2016 and August 3, 2016, the IRS disallowed the claim in full. (*See* Exhibit B, attached hereto).

68. As a result of the IRS's failure to allow its claim for refund, Plaintiff has overpaid income taxes for the 2007 tax year, in the amount of $439,193. Plaintiff is entitled to a refund and interest as allowed by law.

## COUNT FIVE-2010

69. Plaintiff incorporates and re-alleges paragraphs 1 through 44 as if set forth fully herein.

70. On or before November 15, 2011, Plaintiff timely filed a Form 990-T, Exempt Organization Business Income Tax Return for the tax year ending December 31, 2010.

71. Plaintiff timely paid to the IRS taxes reported on its Form 990-T for the tax year ending December 31, 2010.

72. Plaintiff timely filed a Second Amended Form 990-T requesting a refund of $51,395 for the tax year ending December 31, 2010. (*See* Exhibit F, attached hereto).

73. By notices dated May 16, 2016 and August 3, 2016, the IRS disallowed the claim in full. (*See* Exhibit G, attached hereto).

74. As a result of the IRS's failure to allow its claim for refund, Plaintiff has overpaid income taxes for the 2010 tax year, in the amount of $51,395. Plaintiff is entitled to a refund and interest as allowed by law.

## COUNT SIX-2011

75. Plaintiff incorporates and re-alleges paragraphs 1 through 44 as if set forth fully herein.

76. On or before November 15, 2012, Plaintiff timely filed a Form 990-T, Exempt Organization Business Income Tax Return for the tax year ending December 31, 2011.

77. Plaintiff timely paid to the IRS taxes reported on its Form 990-T for the tax year ending December 31, 2011.

78. Plaintiff timely filed an Amended Form 990-T requesting a refund of $597,235 for the tax year ending December 31, 2011. (*See* Exhibit H, attached hereto).

79. By notices dated May 16, 2016 and August 3, 2016, the IRS disallowed the claim in full. (*See* Exhibit G, attached hereto).

80. As a result of the IRS's failure to allow its claim for refund, Plaintiff has overpaid income taxes for the 2011 tax year, in the amount of $597,235. Plaintiff is entitled to a refund and interest as allowed by law.

## COUNT SEVEN-2012

81. Plaintiff incorporates and re-alleges paragraphs 1 through 44 as if set forth fully herein.

82. On or before November 12, 2013, Plaintiff timely filed a Form 990-T, Exempt Organization Business Income Tax Return for the tax year ending December 31, 2012.

83. Plaintiff timely paid to the IRS taxes reported on its Form 990-T for the tax year ending December 31, 2012.

84. Plaintiff timely filed an Amended Form 990-T requesting a refund of $154,541 for tax year ending December 31, 2012.  (*See* Exhibit I, attached hereto).

85. By notices dated May 16, 2016 and August 3, 2016, the IRS disallowed the claim in full.  (*See* Exhibit G, attached hereto).

86. As a result of the IRS's failure to allow its claim for refund, Plaintiff has overpaid income taxes for the 2012 tax year, in the amount of $154,541.  Plaintiff is entitled to a refund and interest as allowed by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Mayo Clinic prays that the Court enter an order and final judgment in its favor and against Defendant the United States of America as to each count above and requests the following relief:

(1) On the claim in Count One of the Complaint, a refund of 2003 federal income tax in the amount of $31,365 or such greater amount as is legally refundable, together with assessed interest, as well as statutory interest on the amounts to be refunded and any other relief to which Plaintiff may be entitled;

(2) On the claim in Count Two of the Complaint, a refund of 2005 federal income tax

in the amount of $837,111 or such greater amount as is legally refundable, together with assessed interest, as well as statutory interest on the amounts to be refunded and any other relief to which Plaintiff may be entitled;

(3)   On the claim in Count Three of the Complaint, a refund of 2006 federal income tax in the amount of $9,390,781 or such greater amount as is legally refundable, together with assessed interest, as well as statutory interest on the amounts to be refunded and any other relief to which Plaintiff may be entitled;

(4)   On the claim in Count Four of the Complaint, a refund of 2007 federal income tax in the amount of $439,193 or such greater amount as is legally refundable, together with assessed interest, as well as statutory interest on the amounts to be refunded and any other relief to which Plaintiff may be entitled;

(5)   On the claim in Count Five of the Complaint, a refund of 2010 federal income tax in the amount of $51,395 or such greater amount as is legally refundable, together with assessed interest, as well as statutory interest on the amounts to be refunded and any other relief to which Plaintiff may be entitled;

(6)   On the claim in Count Six of the Complaint, a refund of 2011 federal income tax in the amount of $597,235 or such greater amount as is legally refundable, together with assessed interest, as well as statutory interest on the amounts to be refunded and any other relief to which Plaintiff may be entitled;

(7)   On the claim in Count Seven of the Complaint, a refund of 2012 federal income tax in the amount of $154,541 or such greater amount as is legally refundable, together with

assessed interest, as well as statutory interest on the amounts to be refunded and any other relief to which Plaintiff may be entitled; and

(8)     Plaintiff's costs of this action, and such other and further relief as the Court deems appropriate.


Dated:  September 16, 2016                    Respectfully submitted,


/s/Annamarie A. Daley
Annamarie A. Daley (MN 158112)
Jones Day
100 South Fifth Street
19th Floor
Minneapolis, MN 55402
Telephone:  (612) 605-6215
Facsimile:  (612) 605-6001
adaley@jonesday.com


Of Counsel:
Mark P. Rotatori, Esq.
(*pro hac vice* motion to be filed)
JONES DAY
77 West Wacker
Chicago, IL 60601-1692
Telephone:   (312) 782-3939
Facsimile:    (312) 782-8585
mprotatori@jonesday.com

ATTORNEYS FOR PLAINTIFF
MAYO CLINIC