UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Mayo Clinic, a Minnesota Corporation, on
its own behalf and as a successor in interest
to Mayo Foundation,

        Plaintiff,

v.

United States of America,

        Defendant.

File No. 16-cv-03113 (ECT/KMM)


**OPINION AND ORDER**

---

Mark P. Rotatori, Jones Day, Chicago, IL; and Annamarie A. Daley, Caroline Heicklen, and Andrew Leiendecker, Jones Day, Minneapolis, MN, for Plaintiff Mayo Clinic.

Curtis J. Weidler, Samuel P. Robins, and Eric M. Aberg, U.S. Department of Justice Tax Division, Washington, DC, for Defendant the United States of America.

---

Mayo Clinic brought this case to obtain $11,501,621 in tax refunds. Mayo qualifies for the tax refunds it seeks if, during the tax years in question, it was:

> an educational organization which normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are regularly carried on.

26 U.S.C. § 170(b)(1)(A)(ii). The Government concedes that, during the tax years at issue and today, Mayo "normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are regularly carried on." The Government says Mayo is nonetheless not an "educational organization." To support this position, the Government argues that

the term "educational organization" as used in § 170(b)(1)(A)(ii) unambiguously requires education to be an organization's "primary purpose."  The Government also relies on a Treasury Department regulation interpreting § 170(b)(1)(A)(ii).  That regulation, 26 C.F.R. § 1.170A-9(c)(1), provides that an organization cannot qualify as an "educational organization" under § 170(b)(1)(A)(ii) unless education is the organization's "primary function" and its noneducational activities are "merely incidental" to its educational activities.  These requirements do not appear explicitly in the statute.

The Government and Mayo have filed cross-motions for summary judgment.  The Government argues that Mayo's primary function is health care, not education, and even if that were not so, that Mayo's health-care activities are not merely incidental to its educational activities.  Mayo disagrees with the Government's interpretation of the law at every step and disputes the Government's characterization of the facts.  Mayo describes its educational and patient-care activities as essential to each other and inextricable.

Resolving the Parties' summary-judgment motions requires analyzing § 170(b)(1)(A)(ii) and its accompanying regulation under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  This analysis shows that the regulation does more than the law allows because it adds requirements—the primary-function and merely-incidental tests—Congress intended not to include in the statute.  Because the Government's position is based entirely on these impermissible requirements, Mayo is entitled to the sued-for refunds.  Mayo's summary-judgment motion will be granted, and the Government's motion will be denied.

I

Mayo is a Minnesota nonprofit corporation and tax-exempt organization under 26 U.S.C. § 501(c)(3).[1]   Mayo SOF ¶ 4 [ECF No. 185].   For this case, it helps as background to know that Mayo is the parent organization of several hospitals, clinics, and the Mayo Clinic College of Medicine and Science.   *Id.* ¶ 34.   The College is comprised of five distinct medical schools that offer M.D., Ph.D., and other degrees, as well as residencies, fellowships, and continuing medical education: (1) Mayo Clinic Graduate School of Biomedical Sciences; (2) Mayo Clinic School of Graduate Medical Education; (3) Mayo Clinic Alix School of Medicine; (4) Mayo Clinic School of Health Sciences; and (5) Mayo Clinic School of Continuing Professional Development.   *Id.* ¶ 35.

After conducting an audit, the Internal Revenue Service in 2009 issued a Notice of Proposed Adjustment asserting that Mayo owed tax on certain income that it received from partnerships.   *Id.* ¶ 7.   The IRS concluded Mayo was not entitled to a tax exemption with respect to this partnership income because, in its view, Mayo was not an "educational organization."   *Id.*   In 2013, the IRS issued a Technical Advice Memorandum confirming its position that Mayo did not qualify as an "educational organization."   Applying a test from a Treasury Department regulation, the IRS concluded Mayo's "primary function" was not "formal instruction."   *Id.* ¶¶ 8–9; *see* Mayo SOF Ex. 10 [ECF No. 186-1 at 371].

Mayo paid the disputed taxes and, in 2016, filed this lawsuit seeking a refund.   Mayo SOF ¶ 10; *see* Compl. [ECF No. 1].   Mayo is the proper party to seek all tax refunds at

---

[1]   Unless otherwise indicated, only statements of material facts not disputed by the adverse party will be cited in this Opinion and Order.

issue in this case.  *Id.* ¶ 6.  The Parties have stipulated that the value of the refund at issue

is $11,501,621, together with interest as provided by law, and breaks down as follows for

each tax year for which Mayo seeks a refund:

| Taxable Year | Refund Requested |
|---|---|
| 2003 | $31,365 |
| 2005 | $837,111 |
| 2006 | $9,390,781 |
| 2007 | $439,193 |
| 2010 | $51,395 |
| 2011 | $597,235 |
| 2012 | $154,541 |

*Id.* ¶ 11.  The Parties also have stipulated that Mayo's refund claims are timely.  *See* Compl.

¶ 18 (discussing tolling of statute of limitations).

There is subject-matter jurisdiction over this case pursuant to 28 U.S.C.

§ 1346(a)(1).  *See* 28 U.S.C. § 1346(a)(1) (providing jurisdiction for "[a]ny civil action

against the United States for the recovery of any internal-revenue tax alleged to have been

erroneously or illegally assessed or collected"); *see also* 26 U.S.C. § 7422 (containing

pre-suit requirement that plaintiff in tax-recovery lawsuit must first file "a claim for refund

or credit . . . with the Secretary" of the Treasury) and Compl. ¶ 9 and Answer ¶ 9 [ECF

No. 23] (establishing Mayo's compliance with this requirement).

## II

The statutory system governing unrelated business income ("UBI") and the related

tax ("UBIT") seem complex and contain multiple exceptions to the rule and exceptions to

the exceptions.  For this case, the precise framework of the UBIT (26 U.S.C. § 514) is less

significant than the statute concerning "educational organizations" that the UBIT statute incorporates by reference (26 U.S.C. § 170(b)(1)(A)(ii)).  Regardless, some background information on UBIT helps to understanding this case.  As the United States explains it, tax-exempt charitable organizations under § 501 are permitted to exclude from their UBI "certain types of passive income—such as income from dividends, interest, and real-property rents."  USA Mem. in Supp. at 4–5 [ECF No. 177].  "This passive-income exclusion is generally what allows a tax-exempt organization to avoid incurring UBIT on the dividends and interest that it earns on its endowment."  *Id.* at 5.  But there is an exception to this exclusion: "If the passive income is earned using leverage—that is, borrowed money—then the amount that is excluded from UBI is reduced."  *Id.*  And this exception, too, has an exception: "[W]hen the passive income comes from debt-financed real property, the income can be excluded from UBI if the organization is a 'qualified organization' under 26 U.S.C. § 514(c)(9)(C)."  *Id.*  Included among the qualified organizations is "an organization described in section 170(b)(1)(A)(ii)," which is the educational-organization statute at issue in this case.

Section 170(b)(1)(A)(ii) is one subsection of a statute that lists nine types of charitable contributions by individuals that are eligible for tax deductions.  As relevant here, the statute provides:

> (A) General rule. Any charitable contribution to—
> (i) a church or a convention or association of churches,
> (ii) an educational organization which normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are regularly carried on,

> (iii) an organization the principal purpose or functions of which are the providing of medical or hospital care or medical education or medical research, if the organization is a hospital . . .
>
> . . .
>
> shall be allowed to the extent that the aggregate of such contributions does not exceed 50 percent of the taxpayer's contribution base for the taxable year.

26 U.S.C. § 170(b)(1)(A).

In addition to this statute, there is a regulation promulgated by the Treasury Department interpreting § 170(b)(1)(A)(ii), 26 C.F.R. § 1.170A-9.  The regulation is entitled "Definition of section 170(b)(1)(A) organization."  The regulation essentially repeats the statute in some respects, parroting the "faculty-curriculum-student-place" requirements of the statute.  It also includes two requirements that do not appear explicitly in the statute—what will be referred to as the "primary-function requirement" and the "merely-incidental test"—and provides examples of organizations that are or are not "educational organizations."  The regulation provides as follows:

> An educational organization is described in section 170(b)(1)(A)(ii) if its **primary function** is the presentation of formal instruction and it normally maintains a regular **faculty** and **curriculum** and normally has a regularly enrolled body of pupils or **students** in attendance at the **place** where its educational activities are regularly carried on.  The term includes institutions such as primary, secondary, preparatory, or high schools, and colleges and universities.  It includes Federal, State, and other public-supported schools which otherwise come within the definition.  It does not include organizations engaged in both educational and noneducational activities unless the latter are **merely incidental** to the educational activities.  A recognized university which incidentally operates a museum or sponsors concerts is an educational organization within the meaning of section 170(b)(1)(A)(ii).  However, the operation of a school by a

> museum does not necessarily qualify the museum as an educational organization within the meaning of this subparagraph.

26 C.F.R. § 1.170A-9(c)(1) (emphasis added).

As noted in the introduction, the Government concedes that Mayo "normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are regularly carried on," as 26 U.S.C. § 170(b)(1)(A)(ii) describes and the regulation repeats.  As the Government puts it: "The United States does not dispute that Mayo Clinic, by virtue of its schools, satisfies the requirements relating to faculty, curriculum, students, and place." USA Mem. in Supp. at 6.  The Government nonetheless argues that Mayo is not an "educational organization" in light of (what the Government says is) that term's intended meaning in § 170(b)(1)(A)(ii) and the Treasury Department's interpretive regulation.

III

A

The Parties' summary-judgment motions require consideration of the statute and regulation under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  *Chevron* provides "a familiar two-step framework" for deciding whether an agency's regulation interpreting a statute is entitled to deference. *Andrade-Zamora v. Lynch*, 814 F.3d 945, 951 (8th Cir. 2016).  As the Supreme Court explained several years ago when deciding another tax case implicating Mayo's predecessor, "[t]he principles underlying . . . *Chevron* apply with full force in the tax context."  *Mayo Found. v. United States*, 562 U.S. 44, 55–56 (2011) ("We see no reason

why our review of tax regulations should not be guided by agency expertise pursuant to *Chevron* to the same extent as our review of other regulations."). "*Chevron* deference is appropriate 'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'" *Id.* at 57 (quoting *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001)). The two steps, in a nutshell, are as follows:

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. . . . Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. . . . [A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

*Chevron*, 467 U.S. at 842–43 (footnotes omitted).

The *Chevron* analysis must begin with the statute, 26 U.S.C. § 170(b)(1)(A)(ii). But the question is not whether the term "educational organization" is ambiguous in the abstract. Instead, the proper inquiry is "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. The fact that Mayo and the Government advocate competing interpretations of the statute does not alone answer this question. As the Supreme Court recently stated, "[i]t is not enough to casually remark . . . that both

parties insist that the plain [statutory] language supports their case, and neither party's position strikes the court as unreasonable." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2423 (2019) (cleaned up). "Rather, the court must make a conscientious effort to determine, based on indicia like text, structure, history, and purpose, whether the [statute] really has more than one reasonable meaning." *Id.* at 2423–24; *Chevron*, 467 U.S. at 843 n.9 (indicating that courts should "employ[] traditional tools of statutory construction" to determine whether "Congress had an intention on the precise question at issue").

Properly framing the "precise question at issue" is important. What question is asked affects (if not dictates) whether the statute provides a clear answer or leaves room for a regulation to fill gaps. *See Bank of Am., N.A. v. F.D.I.C.*, 244 F.3d 1309, 1316 (11th Cir. 2001) ("The resolution of this threshold inquiry [at *Chevron* step one] will be at least influenced, if not determined, by how broadly we frame the 'precise question.'"); *Canyon Fuel Co., LLC v. Sec'y of Labor*, 894 F.3d 1279, 1294 (10th Cir. 2018) (same). Although *Chevron* provides limited guidance about just how broadly or narrowly to frame the question, the Supreme Court has since described the proper inquiry as whether "the statute is silent or ambiguous with respect to the specific issue *addressed by the regulation*." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) (emphasis added); *see also Chevron*, 467 U.S. at 843 (suggesting that the analysis involves asking whether "the statute is silent or ambiguous with respect to the specific issue").

Here, apart from essentially parroting the statute, the regulation includes the primary-function and merely-incidental requirements, and these are the elements the Government has relied on for its position that Mayo is not an "educational organization."

The proper framing of the precise question at issue, then, is whether § 170(b)(1)(A)(ii) is silent or ambiguous with respect to the primary-function and merely-incidental requirements in the regulation.  This framing appears consistent with how the precise question was framed in the *Mayo Foundation* case.  There, the Eighth Circuit framed the inquiry at *Chevron* step one as "whether a medical resident working for the school full-time is a 'student who is enrolled and regularly attending classes' for purposes of 26 U.S.C. § 3121(b)(10)," presumably because the specific issue addressed by the regulation was a full-time employee limitation.  *Mayo Found. for Med. Educ. & Research v. United States*, 568 F.3d 675, 680 (8th Cir. 2009), *aff'd*, 562 U.S. 44 (2011).  The Supreme Court seemed to approve of this framing, saying "[w]e agree with the Court of Appeals that Congress has not [directly addressed the precise question at issue]" and that "[t]he statute does not define the term 'student' and does not otherwise attend to the precise question whether medical residents are subject to FICA."  *Mayo Found.*, 562 U.S. at 52; *see also City of Arlington v. F.C.C.*, 569 U.S. 290, 297 (2013) ("No matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, *whether the agency has stayed within the bounds of its statutory authority*.").

## B

Congress unambiguously chose not to include a primary-function requirement in 26 U.S.C. § 170(b)(1)(A)(ii), and the Treasury Department exceeded the bounds of its statutory authority when it promulgated the primary-function requirement in 26 C.F.R. § 1.170A-9(c)(1).   Section 170(b)(1)(A)(ii) contains no explicit primary-function requirement, but the equivalent of that very requirement appears in the very next subsection

of the statute, § 170(b)(1)(A)(iii).  In this situation—that is, when Congress imposes a particular requirement in one subsection of a statute but not in another—settled rules of statutory construction say that the absence of the requirement is generally to be considered a deliberate omission that must be respected.  *See Estate of Farnam v. C.I.R.*, 583 F.3d 581, 584 (8th Cir. 2009) ("The goal of statutory analysis, of course, is to give effect to the Congressional intent behind the statute's enactment." (citing *Chevron*, 467 U.S. at 842–43)); *Estate of Farnam*, 583 F.3d at 584 ("In determining whether statutory language is plain and unambiguous [at *Chevron* step one], the court must read all parts of the statute together and give full effect to each part." (citation omitted)).

The law requires statutes to be interpreted in the light of their surrounding provisions.  As the Supreme Court has explained, "[s]tatutory construction is a holistic endeavor."  *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60 (2004) (citation and internal quotation marks omitted); *see Clark v. U.S. Dep't of Ag.*, 537 F.3d 934 (8th Cir. 2008) ("In reviewing statutory language, we do not read individual words in isolation, but rather, we read them in the context in which they are used and in the context of the statute as a whole."); *cf. United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere in a context that makes its meaning clear.").  Courts routinely ascribe significance to Congress's expression of something in one statute when that same something does not appear in another statute.  *See Dean v. United States*, 137 S. Ct. 1170, 1177–78 (2017); *Dep't of Homeland Sec. v. MacLean*, 135 S. Ct. 913, 921 (2015);

*Christians v. Dulas*, 95 F.3d 703, 705 (8th Cir. 1996) ("The legislature has the ability and knows how to effectively provide [an exemption] if it so chooses.  Clearly then, the fact that the legislature omitted any [exemption] indicates a deliberate choice not to do so." (citation and internal quotation marks omitted)).  This uncontroversial tenet of statutory interpretation is all the more forceful when the expression appears in the same statute or statutory subdivision as the failure of expression.  *See Loughrin v. United States*, 573 U.S. 351, 358 (2014) ("[W]hen Congress includes particular language in one section of a statute but omits it in another—let alone in the very next provision—this Court presume[s] that Congress intended a difference in meaning." (alteration in original) (citation and internal quotation marks omitted)); *Jama v. I.C.E.*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").  There is ample authority for this proposition in the *Chevron* context.  *See City of Chicago v. Envt'l Def. Fund*, 511 U.S. 328, 338–39 (1994) (stating that "Congress knew how to draft a waste stream exemption in RCRA when it wanted to" and "reject[ing] the Solicitor General's plea for deference to the EPA's interpretation, which goes beyond the scope of whatever ambiguity [the statute] contains"); *Union Pac. R.R. Co. v. Surface Transp. Bd.*, 863 F.3d 816, 825 (8th Cir. 2017) (suggesting that "Congress knew how to [use certain definitional language], so its failure to expressly do so [here] might suggest that it chose to leave the . . .

definition . . . in the Board's hands," but ultimately concluding that such an interpretation "fades in the light of the full text and context").[2]

With these principles in mind, return to the statute.  Section 170(b)(1)(A)(iii), the romanette immediately following the educational-organization romanette in § 170(b)(1)(A)(ii), demonstrates that Congress knew how to incorporate a primary-function requirement into the definition or description of a qualifying organization when that was its intent.  In § 170(b)(1)(A)(iii), Congress provided for "an organization *the principal purpose or functions* of which are the providing of medical or hospital care or medical education or medical research, if the organization is a hospital . . . ." (Emphasis added).  As Mayo argues, this "is clear evidence Congress rejected a 'primary function'

---

[2]  Many cases apply this principle outside the *Chevron* context.  *See, e.g.*, *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252 (2010) (interpreting 29 U.S.C. § 1132(g)(2) and comparing it to 29 U.S.C. § 1132(g)(1), finding "[t]he contrast between these two paragraphs makes clear that Congress knows how to impose express limits on the availability of attorney's fees in ERISA cases," and that the court must not add that limitation to a statute "from which it is conspicuously absent"); *United States v. Bruguier*, 735 F.3d 754, 766 (8th Cir. 2013) (Riley, J., concurring) ("The 'immediately surrounding' sections [2241(d) and 2243(d), "the immediately preceding and immediately following sections"] show that if Congress intended to make [the statute] a strict liability crime, Congress knew exactly how to do so. . . . [A]nd Congress did not mean to say so in [section] 2242(2)." (citations omitted)); *Knowlton v. Allied Van Lines, Inc.*, 900 F.2d 1196, 1199 (8th Cir. 1990) ("These words of limitation, occurring in the very same section of the statute, clearly indicate that the Legislature knew how to limit the purposes of service of process when it wanted to do so . . . ."); *Cty. of Ramsey v. MERSCORP Holdings, Inc.*, 962 F. Supp. 2d 1082, 1088 (D. Minn. 2013) ("Indeed, a similar section of the Act . . . demonstrates that the legislature knows how to create a mandatory recording obligation when it so desires."), *aff'd*, 776 F.3d 947 (8th Cir. 2014); *see also Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) (stating that reading in a phrase into a statute "when it is clear that Congress knew how to specify [it] when it wanted to, runs afoul of the usual rule that when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended" (citation and internal quotation marks omitted)).

requirement for section 170(b)(1)(A)(ii)."  Mayo Mem. in Supp. at 15 [ECF No. 184].  The

Government has identified no reason why the "principal purpose or functions" phrase in

§ 170(b)(1)(A)(iii) could not have been deployed in similar fashion § 170(b)(1)(A)(ii).

And nothing about the "principal purpose or functions" phrase in § 170(b)(1)(A)(iii)

suggests it was intended to mean something different than what "primary function" means

in 26 C.F.R. § 1.170A-9(c)(1).

The statutory and regulatory framework suggest that "primary" and "principal," as

well as "function" and "purpose," are interchangeable.   The interchangeability of

"primary" and "principal" is demonstrated by dictionary definitions, cited by the

Government here, indicating that the two are synonymous.  USA Reply Mem. at 35 [ECF

No. 199] (citing Oxford English Online Dictionary, which defines "primary" as "of the

highest rank or importance; *principal*, chief" (emphasis added)).  Courts also have used the

terms "principal" and "primary" interchangeably in past tax cases.  *See, e.g.*, *Holman v.

C.I.R.*, 601 F.3d 763, 780 n.12 (8th Cir. 2010) (using "principal purpose" and "primary

purpose" interchangeably in interpreting the Internal Revenue Code); *Crystal Lake

Cemetery Ass'n v. United States*, 413 F.2d 617, 620 (8th Cir. 1969) (same); *see also* USA

Reply Mem. at 37 (citing *Malat v. Riddel*, 383 U.S. 569, 571–72 (1966), where the

Supreme Court interpreted "primarily" in its "ordinary, everyday sense" to mean

"principally").[3]  The interchangeability of "function" and "purpose" is evidenced by

---

[3]      Also notable is the frequency of the different permutations of these four words:
"primary function," "principal function," "primary purpose," and "principal purpose."
Nowhere in the Internal Revenue Code does the phrase "primary function" appear.  *See
also* Pub. L. 111-312, Title III, § 301(a), Dec. 17, 2010, 124 Stat. 3300 (repealing

statutes (including romanette (iii) here) that specifically provide for the two words as alternatives. *See, e.g.*, 26 U.S.C. § 501(r)(2)(A)(ii) ("principal function or purpose"); 26 U.S.C. § 170(b)(1)(A)(iii) ("principal purpose or functions"); 26 U.S.C. § 414 ("principal purpose or function"). And though courts typically presume that different words mean different things, this general rule does not apply when terms are interchangeable or not "materially different." *See United States v. Clark*, 926 F.3d 487, 489 (8th Cir. 2019) ("The natural inference is that when the statute means release, it says so, and when it says 'expire,' it must mean something else." (citing *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012) ("[W]here [a] document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea.")). If Congress intended for an "educational organization" to be defined by a primary-function requirement, "it had an excellent chance to say so" but elected not to. *Watt v. GMAC Mortg. Corp.*, 457 F.3d 781, 783 (8th Cir. 2006). Romanette

---

26 U.S.C. § 7701(a)(48)(A)(i), a provision within the "Definitions" statute, which had previously been used to define "off-highway vehicles" based on their "primary function"). The phrase "principal function" also appears just once. *See* 26 U.S.C. § 535(c)(2)(B). The phrase "primary purpose" appears seven times, *see* 26 U.S.C. § 179C(d) and (f)(1); 26 U.S.C. § 144(a)(8)(A); 26 U.S.C. § 7702B(c)(3); 26 U.S.C. § 4944(c); 26 U.S.C. § 502(a); 26 U.S.C. § 7701(b)(5)(A)(iv)(I), whereas the phrase "principal purpose" appears in over forty sections (and more than forty times) throughout title 26, *see, e.g.*, 26 U.S.C. §§ 269, 357, 501, 514, 877. There is a similar pattern in the regulation. Section § 1.170A-9 uses the phrases "primary purpose" once, § 1.170A-9(d)(2)(v)(C); "primary function" once, 1.170A-9(c)(1); "principal function" once, § 1.170A-9(d)(2)(iii); and "principal purpose" fourteen times, *see generally* § 1.170A-9(d). Taken together, it would appear that "principal purpose" is the most common variant, but there is no grammatical or textual reason to think that less frequent variants like "principal function" or "primary purpose" have a different meaning.

(ii) should not be understood implicitly to contain the very same requirement that is explicit in romanette (iii).

C

The corollary of determining that Congress unambiguously did not include a primary-function requirement in § 170(b)(1)(A)(ii) is that Congress also must be understood to have decided not to include a merely-incidental test in this statute, at least as that test is described in the corresponding regulation. Understanding why this is so requires close attention to the text of the regulation. The regulation says that an educational organization "does not include organizations engaged in both educational and noneducational activities unless the latter are merely incidental to the educational activities." 26 C.F.R. § 1.170A-9(c)(1). The Government's understanding of this regulation has not been consistently faithful to its text. At times, the Government has described the regulation as asking whether Mayo's "educational activities are merely incidental." USA Mem. in Supp. at 26.[4] That is not what the regulation says. Under the regulation's plain language, the requirement is that noneducational activities be "merely incidental to the educational activities." 26 C.F.R. § 1.170A-9(c)(1). Requiring noneducational activities to be "merely incidental to educational activities" to qualify as

---

[4] The IRS also has confused the inquiry in its revenue rulings. *See, e.g.*, Rev. Rul. 56-262 (concluding that an organization that "incidental to its primary functions" satisfies the faculty-curriculum-student-place requirement "is not an 'educational organization' referred to in section 170(b)(1)(A)(ii)"); Rev. Rul. 58-433 ("[S]uch educational activities must be more than incidental to other functions of the organization."). The same is true of the Technical Advice Memorandum issued in this case. *See* Mayo SOF Ex. 10 at 6 ("The formal educational activities of the Schools are incidental to that [noneducational] primary function.").

16

an educational organization seems another way of saying that an organization's educational activities must be its primary purpose or function.  The regulation identifies only one purpose—"educational activities"—to which all other activities must be "merely incidental."  Put another way, requiring all noneducational activities to be "merely incidental to the educational activities" means an organization could have no non-incidental or primary purpose other than education to qualify as an "educational organization."[5]

This understanding of the regulation finds support in several sources.  The Parties seem to understand the primary-function requirement and merely-incidental test as opposing expressions of the same test.  *See* Mayo Mem. in Supp. at 24 ("Because Mayo's 'primary' function is educational, it necessarily meets this [merely-incidental] prong of the regulation's test, too.  (Other functions of an organization would inherently be 'incidental' to the organization's 'primary' function)."); USA Reply Mem. at 36 (arguing that the regulation's merely-incidental language "demonstrate[s] that an 'educational' organization's principal function must be the presentation of formal instruction . . . with all other activities being incidental to that activity"), 37 ("The Regulation provides [that] the primary-function . . . test is not satisfied if the organization's noneducational activities are more than incidental to its educational activities.").  Dictionaries also support this

---

[5]    By comparison, a hypothetical regulation requiring educational activities not to be merely incidental to noneducational activities—as the Government occasionally has misunderstood 26 C.F.R. § 1.170A-9(c)(1) to say—would not pose this problem because it would leave open the possibility that educational activities could be integrated with or occur alongside another primary purpose or purposes.

understanding of the regulation. Dictionaries define "incidental" to mean "minor," "subordinate," or "nonessential" in nature. *See American Heritage Dictionary of the English Language* (5th ed. 2019) (defining "incidental" as "[o]f a minor, casual, or subordinate nature," as in "incidental expenses"); *Merriam-Webster.com Dictionary* (indicating the term is synonymous with "minor") (last visited Aug. 6, 2019); *Webster's Third New International Dictionary* 1142 (1993) (defining "incidental" to mean "subordinate, nonessential, or attendant"). IRS revenue rulings support this interpretation. It is true that "[t]he Supreme Court has refrained from deciding whether revenue rulings are entitled to deference." *O'Shaughnessy v. Comm'r*, 332 F.3d 1125, 1130 (8th Cir. 2003). Even if not entitled to deference, the rulings are useful in that they "reflect the agency's longstanding interpretation of its own regulations," which might help ascertain if this understanding of "merely incidental" is correct. *United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 220 (2001); *see also N.D. State Univ. v. United States*, 255 F.3d 599, 603 n.6 (8th Cir. 2007) (stating revenue rulings were "especially useful" where there was "no case law directly on point"). *But see Loos v. BNSF Ry. Co.*, 865 F.3d 1106, 1119 n.11 (8th Cir. 2017) ("We give no consideration to [two] Revenue Ruling[s] . . . because neither revenue ruling is directly on point."), *rev'd on other grounds*, 139 S. Ct. 893 (2019), *opinion reinstated in part*, 920 F.3d 1218 (8th Cir. 2019). Though most revenue rulings simply recite the regulation's standard without defining "incidental," at least one revenue ruling expresses that the primary-function requirement and merely-incidental test are related, suggesting that "incidental" means "secondary" to the organization's "primary functions." Rev. Rul. 56-262 at *1–2 ("Only those 'educational

organizations' organized primarily for, and engaged in, the presentation of formal

education in the instructive sense constitute 'educational organizations' within the meaning

of section 170(b)(1)(A)(ii) of the Code."). Finally, other tax regulations suggest this same

relationship between "primary function" and "merely incidental."   *See* 26 C.F.R.

§ 1.132-2(a)(5)(ii) ("if the services provided to the employee are *merely incidental* to the

*primary* service being provided by the employer" (emphasis added)); 26 C.F.R. § 1.141-

1(b) ("uses that are *incidental* to the *primary* use of the facility" (emphasis added));

26 C.F.R. § 1.141-3(b)(4)(iii)(A); 26 C.F.R. § 1.168(k)-1(c)(3)(ii); 26 C.F.R. § 1.170A-

4A(b)(2)(ii)(A); 26 C.F.R. § 1.367(a)-2(d)(4); 26 C.F.R. § 1.501(c)(3)-1(c)(3)(iv) ("its

main or *primary* objective or objectives (*as distinguished from its incidental or secondary*

*objectives*)" (emphasis added)); 26 C.F.R. § 49.5000B-1(g); 26 C.F.R. § 57.2(h)(2)(viii)

("under which benefits for medical care are *secondary or incidental* to other insurance

benefits" (emphasis added)).[6]

---

[6]      Unlike the situation described in *Mayo Foundation*, 562 U.S. at 49–50 (recounting the "flood of claims" for tax refunds received by the IRS following the decision in *Minnesota v. Apfel*, 151 F.3d 742, 747–48 (8th Cir. 1998), "that the SSA could not categorically exclude residents from student status, given that its regulations provided for a case-by-case approach"), it is not obvious here that the invalidity of the primary-purpose and merely-incidental requirements in 26 C.F.R. § 1.170A-9(c)(1) will have a substantial impact. The Government describes no impact in its summary-judgment submissions. Implicit in a determination that Congress did not include a primary-function requirement in § 170(b)(1)(A)(ii) is a determination that Congress intended the statute's requirements around faculty, curriculum, students, and place to carry most of the weight in identifying an educational organization. At the hearing on these motions, the Government was asked to identify an organization other than Mayo that meets the statute's faculty, curriculum, students, and place requirements but nonetheless does not qualify as an educational organization. Tr. 41. The Government identified the American Red Cross as an example and suggested it might create a regular curriculum and regular faculty and "once a year . . . fly in all the [CPR] trainers" so that they could be "trained by the top CPR person in the

D

The Parties present other arguments that must be addressed, but none undermines or adds significant support to the conclusion that the Treasury Department exceeded the bounds of its statutory authority when it promulgated the primary-function requirement and merely-incidental test in 26 C.F.R. § 1.170A-9(c)(1).

1

The Parties disagree whether § 170(b)(1)(A)(ii) describes a subset of educational organizations or defines the term "educational organization." The Government takes the former position, USA Mem. in Supp. at 7 ("Neither Subparagraph (A)(ii) nor the Internal Revenue Code in general defines the phrase 'educational organization.'"), and Mayo the latter, Mayo Mem. in Supp. at 7 ("[T]he definition . . . is in the statute, not the dictionary."). On this issue, the Government seems correct, but accepting that does not change the outcome. Specifically, the Government says that the statute employs the word "which" as a modifier and that the criteria described after that ("regular faculty and curriculum," etc.) cabin the undefined term "educational organization." *See* USA Reply Mem. at 30–31. In other words, according to the Government, it is possible for an organization to be an

---

organization." Tr. 41–42. It is not clear this arrangement would satisfy the statute's requirements that students be "regularly enrolled" and "in attendance at the place where [] educational activities are regularly carried on." 26 U.S.C. § 170(b)(1)(A)(ii). Regardless, the lack of more obvious examples suggests that the invalidity of the primary-purpose and merely-incidental requirements will not have a substantial impact. It also seems worth observing that the precise meaning of the statute's faculty, curriculum, students, and place requirements appears fairly debatable. If that is so, then—short of imposing a primary-function or merely-incidental test—there would be room to regulate around these requirements.

"educational organization" but not satisfy the statute's additional requirements.  Accepting that the term "educational organization" is ambiguous does not contradict the conclusion that the regulation's primary-function and merely-incidental requirements go too far.  It means only that any regulation addressing that ambiguity must stop short of imposing a primary-function, merely-incidental, or equivalent requirement.

Mayo, on the other hand, argues that the statute uses "which" to say effectively "an educational organization [is one] which normally maintains a regular faculty and curriculum . . . ," such that the faculty-curriculum-student-place criteria define the term "educational organization." *See* Mayo Reply Mem. at 4 [ECF No. 206].  But this doesn't seem right.  The Supreme Court's analysis in *Mayo Foundation* is particularly instructive with respect to this issue.  There, the Supreme Court interpreted another provision of the Internal Revenue Code affecting Mayo, 26 U.S.C. § 3121(b)(10), that excluded certain taxes for "a student who is enrolled in and regularly attending classes at such school, college, or university." *See* 562 U.S. at 49.  The Supreme Court held that the provision "does not define the term 'student.'" *Id.* at 52.  Section 3121(b)(10)'s use of the term "who" followed by the enrollment-and-attendance clause parallels § 170(b)(1)(A)(ii)'s use of the word "which" followed by the faculty-curriculum-student-place clause.  Consistent with *Mayo Foundation*, then, § 170(b)(1)(A)(ii) does not define an "educational organization."  Mayo cites statutes that cross-reference § 170(b)(1)(A)(ii) to support its position that the statute defines educational organization, Mayo Mem. in Supp. at 7, but those statutes, of which there are dozens, consistently refer to an educational organization as "*described* in section 170(b)(1)(A)(ii)." *Id.* (emphasis added); *see, e.g.*, 26 U.S.C.

§§ 21(e)(8), 117(a), 152(f)(2), 415(n)(3)(C)(ii), 508(c)(2)(A).  Only one statute uses the language "as *defined* in section 170(b)(1)(A)(ii)," and that statute also uses the language "educational institution" as opposed to "educational organization."   26 U.S.C. § 410(a)(1)(B)(ii) (emphasis added).  Had Congress intended to define "educational organization" in § 170(b)(1)(A)(ii), it would have used terminology like "an educational organization is . . ." or "educational organization means . . ."  In fact, Congress used the verb "mean" over thirty times throughout § 170.  *See, e.g.*, 26 U.S.C. § 170(b)(1)(E)(v) ("*Definition*.--For purposes of clause (iv), the term 'qualified farmer or rancher' *means* a taxpayer whose gross income from the trade or business of farming (within the *meaning* of section 2032A(e)(5)) is greater than 50 percent of the taxpayer's gross income for the taxable year." (emphasis added)).  Mayo also defends its interpretation by citing a footnote in *Center for Family Medicine v. United States*, 614 F.3d 937, 942 n.7 (8th Cir. 2010), which refers to "26 U.S.C. § 170(b)(1)(A)(ii)'s *definition of* an educational institution." *See* Mayo Mem. in Supp. at 8 (emphasis added).  Mayo similarly relies on *Streiff v. Comm'r*, 77 T.C.M. (CCH) 1565, 1999 WL 153738, at *2 (T.C. 1999), in which the tax court referenced "the definitional requirements" in § 170(b)(1)(A)(ii).  Mayo Mem. in Supp. at 8.  In neither case, however, was the issue of whether § 170(b)(1)(A)(ii) defined "educational organization" presented, and neither court construed the statute to justify its characterization of § 170(b)(1)(A)(ii) as definitional.

2

The Parties each argue that the term "educational organization" in § 170(b)(1)(A)(ii) is unambiguous.  The Government argues that the term means an

organization whose "particular purpose" is education, USA Mem. in Supp. at 7, implying that the regulation's primary-function requirement is in line with the statute, if repetitious. If correct, the Government's position would contradict the conclusion that the statute contains no primary-function requirement.  Mayo, on the other hand, argues that the term means any organization "of or relating to education," and that this unambiguous meaning alone leaves no room for the primary-function and merely-incidental requirements in 26 C.F.R. § 1.170A-9(c)(1).  Mayo Mem. in Supp. at 11–13.  If accepted, Mayo's position would add support to the conclusion that the statute purposely does not contain these requirements.  The Parties support their arguments amply with citations to dictionaries, other statutes, and legislative history, but these authorities do not show that the term "educational organization" as it is used in § 170(b)(1)(A)(ii) is unambiguous one way or the other.

The Government maintains that a "particular purpose" requirement should be read into the statute because it is inherent in the plain meaning of "educational organization." *See* USA Mem. in Supp. at 7.  The Government posits that the "ordinary" and "definite meaning" of "educational organization" is "an organization whose particular purpose is to provide education."  *Id.*  The Government relies specifically on the Oxford English Dictionary Online, which defines "organization" as "[a]n organized body of people with a *particular purpose*."  USA Mem. in Supp. at 8.  That dictionary in turn defines "particular" as "single, distinct, . . . [or] specific."  *Id.* at 9.  Other dictionaries do not define "organization" using this same "particular purpose" language, making the Government's "plain meaning" appear more engineered than plain.  *See, e.g.*, *Merriam-Webster.com*

*Dictionary* (defining "organization" as "association, society," such as "charitable organizations") (last visited Aug. 6, 2019), *Webster's Third New International Dictionary* 1590 ("a group of people that has a more or less constant membership, a body of officers, a purpose, and usu[ally] a set of regulations," such as "religious and charitable" organizations).  The Supreme Court's reasoning in *Mayo Foundation* also undermines this interpretation.  There, the Supreme Court rejected the district court's interpretation that the statute at issue unambiguously contained a "predominance" requirement, saying that "[w]e do not think it possible to glean so much from the little that § 3121 provides."  *Mayo Found.*, 562 U.S. at 53.  The same is true here.

Mayo relies on definitions from American Heritage and Merriam-Webster's Collegiate Dictionary to argue that the ordinary meaning of "educational organization" is "an association . . . of or relating to education."  Mayo Mem. in Supp. at 11–12.  Much like how Mayo argued previously in *Mayo Foundation* that the dictionary definition of "student" plainly encompassed medical residents, *Mayo Foundation*, 562 U.S. at 52, Mayo now argues that the dictionary definition of "educational organization" plainly encompasses academic medical centers like itself.  But just as in *Mayo Foundation*, this proffered definition "does not eliminate the statute's ambiguity."  *Id.*  The term "educational organization" does not itself resolve the question of the extent to which an organization must engage in education to qualify as "educational."  The Eighth Circuit's analysis in *Mayo Foundation* is apt:

> But this [unambiguous] interpretation of 26 U.S.C. § 3121(b)(10), part of the Internal Revenue Code, cannot be correct.  In numerous cases, the Supreme Court has upheld

> Treasury Regulations construing words in tax statutes that may have a common or plain meaning in other contexts. . . . [I]n the vast majority of cases, the Court has not invalidated an interpretive Treasury Regulation simply because the statute used a term that has a plain or common meaning in other contexts.

*Mayo Found.*, 568 F.3d at 679–80 (collecting cases).  And many of the cases cited by the Eighth Circuit therein are relevant here, too.  Just as in *United States v. Correll*, where the Supreme Court found that the language "meals and lodging . . . away from home" was ambiguous, the term "educational organization" here is "obviously not self-defining." 389 U.S. 299, 304 (1967).  The term is "not so easy of application to varying facts that [it] leave[s] no room for administrative interpretation or elucidation."  *Magruder v. Washington, Baltimore & Annapolis Realty Corp.*, 316 U.S. 69, 73 (1942).  In fact, the term "educational organization" seems comparable to the term "business league"—an adjective modifying a noun, neither of which appears highly technical or out of the ordinary—which the Supreme Court concluded was "so general . . . as to render an interpretive regulation appropriate."  *Nat'l Muffler Dealers Ass'n v. United States*, 440 U.S. 472, 476 (1979) (alteration in original) (citation omitted).

3

The Government argues that it is "noteworthy" that "Congress did not provide an exception [in section 514] for any of the organizations described in any other subparagraph in § 170(b)(1)(A)," particularly because Mayo describes itself also as a (b)(1)(A)(vi) organization, or perhaps qualifies as an academic medical center under (b)(1)(A)(iii).  USA Reply Mem. at 18.  This argument assumes either that an organization cannot satisfy

multiple prongs of § 170(b)(1)(A) simultaneously, or that an organization that satisfies a subsection other than (b)(1)(A)(ii) cannot qualify as an "educational organization" under (b)(1)(A)(ii).  The better conclusion is that an organization may qualify under more than one subsection of § 170(b)(1)(A).  Neither § 514 nor § 170 explicitly prevent an organization from qualifying under multiple subparagraphs of (b)(1)(A), and the Government identifies no part of the statute that might accomplish this result implicitly. IRS revenue rulings also support this interpretation.  *See* Rev. Rul. 64-287 (concluding that church foundation, located on university campus, that offered courses to university students qualified as an educational organization); *see also* Rev. Rul. 78-95 (organization qualifying under subsection (vi) could also qualify under (i)); Rev. Rul. 76-416 (organization qualifying under subsection (iii) could also qualify under (iv)).

The Government also looks beyond §§ 514 and 170 for statutory context to support this position.  This is appropriate; "reasonable statutory interpretation must account for both 'the specific context in which . . . language is used' and 'the broader context of the statute as a whole.'"  *Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302, 321 (2014) (alteration in original) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)); *see also Clark*, 926 F.3d at 489 (citing *Wachovia Bank v. Schmidt*, 546 U.S. 303, 315–16 (2006) and Scalia & Garner, *supra*, at 252, for the *in pari materia* canon, under which "statutes addressing the same subject matter generally should be read as if they were one law").  Specifically, the Government points out that in 26 U.S.C. § 119(d)(4)(A), the term "educational institution" is defined to include both "an [educational organization] described in section 170(b)(1)(A)(ii)" or "an academic health center," which in turn is

defined under § 170(b)(1)(A)(iii).   USA Reply Mem. at 20 (citing 26 U.S.C. § 119(d)(4)(A)).  The Government argues that "[u]nder Mayo's proposed interpretations of § 170(b)(1)(A)(ii), an academic health center would necessarily qualify" as both an educational organization and academic health center, and there would have been no need for Congress to distinguish between the two in § 119(d)(4).  *Id.* at 21.  But again, nothing in the statute (either 119 or 170) precludes an organization from qualifying as both an educational organization and an academic health center.  Some organizations might be one, some might be the other, and some might be both.

4

At oral argument, the Government for the first time cited three statutes sharing a definition of the term "nonprofit educational organization."  Tr. 47–48.  The statutes are 26 U.S.C. §§ 4041(g), 4221(d)(5), and 4253(j).  These sections exempt "nonprofit educational organizations" from paying taxes on the sale or purchase of certain items.  Section 4041(g), for example, exempts these organizations from paying a tax on diesel fuel and kerosene.  All three statutes define a nonprofit educational organization to mean:

> an educational organization described in section 170(b)(1)(A)(ii) which is exempt from income tax under section 501(a) . . . [and] a school operated as an activity of an organization described in section 501(c)(3) which is exempt from income tax under section 501(a), if such school normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are regularly carried on.

26 U.S.C. §§ 4041(g), 4221(d)(5), and 4253(j).  The Government argues that the distinction these statutes draw between an "educational organization described in section

170(b)(1)(A)(ii)" and "a school operated as an activity of [a section 501(c)(3) organization" that meets the faculty-curriculum-student-place requirement, *see id.*, shows that Congress intended the latter ("a school operated as an activity") not to qualify as an "educational organization" under § 170(b)(1)(A)(ii), *see* Tr. 49. At oral argument, the Government appeared to suggest this signals Congress's endorsement of the primary-function and merely-incidental tests as applied to § 170(b)(1)(A)(ii).

These statutes should not be understood to provide such a clear or dispositive answer. The conclusion that a primary-function or merely-incidental requirement is inconsistent with § 170(b)(1)(A)(ii) is based primarily on the explicit presence of a primary-purpose test in the next subsection of the same statute, § 170(b)(1)(A)(iii). That adjoining subsection was enacted at the same time as § 170(b)(1)(A)(ii) and for the same purpose. 1954 Internal Revenue Code, as enacted by Pub. L. No. 83-591 (codified at 26 U.S.C. § 170). The three statutes cited by the Government appear in comparatively distant sections of the Internal Revenue Code and were enacted for different purposes. The considerations around enacting favored tax treatment for unrelated business income seem likely to be different from, for example, those that might inform creating an exemption from taxes payable on the sale of diesel fuel. Thus, even if these three statutes provided contrary signals, it seems wiser to follow that given by § 170(b)(1)(A)(iii). And we do not know what "school operated as an activity of an organization" means. *See* 26 U.S.C. §§ 4041(g), 4221(d)(5), and 4253(j). The cited statutes do not define that phrase. Regardless, accepting that a "school operated as an activity of an organization" is not an

"educational organization" under § 170(b)(1)(A)(ii) does not mean that a primary-function test is necessary to defining an "educational organization."

5

Finally, the Parties cite different parts of § 170's legislative history as support for their competing interpretations of "educational organization."  The Government focuses on testimony presented by a "representative of the Carnegie Institute" in 1969 who argued that "educational organization" should be redefined "'to include not only schools, colleges, and universities, but also an 'organization primarily engaged in fundamental research . . . and provid[ing] related instruction to individuals who are candidates for degrees at colleges or universities and postdoctoral training."  USA Resp. Mem. at 29 (alterations in original) (citing Tax Reform Act of 1969: Hearings on H.R. 13270 Before the S. Comm. On Finance, 91st Cong. 5589-91 (1969)).  The Government points out that, despite this testimony, Congress chose not to amend § 170(b)(1)(A)(ii) in this way.  *Id.* at 30.  Mayo points, for example, to a 1954 Senate report accompanying the House resolution.  Mayo Mem. in Supp. at 8–9.  That report says that "[t]he term 'educational institution' *is defined as* an organization which normally maintains a regular faculty and curriculum, and normally has a regular organized body of students in attendance at the place where its educational activities are carried on."  *Id.* (emphasis added) (citing S. Rep. 83-1622 at 4660 (1954)). Legislative history is not helpful when it consists of general and inconsistent remarks "not made with th[e] narrow issue in mind."  *Chevron*, 467 U.S. at 862 (quoting *Jewell Ridge Coal Corp. v. Mine Workers*, 325 U.S. 161, 168–69 (1945)).  That is true of the legislative history cited by the Parties.  *See also Rust v. Sullivan*, 500 U.S. 173, 188–90 (1991) ("[T]he

legislative history is clear about very little . . . . It is well established that legislative history which does not demonstrate a clear and certain congressional intent cannot form the basis for enjoining regulations." (citation omitted)).

\*

The Government concedes that, during the tax years at issue and today, Mayo "normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are regularly carried on." *See* USA Mem. in Supp. at 5–6. The Government's position that Mayo is not entitled to the refunds it seeks is premised entirely on Mayo's alleged inability to satisfy the primary-function and merely-incidental requirements in 26 C.F.R. § 1.170A-9(c)(1). Because those requirements exceed the bounds of authority given by 26 U.S.C. § 170(b)(1)(A)(ii), they are unlawful. Thus, there is no genuine issue of material fact that Mayo qualifies as an "educational organization" under § 170(b)(1)(A)(ii) and is entitled to summary judgment on its refund claims.

IV

With its motions for summary judgment, the Government also moved to exclude Mayo's expert, Melvin Hurley, under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). ECF No. 174. The upshot of Hurley's opinion is that Mayo's educational and clinical operations are "fully integrated" and that "its primary function is education." Mayo SOF Ex. 1 at 6 [ECF No. 186-1]. His expert report identifies twenty-two factors, both qualitative and quantitative, bearing on whether an organization qualifies as educational. *Id.* at 39–40. The analysis justifying the entry of summary judgment for Mayo did not

require consideration of Hurley's report.   Therefore, the Government's motion will be denied as moot.  *See, e.g.*, *Nelson v. Am. Family Mut. Ins. Co.*, 262 F. Supp. 3d 835, 863 (D. Minn. 2017) (denying *Daubert* motions as moot in connection with granting summary judgment).

## ORDER

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED THAT:**

1.     Plaintiff's Motion for Summary Judgment [ECF No. 182] is **GRANTED**;

2.     Defendant's Motion for Summary Judgment [ECF No. 152] is **DENIED**; and

3.     Defendant's Motion to Exclude Expert Testimony of Melvin Hurley [ECF No. 174] is **DENIED** as **MOOT**.

### LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  August 6, 2019                                  s/ Eric C. Tostrud
                                                                     Eric C. Tostrud
                                                                     United States District Court