# JONES DAY

77 WEST WACKER • SUITE 3500 • CHICAGO, ILLINOIS 60601.1692

TELEPHONE: +1.312.782.3939 • FACSIMILE: +1.312.782.8585

Direct Number: (312) 269-4294
mprotatori@jonesday.com

August 24, 2021

CM/ECF

The Honorable Eric C. Tostrud
United States District Court Judge
316 N. Robert St.
St. Paul, MN 55101

                        Re:    *Mayo Clinic v. United States of America*,
                                 Court File No. 0:16-cv-03113-ECT-KMM

Dear Judge Tostrud:

      On July 27, 2021, Magistrate Judge Menendez asked the parties to "to file letters setting forth their positions regarding the appropriate post-remand next step in this case." Tel. Conference Minutes, ECF No. 238. Magistrate Menendez also asked the parties to "include an estimate of how long a bench trial will require," should the Court find that it is the next appropriate step. *Id.* For the reasons outlined below, Mayo believes that the appropriate next step is to proceed directly to a bench trial. In the event the Court chooses to proceed with a bench trial, the parties estimate that the trial would take no more than four (possibly five) days.

## I.    SUMMARY JUDGMENT BRIEFING

      As the Court will recall, the parties in this matter previously cross-moved for summary judgment. The sole question before the Court was whether during refund years 2003, 2005–07, and 2010–12 Mayo was entitled to exclude certain investment income from its unrelated business income tax ("UBIT"). Mayo is entitled to treat the investment income as exempt from UBIT if Mayo qualifies as a nonprofit "educational organization" that "normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are regularly carried on." 26 U.S.C. § 170(b)(1)(A)(ii) ("the statute"). A corresponding Department of Treasury regulation requires the organization's "primary function [to be] the presentation of formal instruction" and its noneducational activities to be "merely incidental" to its educational activities. 26 C.F.R. § 1.170A–9(c)(1) ("the regulation").

      In short, the government argued that Mayo did not have education as its "single, distinct, or specific" purpose because in addition to operating the five graduate medical schools ("the Schools") themselves, it provided support services such as human resources, accounting, and

AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • DETROIT
DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • LONDON • LOS ANGELES • MADRID • MELBOURNE
MEXICO CITY • MIAMI • MILAN • MINNEAPOLIS • MOSCOW • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH • SAN DIEGO
SAN FRANCISCO • SÃO PAULO • SAUDI ARABIA • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

The Honorable Eric C. Tostrud
August 24, 2021
Page 2

legal compliance.  *See* Def.'s Mem. Summ. J. 9–18, ECF No. 156.  It supported this argument by pointing to how certain revenue and expenses were categorized in certain Form 990s Mayo had filed with the IRS.  *Id.* at 12–13.

The government further argued that Mayo operated as a health care system, and as such, it could not qualify as an "educational organization" entitled to the UBIT exemption.  *Id.* at 13–18.  That is true, the government argued, because to be an "educational organization" as used in the statute, an organization must have a "particular," or "single, distinct, specific" purpose of education.  *Id.* at 8–9.  The government argued that, for similar reasons, Mayo's "primary purpose" was not "formal instruction," and its noneducational activities were not "merely incidental" to educational activities.  Accordingly, the government argued, Mayo did not qualify for the UBIT exemption under the plain language of the statute or the regulation.  *Id.* at 19–26.

Mayo, on the other hand, argued that it was necessarily an "educational organization" because both sides agreed that Mayo met the faculty, students, curriculum, place requirements in the statute.  Plf.'s Mem. Summ. J. 6–11, ECF No. 184.  Mayo argued that those requirements were definitional.  *Id.* 7–9.  In the alternative, Mayo argued that it was an "educational organization" under the plain meaning of that term (an organization "of or relating to education").  *Id.* at 11–13.

Mayo also argued that if the regulation were to be interpreted consistent with the statute, Mayo satisfied it as well.  *Id.* at 18–26.  Mayo argued that education was a "substantial function" or "principal function" of the organization, and Mayo satisfied the regulation's requirements.  *Id.* at 20–24.  Mayo also argued that its "primary purpose" was "formal instruction" of medical students and its noneducational activities were "merely incidental" to its educational activities.  *Id.* at 24–25.  The latter was true, Mayo argued, because Mayo's patient care and research activities were inextricably intertwined with its educational activities, such that those activities must be considered educational.  *Id.*; *see also id.* at 27–31.  Moreover, to the extent administrative activities are "noneducational," Mayo argued, they are merely subordinate to (i.e., incidental to) the broader educational purposes, as required by the regulation.  *Id.* at 25.

This Court rejected Mayo's argument that the faculty, students, curriculum, place requirements in the statute were definitional.  Op. & Order 20–22, ECF No. 210.  However, it ruled that the regulation exceeded the Treasury Department's statutory authority.  Accordingly, the Court granted summary judgment in Mayo's favor on the ground that Mayo fell within the meaning of "educational organization" as used in the statute.  *Id.* at 10–19, 30.  The Court did not reach a decision on the other fully briefed arguments.

The Honorable Eric C. Tostrud
August 24, 2021
Page 3

## II. EIGHTH CIRCUIT OPINION

The government appealed the Court's ruling. The Eighth Circuit reversed and remanded, holding that a portion (but only a portion) of the Treasury Regulation was a valid interpretation of the statute, but that applying the statute and the valid portion of the regulation "to Mayo's tax years in question cannot be determined as a matter of law on this summary judgment record." Slip Op. at 3.

### A. Meaning of "Educational Organization" as Used in the Statute

Both parties agree that to qualify for the UBIT exemption, Mayo must be an "educational organization" under the statute. The Eighth Circuit found, based on the legislative history and case authority, that the statute implicitly requires that an "educational organization" be "organized and operated exclusively for" an educational use, as the term "exclusively" has been historically understood in the nonprofit tax context. Slip. Op. at 16. Courts' "consensus" has been that "the word 'exclusively' should not be interpreted literally if the purposes underlying income tax exemptions and charitable deductions were to be achieved, because every organization has some noncharitable activities." *Id.* at 8. Instead, the "general or predominant purpose is principally to be considered," and purposes "merely incidental to and [used as] a means of furthering the charitable and educational purposes for which the petition was organized" are not disqualifying. *Id.*

To assess whether an organization's "general or predominant" purpose is educational, the "proper frame of reference" is the "broad view of a tax-exempt educational purpose" found in Treasury Regulation §§ 1.501(c)(3)-1(a) and (d)(3)(i)–(ii). Slip Op. at 17. Treasury Regulation § 1.501(c)(3)-1(d)(3)(ii) provides illustrative examples of what organizations qualify as "educational." Such organizations include schools, colleges, and professional schools. But the regulation is clear that that the term "educational" is to be interpreted more broadly than these traditional institutions. For example, the regulation expressly provides that "educational" organizations include museums, zoos, symphony orchestras, and "other similar organizations." 26 C.F.R. § 1.501(c)(3)-1(d)(3)(ii).

### B. Validity of the Regulation

As for the regulation, the Eighth Circuit held that the Treasury Department had exceeded its statutory authority when it decreed that to qualify as an "educational organization," an organization's "primary function" must be "the presentation of formal instruction." Slip Op. at 15 (quoting 26 C.F.R. § 1.170-A-9(c)(1)). The court therefore invalidated that portion of the regulation. However, the court found that it was valid to interpret the statute to require that the

The Honorable Eric C. Tostrud
August 24, 2021
Page 4

"primary purpose" of an organization be "educational," in the broad sense as used in the statute and as suggested by courts' understanding of the term "exclusively educational."  Slip Op. at 16.

However, when the history of the statutory and regulatory scheme was considered, the court found that the agency acted within its authority to require that "noneducational activities" of "educational organizations" must be "merely incidental to educational activities."  *See* 26 C.F.R. § 1.170-A-9(c)(1); Slip Op. at 15–16.  As the court explained, at the time Congress passed the UBIT exemption, the statutory term "educational organization" had a long history of meaning only organizations whose "'primary purpose' was one or more qualifying charitable uses, and whose non-charitable activities were 'merely incidental' to those purposes."  Slip Op at 16.

### C.     Single Question Remaining on Remand

Based on those rulings, the Eighth Circuit held that a taxpayer satisfies the statute and the valid portion of the regulation if it: (1) "is 'organized and operated exclusively' for one or more exempt purposes"; (2) "is 'organized and operated exclusively' for educational purposes"; and (3) "meets the statutory criteria of faculty, curriculum, students, place."  Slip Op. at 18–19.  In this case, the government has conceded (1) and (3).  *Id.* at 19.  Therefore, the issue remaining for this Court to decide is whether Mayo is "organized and operated exclusively for educational purposes" as the term "exclusively" has been historically understood in the nonprofit tax context.  *Id.* at 18 (internal quotation marks omitted).

The Eighth Circuit was clear that the fact that "some of [Mayo's] educational purposes and functions also fall within other charitable categories . . . would not disqualify it from being an educational organization."  *Id.* at 19.  However, the presence of a "single [solely] non-educational purpose, if substantial in nature," will be enough to take Mayo out of the scope of the UBIT exemption.  Slip Op. at 19 (quoting *Better Bus. Bureau of Wash. D.C. v. United States*, 326 U.S. 279, 283 (1945)).

### III.    NEXT STEPS

### A.     A Bench Trial Is Required

The Eighth Circuit provided clear direction that the next step in this proceeding should be trial, not further summary judgment briefing.  The court characterized the sole question on remand as "whether Mayo's overall purpose and operations establish that it is 'organized and operated exclusively' for educational rather than other purposes."  Slip. Op. at 19.  The court ultimately concluded that "the summary judgment record [was] not adequate to permit [it] to decide" this "fact-intensive issue[]."  *Id.*

JONES DAY

The Honorable Eric C. Tostrud
August 24, 2021
Page 5

      Because the Eighth Circuit has already determined that the case cannot be decided at summary judgment, a bench trial is now necessary. At the bench trial, the Court will be asked to determine whether Mayo is "organized and operated exclusively for . . . educational purposes," as the term "exclusively" has been historically understood in the nonprofit tax context. Slip. Op. at 16 (quoting 26 U.S.C. § 170(c)(2)(B)) (alteration in original). This "is a mixed question of law and fact." *Id.* at 18. Regarding the question of law, the Eighth Circuit concluded that the phrase "organized and operated exclusively . . . includes organizations whose 'primary purpose' [is]" education and whose noneducational "activities were 'merely incidental' to that purpose[]." Slip. Op. at 16. However, it left open the question whether "primary purpose" means "principal or most important purpose" or "substantial" purpose. *Id.* at 19.

      As the Supreme Court has recognized, the meaning of "primary" must be determined by context. *See Bd. of Governors of Fed. Reserve Sys. v. Agnew*, 329 U.S. 441, 446 (1947). "Primary purpose" means "substantial purpose" in this context. The Eighth Circuit concluded that Treasury Regulation §§ 1.501(c)(3)-1(a) and (d)(3)(i)–(ii) are the "proper frame of reference" to analyze an entity's "primary purpose." Slip Op. at 17. Treasury Regulation § 1.501(c)(3)-1(d)(3)(ii) expressly provides that "educational" organizations include museums, zoos, symphony orchestras, and "other similar organizations." 26 C.F.R. § 1.501(c)(3)-1(d)(3)(ii). The fact that a symphony orchestra or similar organization can qualify as "educational" under this regulation demonstrates that "primary" means substantial, not principal or most important—and that a variety of other activities can reasonably be said to be merely incidental in that they support or are even essential to the accomplishment of educational purposes.

      The Supreme Court has also interpreted "primary" to mean substantial. In *Agnew*, the Supreme Court held that the phrase "primarily engaged" in a provision of the Banking Act meant "substantially" engaged. 329 U.S. at 444. The Court reasoned that interpreting "primarily" to mean "first, chief, or principal" would create absurd results. *Id.* at 446. Here, interpreting "primary" to mean "substantial" avoids absurd results because it allows an organization like a zoo to have the multiple primary functions of caring for animals and educating the public.

      Consistent with this authority, the Eighth Circuit found that in the charitable contribution context, the Supreme Court has stated that being operated exclusively for educational purposes "plainly means that the presence of a single non-educational purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly educational purposes." *Better Bus. Bureau of Wash. D.C. v. United States*, 326 U.S. 279, 283 (1945). This reasoning does not require the courts to analyze an organization's "principal or most important purpose." Instead, it merely requires analyzing whether any of an educational organization's purposes is noneducational and substantial in nature.

The Honorable Eric C. Tostrud
August 24, 2021
Page 6

Regarding the question of fact, the Court must decide whether Mayo's "overall purpose and operations establish that it is 'organized and operated exclusively,'" as that term has historically been understood in the tax realm, "for educational rather than other purposes." Slip. Op. at 19. In this and other similar cases, the Eighth Circuit, District of Minnesota, and Minnesota Supreme Court have recognized that Mayo's education, research, and patient care functions are inextricably intertwined. *Id.* at 20 ("Mayo's . . . medical and educational purposes . . . are inextricably intertwined."); *United States v. Mayo Found. for Med. Educ. & Research*, 282 F. Supp. 2d 997, 1014 (D. Minn. 2003) ("Actual care in the service of patients is inherent in [Mayo's] educational process. It really cannot be separated from that."); *Mayo Found. v. Comm'r of Revenue*, 236 N.W.2d 767, 774 (Minn. 1975) ("[P]atient care at the Mayo Clinic is inextricably interwoven with the educational and research functions . . . .").

This Court will determine after the bench trial whether any of Mayo's activities are *exclusively* noneducational, and, if so, whether those activities are "substantial" or "merely incidental" to the educational purposes. Slip. Op. 19–20. Mayo anticipates that the Government will ask for additional summary judgment briefing, as opposed to a relatively short bench trial. That request would be inconsistent with the Eighth Circuit's opinion, which clearly states that summary judgment is not appropriate based on the current record. Slip Op. at 3, 19–20. Additional briefing would not change that, particularly because the parties have already briefed the factual issues that the Eighth Circuit has identified for remand. The parties extensively briefed the appropriate measurement of educational activity as opposed to noneducational activity. Def.'s Mem. Summ. J. 10–18; Plf.'s Mem. Summ. J. 27–31; Def.'s Reply Mem. 8–16, ECF No. 199; Plf.'s Reply Mem. 1–3, ECF No. 206. They have already fully briefed whether Mayo's administrative functions were "merely incidental" to education . Def.'s Mem. Summ. J. 25–26; Plf.'s Mem. Summ. J. 24–25; Def.'s Reply Mem. 37; Plf.'s Reply Mem. 11. To the extent the government is requesting a second chance to brief these issues, it is asking for a procedure not provided by the Federal Rules of Civil Procedure, and a procedure that will do nothing but re-create a record that the Eighth Circuit has already deemed inadequate to support a ruling for either party as a matter of law.

A bench trial also would be more efficient for the parties and the Court than additional summary judgment briefing. Rather than submitting hundreds of exhibits totaling thousands of pages through a cumbersome statement of facts process for a second time, the parties would be able to efficiently present the most salient facts to the Court. In addition, a trial would allow witnesses to provide context for and breathe life into the exhibits and thus further illuminate the record. A trial would also grant the Court the opportunity to observe the witnesses, ask them questions directly, and assess the weight of their testimony—something the Eighth Circuit seems to have deemed critical here.

The Honorable Eric C. Tostrud
August 24, 2021
Page 7

### B. Summary of Anticipated Testimony and Evidence at the Bench Trial

To assist the Court in planning for the bench trial that Mayo believes is now necessary, Mayo offers the following summary of the evidence that it intends to offer at the trial. Mayo intends to present testimony from three to four witnesses.

The testimony and evidence will show that Mayo's education, patient care, and research functions are fully integrated. Mayo's official mission statement during the relevant period was to "provide the best care to every patient every day through integrated clinical practice, education and research." Plf.'s Statement of Facts ¶ 102, ECF No. 185. A robust patient care practice is and was integral to the education of Mayo's residents and trainees because a large and diverse patient population is essential to educate residents and trainees effectively. *Id.* ¶ 99. When a physician provides patient care at any Mayo hospital or clinic, it is typical that a student or trainee from a School is involved in the care and is receiving education or formal instruction. *Id.* ¶ 100. In addition, over 80% of Mayo physicians held academic rank and acted as faculty members. *Id.* ¶ 65. Mayo also pays physicians on a salary model to encourage participation in research and education programs. *Id.* ¶ 66. Multiple of Mayo's Schools have a required research component, and much of the research is overseen by Mayo's faculty. *Id.* ¶¶ 41, 45, 108–10. Indeed, the Eighth Circuit recognized these undisputed facts when it stated that "Mayo's status as an academic medical center means that its medical and educational purposes -- and the operations supporting those functions -- are inextricably intertwined." Slip Op. at 20.

The testimony and evidence will also show that any exclusively noneducational activities at Mayo are merely incidental to its educational activities. Mayo provides system-wide administrative services such as legal, compliance, accounting, human resources, and fundraising. These services are, by their nature, subordinate to Mayo's integrated education, patient care, and research functions. If Mayo's support services are so substantial that they render it not "organized and operated exclusively" for educational purposes, there is not a single sophisticated educational organization that could meet that definition, a point again recognized by the Eighth Circuit. *See* Slip. Op. at 8 ("[E]very organization has some noncharitable activities" and requiring all activities to be "exclusively" educational would interfere with "the purposes underlying income tax exemption and charitable deductions.")

Mayo will also explain at trial why its expenses and revenue, as recorded on a particular tax form (Form 990) and financial statements, do not demonstrate that Mayo has a substantial and completely noneducational purpose and function. To the contrary, Mayo's Form 990s show that Mayo is organized and operated exclusively for educational purposes. During the relevant period, Mayo spent more money on education that it received, on a net basis, from all other revenue-producing activity. Plf.'s Statement of Facts ¶¶ 78–79, ECF No. 185. *See Mayo Found. for Med. Educ. & Research,* 282 F. Supp. 2d at 1014 (concluding that Mayo constituted a

JONES DAY

The Honorable Eric C. Tostrud
August 24, 2021
Page 8

"school" under the tax code because, in part, Mayo spent more on education than it received in net revenue from patient care).  In any event, the government's myopic focus on the Form 990s misses important context.  For example, Mayo owned almost all of its infrastructure during the relevant period, which results in higher expenditures (and revenue) from its support services than peer academic organizations that do not own their infrastructure.  These and other facts to be presented at trial should lead the Court to the conclusion that Mayo is a qualified educational organization owed a refund for the tax years at issue.

As to the anticipated length of trial, both the initial and latest pretrial scheduling orders provide that the anticipated trial length is five days. Pretrial Scheduling Order 5, ECF No. 29; Seventh Am. Pretrial Scheduling Order 5, ECF No. 131.  Based on their recent meet and confer, the parties agree that four (and certainly no more than five) days remains a reasonable estimate of the time necessary to try this case.  There are factors that may affect that estimate, including the Court's ruling on the government's motion to strike Mayo's expert Chip Hurley.

Respectfully submitted,

*Mark P. Rotatori*

Mark P. Rotatori
Counsel for Plaintiff Mayo Clinic

cc (via CM/ECF):  Curtis Weidler, Samuel Robins and Eric Aberg, counsel for the United States