UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Mayo Clinic, *a Minnesota Corporation, on its own behalf and as successor in interest to Mayo Foundation*,

        Plaintiff,

v.

United States of America,

        Defendant.

File No. 16-cv-03113 (ECT/ECW)

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

---

Mark P. Rotatori, Jones Day, Chicago, IL; Erin Sindberg Porter and Annamarie A. Daley, Jones Day, Minneapolis, MN, for Plaintiff Mayo Clinic.

Curtis J. Weidler, U.S. Department of Justice Tax Division, Washington, DC, for Defendant United States of America.

---

Mayo Clinic brought this case to obtain $11,501,621 in refunds of unrelated business income tax (or "UBIT") on certain investment income it received from the investment pool it manages for its subsidiaries. At issue are tax years 2003, 2005–2007, and 2010–2012. Mayo qualifies for the tax refunds it seeks if, during the tax years in question, it was:

> an educational organization which normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are regularly carried on.

26 U.S.C. § 170(b)(1)(A)(ii). To answer this question, "it must be determined whether Mayo's overall purpose and operations establish that it is 'organized and operated

exclusively' for educational rather than other purposes," understanding that the term "exclusively" has a specialized, "non-literal construction" in the non-profit tax context. *Mayo Clinic v. United States*, 997 F.3d 789, 800–02 (8th Cir. May 13, 2021). Because this is a tax refund proceeding, Mayo bears the burden of proof. *Helvering v. Taylor*, 293 U.S. 507, 514 (1935).

A bench trial was held from April 25 – 29, 2022. Four witnesses testified: Jonathan Oviatt, Mayo's Chief Legal Officer and Corporate Secretary from 2002 to 2015; Mark A. Warner, M.D., a Mayo physician and professor who served as the Dean of the Mayo School of Graduate Medical Education from 2005 to 2012 and as the Executive Dean of Education from 2012 until 2016; John Noseworthy, M.D., who served as Mayo's CEO from 2009 until 2018; and Melvin "Chip" Hurley, an expert witness retained by Mayo. The Government called no additional witnesses. A list of the parties' admitted exhibits can be found at ECF Nos. 309–10. Following trial and the parties' submission of proposed findings of fact and conclusions of law, a hearing was held on July 6, 2022, for the purpose of entertaining what were in substance closing arguments and arguments concerning the parties' competing proposed findings and conclusions.

Based on the following Findings of Fact and Conclusions of Law, judgment will be entered for Mayo. The better answer on the trial record is that, during the refund years, Mayo was organized and operated exclusively for educational purposes and had no noneducational purpose that was substantial in the relevant sense.

# FINDINGS OF FACT[1]

## Mayo's Relevant Organizational and Operational History Preceding the Refund Years

### *Mayo's Formation and Early Years – 1863 to 1919*

1.      Mayo traces its roots to the medical practice of Dr. William Worrall Mayo, who settled in Rochester, Minnesota, in 1863, and his two sons, Drs. William J. Mayo and Charles H. Mayo ("Mayo Brothers"), who joined the practice in the 1880s.  ECF No. 275 ¶ 9.

2.      "Education has been an integral part of the Mayo Clinic mission from its earliest days.  Mayo's founders shared the conviction that the highest quality patient care is best achieved in an environment of academic inquiry and continuous learning."  P-93 at 112; *see also* Tr. 286:21–287:6 (Warner).

---

[1]      Footnotes included within the Findings of Fact are explanatory only.  They are not findings.  "P-#" Exhibits are Mayo's trial exhibits.  "D-#" Exhibits are the Government's trial exhibits.  For trial exhibits, cited page numbers refer to the offering party's stamped exhibit page numbering, unless otherwise specified.  Trial Transcripts ("Tr.") are docketed at ECF Nos. 314 (vol. 1, pp. 57–216), 315 (vol. 2, pp. 217–474), 316 (vol. 3, pp. 475–714), 317 (vol. 4, pp. 715–842), and 318 (vol. 5, pp. 843–859) and are paginated consecutively throughout those five volumes.  Trial Transcripts will be cited by the transcript page number and line.  The parties' deposition designations were admitted into evidence at trial, Tr. 852:14–853:6, and will be cited by reference to the deponent followed by the deposition transcript page number and line.  *See Little Giant Ladder Sys., LLC v. Tricam Indus., Inc.*, No. 17-cv-1769, 2022 WL 325969, at *1 n.1 (D. Minn. Feb. 3, 2022).

It also seems important to note that trial of this case showed the parties do not seriously dispute the *truth* of each other's factual assertions, but rather dispute the *relevance* of certain facts and the *application* of facts to the governing law.  In other words, trial proved to be less about what facts are true and more about, in view of the governing law, what facts matter and how those facts drive the case's outcome.  For this reason, drafting factual findings proved to be an exercise in incorporating each party's proposed findings in a reasonably thorough, organized, and comprehensible way that gives due credit to the trial record and each party's position.

3.      The Mayo Brothers had a deep commitment to education and research.  For example, the Mayo Brothers founded educational programs to train nurse anesthetists, histology technicians, and surgical assistants.  Tr. 279:10–23 (Warner).

4.      In the 1880s, the Mayo Brothers began hosting physicians from around the world in order to share their knowledge about medical techniques.  During the day, the visitors would observe surgeries in amphitheaters.  At night, the Mayo Brothers, or their colleagues, would deliver lectures to the visitors.  In 1905, the Mayo Brothers formalized this practice, calling it the International Surgeon's Club.  Tr. 281:12–282:8 (Warner).

5.      In 1905, the Mayo Brothers started offering fellowships to physicians.  They provided visiting physicians with room and board, and the visiting physicians learned from the Mayo Brothers and their colleagues at Saint Marys Hospital in Rochester.[2]  Between 1905 and 1915, the Mayo Brothers trained 50 fellows.  Tr. 282:9–22 (Warner).

6.      In 1915, the Mayo Brothers created the Mayo Foundation for Medical Education and Research ("MFMER"), a Minnesota nonprofit corporation.  Tr. 110:5–13 (Oviatt), 283:21–284:1 (Warner).

7.      The Mayo Brothers donated $2,000,000 from their personal wealth to serve as an endowment to fund education at MFMER.  *Id.*; P-155 at 8–9.

---

[2]      The correct spelling of "St. Marys Hospital" evidently omits any possessive apostrophe.  *See* ECF No. 275, ¶ 17; *see also* https://www.mayoclinic.org/patient-visitor-guide/minnesota/campus-buildings-maps/mayo-clinic-hospital-saint-marys-campus   (last visited November 8, 2022).

8.     MFMER operated the Mayo School of Graduate Medical Education ("MSGME"), which trained residents and fellows in Rochester.  Tr. 283:1–5, 283:21–284:3 (Warner).

9.     In 1917, Mayo transferred the endowment to the management of the University of Minnesota, on the condition that the funds could only be used to support medical education in Rochester.  Tr. 110:14–18 (Oviatt); P-155 at 8–10.

10.    The University of Minnesota granted the degrees for MSGME graduates until MSGME later became independently accredited, but Mayo provided the clinical training to MSGME students.  Tr. 110:14–25 (Oviatt); *see* Tr. 109:17–23 (Oviatt).

11.    In 1919, the Mayo Brothers formed the Mayo Properties Association, which was a Minnesota nonprofit corporation.  Tr. 97:10–12 (Oviatt).

12.    At this time, the Mayo Brothers had a substantial clinical practice, which came to be known as "Mayo Clinic."  They employed 30 physicians and scientists, 24 fellows, and eight interns.  Prior to 1919, all of the property and equipment associated with Mayo was personally owned by the Mayo Brothers.  Tr. 97:18–98:1 (Oviatt); P-155 at 1.

*The Deed of Gift – 1919*

13.    On October 8, 1919, the Mayo Brothers executed a Deed of Gift, which transferred all of the assets related to their clinical practice to the Mayo Properties Association.  Tr. 97:1–3, 97:23–98:1 (Oviatt); P-155 at 5–6.

14.    The Deed of Gift stated that prior to 1919, Mayo was operated to serve "the general good of humanity," rather than operated solely for profit.  As an example, the Deed of Gift referred to the creation of MFMER in 1917.  P-155 at 3.

15.     The purpose of the gift was to facilitate education and research:

> To aid and advance the study and investigation of human ailments and injuries, and the causes, prevention, relief and cure thereof, and the study and investigation of problems of hygiene, health and public welfare, and the promotion of medical, surgical and scientific learning, skill, education and investigation, to engage in and conduct and to aid and assist in medical surgical and scientific research in the broadest sense.

Tr. 99:10–100:2 (Oviatt); P-155 at 7.

16.     (The purpose of the Deed of Gift would become the purpose of the Mayo parent entity throughout the Refund Years.)  Tr. 97:13–15 (Oviatt); *see also* Tr. 128:4–129:6 (Oviatt); P-112 at 3–4; P-113 at 1–2; P-114 at 1–2; P-87 at 1–2.

17.     The Deed of Gift placed two conditions on the gift to the Mayo Properties Association.  First, if the Mayo Properties Association ever determined that it was unable to fulfill the purpose of the gift, it could transfer the gift "to a Medical School or to a University or College maintaining one."  Tr. 99:10–100:12, 102:3–17 (Oviatt); P-155 at 7–8, 11–13.

18.     Second, the Deed of Gift contained a condition subsequent, which required reversion of the gift to the Mayo Brothers or their heirs if the purposes of the gift were not fulfilled.  Tr. 101:13–102:2 (Oviatt); P-155 at 10.

19.     The assets that were the subject of the gift have never been transferred to a medical school, university, or college and have never reverted to the Mayo Brothers or their heirs.  Tr. 102:18–25 (Oviatt).

20.     As will be explained, though its name has changed over time, the legal entity first called the Mayo Properties Association (Tax Employer Identification Number ("EIN")

6

41-6011702) has served as the parent entity to the Mayo organization throughout its history except from 2000 to the end of 2009. Tr. 103:8–104:3, 113:6–21 (Oviatt).

*The Mayo Properties Association and the Associates of Mayo Clinic*
*Are Legally Separate, Collaborating Organizations – 1919 to 1969*

21.   Around the time of the formation of the Mayo Properties Association, the Mayo Brothers created the Associates of Mayo Clinic, which was a hybrid between a nonprofit and partnership. Tr. 104:4–10 (Oviatt).

22.   After the execution of the Deed of Gift, all physicians, scientists, and employees worked for the Associates of Mayo Clinic. None of the employees were allowed to have a personal stake in the profits of the Associates of Mayo Clinic or the Mayo Properties Association. Instead, all employees were provided a fixed salary. Tr. 104:11–18 (Oviatt); ECF No. 275 ¶ 13.

23.   The Associates of Mayo Clinic's net income was transferred to the Mayo Properties Association as compensation for the Associates' use of the Mayo Properties Association's real estate and equipment. Tr. 104:16–20, 105:14–22 (Oviatt).

24.   The Mayo Properties Association used its income and assets to fund education and research efforts. Tr. 105:14–22 (Oviatt).

25.   In 1965, the IRS determined that the Associates of Mayo Clinic was a tax-exempt entity under 501(c)(3). P-72 at 1.

*The Mayo Foundation and the Associates of Mayo Clinic Merge – 1969*

26.   By 1969, the Mayo Properties Association had been renamed Mayo Foundation. Tr. 103:8–104:3 (Oviatt).

7

27.     On January 29, 1969, Mayo requested a letter ruling from the IRS regarding whether a merger between the Mayo Foundation and the Associates of Mayo Clinic would affect the Mayo Foundation's "exemption under section 501(c)(3) of the Internal Revenue Code."  Tr. 105:23–106:13 (Oviatt); P-72 at 1.

28.     In 1969, the Associates of Mayo Clinic had over 400 physicians, surgeons and medical scientists and treated approximately 200,000 patients each year.  P-72 at 1.

29.     The Associates of Mayo Clinic "engaged in the care of the sick, medical research, and medical education."  *Id.*

30.     The medical staff of the Associates of Mayo Clinic devoted "a substantial part of its time" to research, which was "made possible by . . . the knowledge developed in connection with clinical operations and patient's records."  Much of the research results were "published in the 'Mayo Clinic Proceedings' and distributed without cost to doctors, libraries, and institutions.'"  The Mayo Foundation funded a significant portion of the research costs.  *Id.*

31.     In 1969, the Mayo Foundation, Associates of Mayo Clinic, and University of Minnesota jointly operated the MSGME.  The Associates of Mayo Clinic and the Mayo Foundation funded the MSGME.  Over 80% of the physicians working for the Associates of Mayo Clinic held academic rank.   *Id.* at 2.

32.     As of 1969, the Associates of Mayo Clinic offered three to six continuing education courses every year for practicing physicians.  In addition, 1,500 to 1,800 physicians visited Mayo every year to observe its medical activities.  *Id.* at 2.

33.     In a letter ruling dated February 24, 1969, the IRS determined that "[t]he large number of patients at the clinic provide[d] training and research opportunities for the staff and medical students.  The medical data obtained from patients provides valuable statistics for use in medical studies."  *Id.* at 2.

34.     The IRS concluded that the Associates of Mayo Clinic "contribute[d] importantly to" the Mayo Foundation's "educational and scientific research purposes and is commensurate in size with those activities."  Therefore, the merger did not affect the Mayo Foundation's 501(c)(3) status.  P-72 at 3.

35.     On February 28, 1969, the Associates of Mayo Clinic merged into the Mayo Foundation.  Tr. 123:16–124:2 (Oviatt); P-137 at 4.

*Mayo Expands Geographically – Late 1980s to 1999*

36.     In the late 1980s, Mayo expanded its geographic footprint and founded Mayo Clinic Jacksonville and Mayo Clinic Arizona.  Tr. 111:9–10 (Oviatt).

37.     By the late 1990s, Mayo had integrated its clinical practice, education, and research at the Jacksonville and Arizona campuses.  As a result, the IRS granted both entities tax exempt status.  Tr. 112:6–14, 113:2–4 (Oviatt).

38.     In the early 1990s, Mayo started acquiring clinics and hospitals within a 200-mile radius of Rochester, which came to be known as the Mayo Clinic Health System ("MCHS").  Tr. 115:2–116:1, 167:23–170:1 (Oviatt).

### Mayo's Structure Close In Time and During the Refund Years

*Mayo Reorganizes – 2000 to 2009*

39.     On April 2, 1999, Mayo created a new Minnesota nonprofit corporation called Mayo Foundation 2000 (EIN 41-1937751).  Tr. 113:22–114:4 (Oviatt); P-112 at 3–6; ECF No. 275 ¶¶ 1–3.

40.     On the Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code (IRS Form 1023) that Mayo Clinic (then known as "Mayo Foundation 2000") submitted to the IRS in 1999, Mayo Clinic wrote:

> As reorganized, Mayo Foundation will conduct the usual activities associated with parent corporations in the tax-exempt healthcare field, including [1] coordination of system-wide activities, [2] overall strategic planning, [3] overall policy development, [4] system-wide medical education and medical research planning, [5] capital and operating budgeting, [6] capital and resource allocation, [7] system-wide fund-raising, [8] management of an investment pool for its subsidiaries, [9] system-wide human resource planning, [10] legal compliance, [11] system-wide accounting and reporting, [12] oversight of taxable entities within the system and so forth.

ECF No. 275 ¶ 20.

41.     On January 1, 2000, the former parent entity previously known as Mayo Foundation (EIN 41-6011702), was renamed Mayo Clinic Rochester and moved to a first-tier subsidiary.  Tr. 113:22–114:4, 118:11–15, 118:16–119:1 (Oviatt).

42.     Also on January 1, 2000, the newly created Mayo Foundation 2000 (EIN 41-1937751) was renamed Mayo Foundation and became the system-wide parent entity.  Tr. 116:2–14 (Oviatt); ECF No. 275 ¶¶ 1, 19; P-112 at 1.

43.     On January 1, 2006, Mayo Foundation was renamed Mayo Clinic.  P-114 at 1; ECF No. 275 ¶ 19.

44.     Mayo Clinic (f/k/a Mayo Foundation) served as the system-wide parent entity from 2000 until the end of 2009.  Tr. 118:16–119:10 (Oviatt).

*Mayo Clinic Rochester Merges Into Mayo Clinic – 2010 to 2012*

45.     On January 1, 2010, Mayo Clinic Rochester (f/k/a Mayo Properties Association, EIN 41-6011702) was merged with the parent entity, Mayo Clinic (EIN 41-1937751).  Tr. 118:16–119:1 (Oviatt); ECF No. 275 ¶ 15.

46.     After the 2010 merger, the surviving entity was Mayo Clinic Rochester, but that entity was then renamed "Mayo Clinic." Consequently, for years 2010 and after, Mayo Clinic's EIN is the EIN that had been assigned to Mayo Clinic Rochester: 41-6011702.  Tr. 118:16–119:1 (Oviatt); P-87 at 1; ECF No. 275 ¶ 16.

47.     Mayo is a Minnesota nonprofit corporation and tax-exempt organization described in section 501(c)(3) of the Tax Code.  ECF No. 275 ¶ 4.

48.     The below organizational charts show Mayo Clinic's relationships to its subsidiaries before and after the 2010 merger:

Before the 2010 merger:



After the 2010 merger:



ECF No. 275 at ¶ 17.

49.    The below chart shows the Mayo parent entity's changes over time:



### The Integration of Mayo's System-Wide Entities

*Mayo's Parent Entity Had Power to Manage Its Subsidiaries*

50.    During the Refund Years, the Mayo parent entity's Bylaws provided that it had power over "system-wide management, strategy and policy formation."  P-116 at 10; P-115 at 10; *see also* P-89 at 11; P-131 at 23.

51.    Mayo's 2010 Bylaws specifically stated:

> Subject to final authority of the Board of Trustees, the Mayo Clinic Board of Governors shall be the primary body that exercises the following reserved powers of Mayo Clinic regarding its subsidiary organizations including Mayo Clinic in Arizona and Mayo Clinic in Florida:
>
> a)  Approval of strategic plans of individual sites including strategic priorities.
> b)  Annual capital and operating budget approval.
> c)  Physician, scientist, and senior administrator salary policy.
> d)  Employee benefits.
> e)  Incurrence of debt.
> f)  Each capital expenditure by item or aggregate program account in excess of $5 million.
> g)  Any transfer of assets other than in the ordinary course of business.
> h)  Use of the "Mayo" and "Mayo Clinic" name.
> i)  Actions that may impact the tax exempt status of Mayo Clinic or any of its subsidiary entities.

P-89 at 11–12; *see also* ECF No. 275 ¶ 20.

*The Subsidiaries' Governing Documents Reserved Every Significant System-Wide Decision for Mayo's Parent Entity*

52.     The Bylaws of every Mayo subsidiary entity contained an identical section entitled "Reserved Powers of Mayo Clinic."  Tr. 141:13–19, 142:9–14 (Oviatt); *see, e.g.*, P-119 at 6.

53.     The Reserved Powers of Mayo Clinic section of the subsidiaries' Bylaws made it clear that every significant system-wide decision at Mayo is subject to the parent entity's final review.  Tr. 141:19–22 (Oviatt).

54.     For example, the Mayo Clinic Rochester Bylaws in effect as of September 18, 2006, required Mayo Clinic Rochester to obtain final approval from the parent entity on the following actions:

> a)  Approval of strategic plans of individual sites including strategic priorities.
> b)  Annual capital and operating budget approval.
> c)  Physician, scientist, and senior administrator salary policy.
> d)  Employee benefits.
> e)  Incurrence of debt.
> f)  Each capital expenditure by item or aggregate program account in excess of $5 million.
> g)  Any transfer of assets other than in the ordinary course of business.
> h)  Use of the "Mayo" and "Mayo Clinic" name.
> i)  Actions that may impact the tax exempt status of Mayo Clinic or any of its subsidiary entities.

P-119 at 6; *see also* Tr. 141:19–142:1 (Oviatt).

*Mayo Consolidated its System-Wide Activities Into One Set of Financial Statements*

55.     During the Refund Years, Mayo prepared consolidated financial statements. Tr. 666:4–12, 687:21–688:6 (Hurley); P-80–86.[3]

56.     The consolidated financial statements included all activity from Mayo's wholly owned or wholly controlled subsidiaries, which includes both tax-exempt and taxable entities.  P-80 at 7; P-81 at 6; P-82 at 6; P-83 at 6; P-84 at 7; P-85 at 7; P-86 at 7.

*The Board of Trustees, President/CEO, and Board of Governors Had System-Wide Responsibilities*

57.     During the Refund Years, Mayo's Board of Trustees had "overall responsibility for the charitable, clinical practice, scientific, and educational mission and purposes of Mayo Clinic."  P-131 at 23.

---

[3]     Shortly before trial, the Government moved to exclude Melvin ("Chip") Hurley, Jr. as an expert witness.  ECF No. 261.  Mayo called Hurley to testify at trial regarding three opinions: (1) that Mayo's educational and clinical operations are fully integrated; (2) that Mayo Clinic's primary function is education for all tax refund years; and (3) that the IRS's contrary conclusions and analyses are not correct.  ECF No. 280-2.  The Government advanced two primary arguments in support of its motion: first, that Hurley relied on "basic facts" to reach his opinions; and second, that Hurley did not connect his experience or other expert qualifications to his opinions, and that as a result his opinions were "his say-so." *See* Gov't Mem. in Supp. [ECF No. 261] at 3.  Relying on the principle that, because this was a court trial, I appropriately may decide during and after trial the weight, if any, to be given Hurley's testimony, Hurley was allowed to testify before any final ruling on the Government's motion.  *See In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006).  In support of his opinions, Hurley testified regarding a considerable amount of qualitative and quantitative data—including financial and healthcare-specific data—and described the data's relationship to the factual and legal questions that I am to decide.  I found Hurley's testimony to be helpful and admissible, certainly to the extent it is cited in these Findings of Fact and Conclusions of Law.  To summarize very generally, I found Hurley's explanation of financial-, accounting-, and healthcare-related information, and this information's relationship to Mayo's educational purposes, sufficiently supported, reliable, relevant, and helpful.  Fed. R. Evid. 702.  For these reasons, the Government's motion [ECF No. 261] will be denied.

58.     During the Refund Years, Mayo's President/CEO was "primarily responsible for leadership and management of the Mayo Clinic."  This included, "[o]versee[ing] decisions with system-wide implications."  P-131 at 24.

59.     During the Refund Years, Mayo's Board of Governors "serve[d] as the single internal point of high level enterprise internal governance of Mayo Clinic."  P-131 at 25. This included exercising "the reserved powers of Mayo Clinic regarding its subsidiary organizations."  P-131 at 26.

60.     Due to Mayo's system-wide integration, the Board of Trustees, President/CEO, and Board of Governors managed Mayo on a system-wide basis.  They did not manage Mayo on a per-entity basis.  Lohkamp Personal 135:14–20.

### Mayo was Organized for Educational Purposes

*Mayo's Articles of Incorporation Reflect its Educational Purpose*

61.     During the Refund Years, the Articles of Incorporation of the Mayo parent entity contained a Purposes and Powers section at Article II.  The Purposes and Powers section remained substantially the same throughout the Refund Years.  Tr. 129:9–13, 130:8–13, 131:11–17, 132:8–11 (Oviatt); P-112 at 3–4; P-113 at 1–2; P-114 at 1–2; P-87 at 1–2.

62.     During the Refund Years, the first sentence of the Purposes and Powers section stated, "This corporation is organized and shall be operated exclusively for charitable, educational, and scientific purposes, all as contemplated and permitted by Sections 170(c)(2) and 501(c)(3) of the Internal Revenue Code of 1986, as amended (the 'Code')."  P-112 at 3; *see also* P-113 at 1; P-114 at 1; P-87 at 1.

16

63.     The remainder of the Purposes and Powers section read as follows:

Within the framework and limitations of the foregoing, the general nature of the activities of this corporation and its general purpose, and the purpose and use for which its assets are received and held, is, and shall be, to conduct, execute and perform a public trust to support, aid and advance the study and investigation of human ailments and injuries, and the causes, prevention, relief and cure thereof, and the study and investigation of problems of hygiene, health and public welfare, and the promotion of medical, surgical and scientific learning, skill, education and investigation, to conduct the practice of medicine and surgery and allied services, to provide medical, surgical, nursing and hospital services, and to establish, operate and/or coordinate clinics, medical and surgical centers, hospitals and similar facilities, to assist and conduct or coordinate the conduct of, programs of medical education and medical research and to offer programs of graduate and undergraduate education and instruction in all fields of medicine, surgery and related scientific study or coordinate the same, and, in the broadest sense, to engage in and conduct and to aid and assist in medical, surgical and scientific education and research, and to make such educational, charitable and public gifts and carry on such programs of public charity as may be incidental or related to the carrying out of the other stated purposes of the corporation; and, further, its plan of operation shall be to receive, by purchase, gift, grant, devise, bequest or in any other lawful manner any real or personal property, and to hold, use, improve, operate, manage, lease, convey, convert, invest, dispose of by gift, sale, lease or otherwise, and transfer any or all of such real or personal property, and to use the same in any lawful manner for the furtherance of its general purposes, and to do and perform generally and anywhere all acts and things reasonably incident to the corporate purposes and objects, including the establishment, augmentation and administration of any fund or funds, which may be reasonably advantageous or convenient to the carrying out of the corporate purposes and objects and to disburse and expend the same and the income and earnings thereof, and to promote and foster its corporate objects and purposes for itself and as agent, trustee or representative of others.

> This corporation shall have power to transfer, assign and
> convey assets or properties which it may receive by gift or
> devise, provided that such transfer is not contrary to any
> provisions of the instrument evidencing the gift or devise of
> such property in the corporation.

P-112 at 3–4; *see also* Tr. 128:4–129:6 (Oviatt); P-113 at 1–2; P-114 at 1–2; P-87 at 1–2.

*Mayo's Bylaws Reflect its Educational Purpose*

64.     During the Refund Years, the Bylaws of the Mayo parent entity contained a

historical Preamble to put "front and center" Mayo's educational purpose and values.  The

Preamble remained substantially the same throughout the Refund Years.  Tr. 121:3–23,

124:3–21 (Oviatt); P-137 at 1–5; P-116 at 1–4; P-115 at 1–4; P-89 at 1–4.

65.     The Bylaws' historical Preamble stated, in part:

> It was the conception of the founders of the Clinic and now is
> and long has been the conception of the Member, Trustees, and
> Professional Staff of Mayo Foundation that the primary object
> of the Clinic should be service to humanity, in its broadest
> sense, and not the material advancement or enrichment of the
> individual, and that only such part of the earnings of the Clinic
> as is necessary reasonably to compensate them for services
> should inure to the members thereof, and that the rest of the
> earnings should be used for the benefit of the public, from
> whom it came in the past and through whom it must come in
> the future, through better care of the sick, medical education
> for better trained doctors, research and the general welfare of
> the public.

P-137 at 2; *see also* P-116 at 1–2; P-115 at 1–2; P-89 at 1–2; Tr. 121:24–122:17 (Oviatt).

66.     That paragraph of the Bylaws' Preamble was intended to show that the

purpose of the organization is the integration of education, research, and clinical practice.

Tr. 122:18–22 (Oviatt).

67.    The Bylaws' Preamble continues:

> In keeping with this spirit, a substantial part of the earnings of the Clinic have heretofore been set aside and devoted to medical education, research, investigation and public health and Mayo Foundation and its Members, Trustees and Professional Staff are in full accord with the existing policy and expect to continue the same policy in the future.

P-137 at 2; *see also* P-116 at 2; P-115 at 2; P-89 at 2.

68.    Later, the Bylaws' Preamble summarized the 1919 Deed of Gift, the purposes of the gift, and the gift's conditions.  At the conclusion of that paragraph, the Bylaws stated, "The Members, Trustees, and Professional staff of Mayo Foundation are entirely in sympathy and accord with the intentions hereinbefore set forth and with the conveyance of the Clinic property as aforesaid, including the contingent transfer to a medical school or to a college or university maintaining one."  P-137 at 3–4; *see also* P-116 at 2–3; P-115 at 2–3; P-89 at 2–3.

*A Key Governance Document Reflects Mayo's Educational Purpose*

69.    In addition to the directives set out in the Mayo parent's Bylaws, "[s]pecific responsibilities, accountability, and authority of the Board of Trustees and of other primary Mayo Clinic leadership positions, boards, and committees are further defined in the document entitled 'Mayo Clinic: Governance and Management Structure' which has been adopted by and is subject to amendment from time to time by the Board of Trustees."  P-89 at 4; *see also* P-131 at 1; Tr. 135:2–6 (Oviatt).

70.    "Mayo Clinic: Governance and Management Structure ('MC:G&MS') has the same legal status as the Bylaws of Mayo Clinic."  P-131 at 1; *see also* Tr. 135:2–6 (Oviatt).

19

71.     MC:G&MS was first approved by Mayo's Board of Trustees in 2003 and was amended in 2006, 2008, and 2009.  P-131 at 1; *see also* Tr. 541:2–4 (Noseworthy).

72.     Mayo's Board of Trustees "is the governing body of Mayo Clinic.  It has overall responsibility for the charitable, clinical practice, scientific, and educational mission and purposes of Mayo Clinic as set forth in its Articles of Incorporation and Bylaws."  P-131 at 23; Tr. 681:20–682:15 (Hurley).

73.     Mayo's President/CEO is, "[s]ubject to oversight and authority of the Board of Trustees," "primarily responsible for leadership and management of the Mayo Clinic." P-131 at 24.

74.     The primary responsibility of the President/CEO was to "[s]erve as the ultimate guardian of the mission of Mayo Clinic."  P-131 at 24; *see also* Tr. 145:3–14 (Oviatt); Tr. 539:8–15, 541:11, 644:9–645:8 (Noseworthy); Tr. 682:22–683:4 (Hurley).

75.     Serving as the ultimate guardian of the mission meant that the President/CEO was responsible for ensuring that Mayo met the needs of its patients every day through integrating clinical practice, education, and research.  The CEO was responsible for keeping the integration of Mayo's three-part mission front of mind during every initiative and every Board of Trustees and Board of Governors decision.  Tr. 541:15–542:3, 644:17–21 (Noseworthy).

76.     The CEO was also responsible for setting the system-wide funding level for education and "ensur[ing] and maintain[ing] system-wide integration."  P-131 at 24; *see also* Tr. 145:3–14 (Oviatt).

*Mayo's Committee Structure Furthers System-Wide Integration Among Education, Research, and Clinical Practice*

77.     During the Refund Years, Mayo had an Education Committee, Research Committee, and Clinical Practice Committee.  Tr. 542:12–19 (Noseworthy).

78.     Each committee had system-wide responsibility for all activities within its area of expertise.  *Id.*

79.     The Board of Trustees established Mayo's strategic initiatives and goals. The Board of Governors then operationalized those goals and relied on the leaders of the three committees to carry out the initiatives. The committees developed plans and budgets, which are approved by the Board of Governors and, ultimately, by the Board of Trustees. Tr. 300:2–17 (Warner), 542:16–24 (Noseworthy).

80.     As part of the President/CEO's responsibility to "ensure and maintain system-wide integration," he was tasked with ensuring Mayo "achieves coordinated and consistent levels of high value" "[t]hrough the Executive Deans of Practice, Education, and Research." P-131 at 24.

81.     This meant that every initiative, old or new, was reviewed to determine if it effectively integrated education, research, and clinical practice.  Tr. 546:21–547:8 (Noseworthy).

*Mayo's Mission Statement Reflects its Educational Purpose*

82.     During the Refund Years, Mayo had a Mission Statement.  P-16; P-15; Tr. 172:9–21, 173:16–23, 175:2–4 (Oviatt).

83.    The Board of Governors and Board of Trustees approved the Mission Statement.  Tr. 172:15–21, 173:11–15 (Oviatt).

84.    The Mission Statement set forth the purpose of Mayo.  Tr. 561:21–25 (Noseworthy).

85.    Prior to 2010, Mayo's Mission Statement was: "Mayo will provide the best care to every patient every day through integrated clinical practice, education and research."  P-16; Tr. 173:16–18 (Oviatt).

86.    From 2010 to 2012, Mayo's Mission Statement was: "To inspire hope and contribute to health and well-being by providing the best care to every patient through integrated clinical practice, education and research."  P-15; Tr. 175:2–4 (Oviatt).

87.    Although the initial phrase in the Mission Statement changed during the Refund Years, the integration of education, research, and clinical practice never changed.  That portion of the Mission Statement was, is, and will likely always be the purpose of Mayo.  Tr. 561:21–25 (Noseworthy).

*Mayo's Statement of Commitment to Graduate Medical Education Reflects its Educational Purpose*

88.    In 2005 and 2011, Mayo submitted a Statement of Commitment to Graduate Medical Education ("Statement") as part of its accreditation submissions for MSGME.  The two Statements were materially identical.  P-98 at 71–72; P-93 at 112–13; Tr. 285:21–287:19 (Warner); 683:12–684:12 (Hurley).

89.    Each Statement began:

> Education has been an integral part of the Mayo Clinic mission
> from its earliest days.  Mayo's founders shared the conviction

22

> that the highest quality patient care is best achieved in an environment of academic inquiry and continuous learning. The three interconnecting shields of the Mayo Clinic logo signify our dedication to Mayo's mission to provide the best care to every patient every day through integrated clinical practice, education and research.

P-98 at 71; P-93 at 112; Tr. 286:24–287:19 (Warner).

90.     Both Statements were signed by Mayo's President/CEO along with Mayo Education Committee leaders.  P-98 at 72; P-93 at 112; 684:3–12 (Hurley).

## Mayo Was Operated for Educational Purposes

*Mayo Established Five Schools to Support its Educational Purpose*

91.     Between 2003 and 2012, the Mayo Clinic College of Medicine and Science, a private university, comprised five schools (the "Schools"): (1) Mayo Clinic School of Graduate Medical Education ("MSGME"); (2) Mayo Clinic School of Medicine ("Mayo Medical School"); (3) Mayo Clinic School of Health Sciences ("Mayo School of Health Sciences"); (4) Mayo Clinic School of Continuing Professional Development ("Mayo School of Continuing Medical Education"); and (5) Mayo Clinic Graduate School of Biomedical Sciences ("Mayo Graduate School").   ECF No. 275 ¶ 23; Tr. 289:3–6 (Warner).

92.     The Schools were not separate legal entities during the Refund Years.  ECF No. 275 ¶ 24.

93.     During the Refund Years, the Schools were legally housed in the parent entity.  Tr. 143:9–21 (Oviatt); P-53 at 24–25; P-56 at 26–29; P-58 at 25–26; P-60 at 23–24.

94.     The Schools were located in the parent due to the importance Mayo places on education and due to the system-wide nature of education at Mayo.  Lohkamp Personal 22:21–23:19.

95.     The Board of Trustees has ultimately responsibility for the Mayo Schools. Tr. 289:3–8 (Warner).

96.     The head of the Mayo Schools is the Executive Dean.  Tr. 289:3–8 (Warner).

97.     The Board of Trustees gives the Schools authority to maintain a regular faculty.  Tr. 298:25–299:8 (Warner).

98.     Each of the Schools maintains a regular curricula.   Tr. 300:18–301:21 (Warner).

99.     Each of the Schools has an enrollment process.  Tr. 301:22–303:8 (Warner).

100.    Students of the Schools are taught in classrooms and "basically anywhere that there's patient care," which includes the patient's bedside, outpatient clinics, operating rooms, clinical wards, or even in the hallways.  Thus, education occurs almost everywhere at Mayo.  Tr. 303:9–304:4 (Warner).

101.    The faculty for Mayo's Schools is primarily drawn from Mayo's physicians, scientists, and allied health professionals.  Tr. 298:2–6 (Warner).

102.    During the Refund Years, the Mayo Clinic College of Medicine and Science was an "educational organization" as described in Section 170(b)(1)(A)(ii) of the Tax Code.  P-5 at 1–2.

103.    During the Refund Years, the Mayo Clinic College of Medicine and Science was involved with the presentation of formal instruction.  P-5 at 2.

24

104.   During the Refund Years, the Mayo Clinic College of Medicine and Science met the primary function test as described in Section 170(b)(1)(A)(ii) of the Tax Code.  P-5 at 2.

### Mayo Clinic School of Graduate Medical Education

105.   MSGME was established in 1915 and offers residency and fellowship training for physicians.  ECF No. 275 ¶ 25.

106.   Residents are medical school graduates who are receiving training in any of 25 different primary medical specialties.  Primary medical specialties include pediatrics, gynecology, psychiatry, surgery, and anesthesiology.  Tr. 289:14–22 (Warner).

107.   After completing their residency, approximately 40% of students in the country, including those at Mayo, later become fellows.  Fellows receive subspecialty training.  Tr. 289:23–290:11 (Warner).

108.   Mayo bestows certificates of completion upon residents and fellows who complete their programs, which allows them to apply, when applicable, for board certification in their specialty field.  Tr. 290:21–291:3 (Warner).

109.   The Accreditation Council on Graduate Medical Education ("ACGME") is the accrediting body for graduate medical education in the United States.  Tr. 291:6–13 (Warner).

110.   MSGME is fully accredited through ACGME.  Tr. 325:18–326:10 (Warner).

111.   In addition, during the Refund Years, every program within MSGME that could be accredited, was in fact accredited.  Tr. 326:22–327:5 (Warner).

112.     During the Refund Years, MSGME offered the most accredited residency and fellowship programs in the country and was top five in the country in terms of the number of residents and fellows.  Tr. 675:6–23 (Hurley), 290:12–18 (Warner).

113.     Residents and fellows do not pay tuition.  Tr. 291:4–5 (Warner).

114.     During the Refund Years, MSGME had a regularly enrolled body of students in attendance at a place where educational activities were regularly carried on.  ECF No. 275 ¶ 30.

115.     As of 2012, there were over 23,000 MSGME alumni.  P-67 at 141.

### Mayo Clinic School of Medicine

116.     The Mayo Medical School was established in 1972 and is a four-year program leading to a Medical Doctor or M.D. degree.  ECF No. 275 ¶ 27.

117.     Although all Mayo Medical School students are charged tuition, the great majority have some type of scholarship support.  Tr. 292:10–25 (Warner).

118.     The Mayo Medical School is fully accredited by the American Association of Medical Colleges' Liaison Committee on Medical Education.  Tr. 293:1–6 (Warner).

119.     During the Refund Years, the Mayo Medical School had a regularly enrolled body of students in attendance at a place where educational activities were regularly carried on.  ECF No. 275 ¶ 30.

### Mayo Clinic School of Health Sciences

120.     Mayo has been training allied health professionals since the late 1800s.  Tr. 293:7–13 (Warner).

121.    The Mayo School of Health Sciences was formally established in 1973.  ECF No. 275 ¶ 28.

122.    During the Refund Years, the Mayo School of Health Sciences offered four levels of programs: associate degree, upper level, clinical affiliate, and graduate/postgraduate.  P-58 at 26.

123.    As of 2012, the Mayo School of Health Sciences offered 133 programs representing more than 70 health science careers.  P-67 at 142.

124.    Not all Mayo School of Health Sciences students pay tuition.  The amount of tuition charged in each program is determined by the nationwide need for each career.  Tr. 294:13–295:1 (Warner).

<u>Mayo Clinic School of Continuing Professional Development</u>

125.    Mayo has been providing continuing medical education since 1905.  Tr. 295:7–17 (Warner).

126.    The Mayo School of Continuing Professional Development was formally established in 1997 and offers courses in continuing education for medical professionals. ECF No. 275 ¶ 29.

127.    The students include physicians and allied health professionals such as nurse anesthetists and echocardiographers.  Tr. 307:19–308:5 (Warner).

128.    The Mayo School of Continuing Professional Development's faculty are drawn from Mayo's staff.  *See* Tr. 306:12–18 (Warner).

129.    The Mayo School of Continuing Professional Development offers many courses that regularly recur.  For example, it offers annual programs, such as Clinical

Reviews and the Internal Medicine Board Review, and weekly programs, such as Grand Rounds.  Tr. 306:8–307:12, 311:12–17 (Warner); *see also* P-144.

130.   Mayo School of Continuing Professional Development students regularly register for the courses they attend.  Tr. 308:6–21 (Warner).

Mayo Clinic Graduate School of Biomedical Sciences

131.   Mayo granted its first PhD degree in the early 1900s in conjunction with the University of Minnesota.  Tr. 296:22–297:8 (Warner).

132.   The Mayo Graduate School was established in 1989 and offers training for M.S. and PhD degrees in biomedical sciences.  ECF No. 275 ¶ 26.

133.   The Mayo Graduate School prepares students for careers as competitive, independent research investigators.  P-64 at 135; *see also* Tr. 314:2–4 (Warner)

134.   Mayo Graduate School students pursuing PhD degrees are not charged tuition.  Tr. 297:20–298:1 (Warner).

*Education's Importance at Mayo Assessed Against Objective Factors*

135.   Factors that show the importance placed on education at Mayo include the quality of its programs and Schools, the growth of its Schools, a willingness to invest substantially in that growth, the worldwide profile of its Schools, and the institutional expectations regarding the support of education.  Tr. 333:13–334:13 (Warner).

136.   Mayo's schools were high-quality.

137.   One way to measure quality is the accreditation duration for a school and programs within a school.  Tr. 334:14–24 (Warner).

138.   During the Refund Years, the bodies accrediting Mayo's Schools would accredit top-performing programs or schools for a maximum of five years.  Schools or programs that were not doing well could get accredited for as short as one year. Tr. 334:25–335:7 (Warner).

139.   During the accrediting process, the accreditation body can also issue citations for issues that need to be fixed within a school or program.  Tr. 335:18–22 (Warner).

140.   During the Refund Years, Mayo had great success in terms of accreditation durations and citations.  Mayo was most likely the best in the country on those two measurements.  Tr. 335:18–24 (Warner).

141.   Another way to measure quality is to consider board certification rates for a school's graduates.  Tr. 335:8–15 (Warner).

142.   During the Refund Years, for a number of resident and fellow specialty programs, Mayo had the highest first-time board certification rate in the country.  Tr. 335:25–336:5 (Warner).

143.   Finally, the quality of medical education programs depends on a broad and diverse patient population.  Medical education programs need a high volume of patients to allow students to gain expertise in routine medical procedures across a wide variety of specialties and sub-specialties.  Medical education programs also rely on a large population of patients with complex or rare diseases.  Tr. 336:6–22 (Warner).

144.   During the Refund Years, Mayo both had a high volume of patients and a large population of patients with complex or rare diseases.  Tr. 183:20–25, 245:14–24

(Oviatt); *see also, e.g.*, P-64 at 139 (stating there were "over 1,050,000" patient registrations in 2010).

145.    Mayo's schools grew significantly from 1969 through the refund years.

146.    One aspect of growth is the sheer number of programs and students offered by a school. *See* Tr. 333:22–24 (Warner).

147.    Below is a chart showing the growth of MSGME programs offered during the Refund Years:

| Programs | 2003 | 2005 | 2006 | 2007 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|
| Accredited | 107 | 112 | 115 | 118 | 127 | 131 | 139 |
| Unaccredited | 52 | 52 | 58 | 58 | 50 | 50 | 61 |
| **Total** | **159** | **164** | **173** | **176** | **177** | **181** | **200** |

P-143 at Summary tab rows B3–I6.

148.    Below is a chart showing the growth in number of students enrolled in Mayo's Schools during the Refund Years:

| Refund Year | MSGME | Medical School | Graduate School | School of Health Sciences | Total enrollment of unique students | Continuing Medical Education |
|---|---|---|---|---|---|---|
| 2003 | 1,330 | 213 | 259 | 782 | 2,584 | 26,500 |
| 2005 | 1,387 | 210 | 179 | 1,014 | 2,790 | 14,700 |
| 2006 | 1,405 | 210 | 178 | 1,386 | 3,179 | 125,000 |
| 2007 | 1,424 | 203 | 257 | 1,350 | 3,234 | 124,000 |
| 2010 | 1,483 | 186 | 265 | 1,563 | 3,497 | 111,625 |
| 2011 | 1,491 | 191 | 270 | 1,571 | 3,523 | 124,068 |
| 2012 | 1,517 | 200 | 281 | 1,591 | 3,589 | 100,572 |

P-143 at Summary tab rows B10–I16 (MSGME, all years); P-53 at 24–25 (all other Schools, 2003); P-56 at 26–27 (all other Schools, 2005); P-58 at 25–26 (all other Schools,

2006); P-60 at 23–24 (all other Schools, 2007); P-64 at 135 (all other Schools, 2010); P-65 at 134–35 (all other Schools, 2011); P-67 at 141–43 (all other Schools, 2012).

149.   During the Refund Years, the total number of students at Mayo's Schools, excluding the Mayo School of Continuing Professional Development, increased by 39%. Tr. 734:23–735:10 (Hurley).

150.   During the Refund Years, Mayo more than doubled the size of the School of Health Sciences because there was a shortage of many allied health professionals at that time.  For example, during the Refund Years, there was a shortage of nurse anesthetists, so Mayo dramatically increased the size of that program to meet that need.  Tr. 344:23–345:8 (Warner).

151.   Between 2006 and 2007, the Mayo Graduate School grew by 79 students. Much of that increase was related to training more students in Mayo's Florida and Arizona locations.  Tr. 347:19–25 (Warner).

152.   Around 2010, the U.S. Department of Education, working with the National Institutes of Health, changed how to account for joint M.D./PhD students.  This resulted in an increase, on paper, of Mayo Graduate School students and a decrease in Mayo Medical School students.  Tr. 348:1–18 (Warner).

153.   The relatively flat enrollment in the Mayo Medical School is a function of the national trend of stagnant enrollment numbers at American medical schools during this period.  Tr. 732:18–734:17 (Hurley).

154.   Between 1969 and 2010, there was proportional growth in students, physician and scientists, and patient registrations.  Tr. 736:2–740:20 (Hurley).

155.    In 1969, Mayo had approximately 700 students, 525 physicians and scientists, and 200,000 patient registrations.  P-158 at 2–3; Tr. 736:6–7, 737:16–738:6 (Hurley).

156.    In 2010, Mayo had 3,497 students, more than 3,700 physicians and scientists, and over 1,050,000 patient registrations.  P-143; P-64 at 135, 139; Tr. 739:5–740:8 (Hurley).

157.    Thus, the number of students grew by a factor of about five, physicians and scientists by about a factor of seven, and patient registrations by a factor of about five.  Tr. 739:20–740:20 (Hurley).

158.    Mayo invested substantially in the growth of its schools during the Refund Years.

159.    Mayo, as an academic medical center, receives partial reimbursement from the Centers for Medicare and & Medicaid Services of the salaries paid to residents and fellows.  In 1997, the government capped the number of residents and fellows for which an institution could receive reimbursement.  During the Refund Years, Mayo exceeded that cap.  Tr. 330:7–331:22 (Warner); P-98 at 14.

160.    Mayo's dedication to ensuring appropriate education and training in all of its specialties and programs is demonstrated by its partnership with Children's Heart Project.  Cardiovascular surgery fellows are required to treat a certain number of patients with congenital heart disease before taking their board examinations.  Due to the low numbers of newborns in southeastern Minnesota, Mayo partners with Children's Heart Project to fly

in up to fifty congenital heart disease patients from Mongolia every year.  This program costs about $5 million per year.  Tr. 350:8–351:25 (Warner).

161.    Mayo's commitment to education is also exemplified by Mayo's partnership with the University of Minnesota's genetic counseling program.  The University of Minnesota has a post-baccalaureate program in genetic counseling.  But the University struggled to create clinical experiences for their students.  Mayo thus partnered with the University of Minnesota to provide all of its genetic counseling internships.  That program costs Mayo about $2 million per year.  Tr. 352:10–353:9 (Warner).

162.    This is all despite the fact that Mayo could provide clinical care much more efficiently without residents and trainees.  Tr. 353:10–354:7 (Warner).

163.    Mayo is recognized as one of the best academic medical centers in the world.  Tr. 354:8–14 (Warner), 671:22–672:2, 806:21–807:2 (Hurley).

164.    Mayo's Medical School is consistently ranked in the top twenty in the country.  Tr. 355:1–3 (Warner); *see also* Tr. 673:1–674:16 (Hurley).

165.    During the Refund Years, of the 24 specialty committees within ACGME, eight were chaired by Mayo physicians.  Tr. 355:15–21 (Warner).

166.    During the Refund Years, Mayo physicians served on 18 of the 25 medical specialty committees within the American Board of Medical Specialties.  Tr. 355:22–24 (Warner).

167.    Thus, during the Refund Years, Mayo had more individuals serving in leadership roles in graduate medical education and related certifying bodies than any other academic medical center in the country.  Tr. 355:24–356:3 (Warner).

168.   Mayo attracts students from all over the world.   About 25% of MSGME students come from outside of the United States, which reveals the quality of Mayo's educational programming.  Tr. 354:14–22 (Warner).

169.   MSGME alumni practice in more than 140 countries around the world.  As of 2007, over 84 countries have had a Mayo graduate serve as minister of health.   Tr. 288:12–17 (Warner).

170.   Many of Mayo's graduates serve in leadership roles in other academic medical centers or as health care leaders in other countries. Tr. 355:5–7 (Warner).

171.   Mayo is in the top 1% of all organizations regarding the amount of funding received from the National Institute of Health, the largest source of research funding in the United States.  Tr. 758:21–759:4 (Hurley).

172.   Mayo conducts almost 5% of all clinical trials in America, and almost 2% of all clinical trials in the world.  Tr. 761:13–18 (Hurley).

173.   Mayo expects physicians to participate in education.

174.   Newly hired physicians at Mayo are placed on a three-year probationary track.   After three years, such physicians are evaluated for advancement to consultant status, which is akin to a tenure process.   Tr. 235:3–13 (Oviatt), 304:21–25, 480:4–12 (Warner).

175.   Advancement to consultant status requires regular participation in educational and research activities as well as clinical practice expertise.   Tr. 305:1–8, 372:7–13 (Warner); *see also* 235:3–13 (Oviatt).

176.    Every physician at Mayo is expected to obtain academic rank.  Tr. 234:23–25 (Oviatt); 298:7–9, 356:5–23 (Warner).

177.    At Mayo's locations in Rochester, Florida, and Arizona, 97% or more of the physicians have academic rank.  Tr. 374:21–375:4 (Warner).

178.    At Mayo's MCHS sites, the goal has always been for all physicians to obtain academic rank.  Some Mayo departments have achieved that goal.  For example, all 43 MCHS anesthesiologists currently have academic rank.  Tr. 375:5–14 (Warner).

179.    During the Refund Years, more than 80% of Mayo physicians held academic rank system-wide.  Tr. 375:21–24 (Warner); Lohkamp 30(b)(6) 61:4–17.

180.    In addition, many non-physician Mayo employees serve as faculty members. Tr. 375:25–376:17 (Warner).

181.    At Mayo, faculty members are initially recommended for academic rank within their educational program.   The school-level dean then reviews that recommendation and, if appropriate, recommends that the Executive Dean approve the appointment.  The Executive Dean is responsible for appointing the faculty member in conjunction with the Board of Governors and Board of Trustees.  Tr. 357:1–10 (Warner).

182.    There are four levels of academic rank at Mayo: instructor, assistant professor, associate professor, and professor.  These levels are similar to those used in a typical university setting.  Tr. 357:11–17 (Warner).

183.    Instructor is the first level of academic rank.  Tr. 358:20–359:2–3 (Warner); *see* P-101.

184.    Assistant professor is the next level of academic rank.  To become an assistant professor, a person must demonstrate scholarly activity through authorship of peer-reviewed publications or educational efforts, be an excellent clinician, participate in administrative activities, and be an active member of appropriate professional societies. Tr. 360:6–361:3, 363:4–6 (Warner); P-99.

185.    The third level of academic rank is associate professor.  To become a Mayo associate professor, a person must have at least 40 peer-reviewed publications, with at least a third of those being first authored or senior authored, have three individuals from outside of Mayo attest that the person is an authority in an aspect of their discipline, be recognized as an effective teacher, and have participated as a leader in institutional service or administration.  Tr. 364:20–367:13 (Warner); P-100.

186.    The highest level of academic rank is professor.  To become a Mayo professor, a person must have a national or international reputation for academic excellence, have made significant research contributions to a particular field over a number of years, and have made significant contributions as a clinician, among other factors.  Tr. 368:25–370:20 (Warner); P-102.

*Mayo's Research Curriculum*

187.    The focus of the Mayo Graduate School is preparing students for research careers.  Tr. 314:2–4 (Warner); P-64 at 135.

188.    Research is part of the curriculum at the Mayo Medical School.  Each student is required to learn about research methodology and participate in a research project.  Over

36

half of graduates publish a paper in a peer-reviewed publication related to their research project.  Tr. 312:18–24, 313:18–20 (Warner).

189.    Research is part of MSGME residents' curriculum.    Tr. 313:23–314:1 (Warner).

190.    In the 2004–05 academic year, 85% of MSGME resident programs had greater than 50% of MSGME resident graduates publish in peer-reviewed publications and 73% of programs had more than 75% of graduates who made presentations at professional meetings.  Those figures were largely consistent during all of the Refund Years.  P-98 at 33; Tr. 313:11–17, 314:22–315:7 (Warner).

191.    Research is part of the curriculum within some School of Health Sciences programs, particularly the doctoral-level programs like physical therapy and nurse anesthesia.  Tr. 315:8–15 (Warner).

192.    It would be extraordinarily rare not to have a student involved in a research study, particularly if it was a complex problem involving a large research team.  Tr. 322:16–323:8 (Warner).

193.    In addition, those seeking the academic rank of associate professor or higher at Mayo must participate in research.  Tr. 360:9–15, 363:4–6, 364:20–22, 365:16–366:23 (Warner); P-99; P-100.

194.    *Mayo Clinic Proceedings* is a peer-reviewed academic journal published monthly by Mayo Foundation for Medical Education and Research.  Its circulation exceeds 125,000 medical professionals worldwide.  ECF No. 275 at ¶ 33.

195.  *Mayo Clinic Proceedings* is the fifth largest medical journal in the world.  Tr. 198:16–20 (Oviatt).

## Mayo's Investment in Research and Education

196.  The consolidated financial statements show that Mayo increased its expenditures on education and research in each of the Refund Years.  Tr. 547:11–13 (Noseworthy); P-80 at 16; P-81 at 15; P-82 at 16; P-83 at 17; P-84 at 25; P-85 at 27; P-86 at 29.

197.  In 2003, Mayo spent $153.9 million on education and $350.5 million on research.  P-80 at 16.

198.  In 2012, Mayo spent $251.8 million on education and $631.2 million on research.  P-86 at 29.

199.  During each of the Refund Years, Mayo's research and education missions operated at a significant net financial loss.  Tr. 562:21–25 (Noseworthy), 707:8–11 (Hurley); P-154; *see also* Tr. 695:9–707:7, 708:10–709:12 (Hurley).

200.  The approximate net losses for education, research, and the two missions combined during the Refund Years is set out below:

| | 2003 | 2005 | 2006 | 2007 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|
| **Net Loss for Education** | ($29.1M) | ($22.9M) | ($32.4M) | ($60.7M) | ($95.1M) | ($95.8M) | ($99.3M) |
| **Net Loss for Research** | ($128.3M) | ($143.2M) | ($177.7M) | ($185.1M) | ($210M) | ($227.1M) | ($246.5M) |
| **Net Loss for Education and Research** | ($157.4M) | ($166.1M) | ($210.1M) | ($245.8M) | ($305.1M) | ($322.9M) | ($345.8M) |

P-154.

38

201.    These net loss figures compare Mayo's education and research revenues to the expenses related to those activities.  Tr. 695:9–707:7, 708:10–709:12 (Hurley); P-154; *see also* Lohkamp Personal 31:9–23.

202.    These figures underreport the education losses at Mayo because they do not account for the time physicians spend teaching students, the facility costs related to education, and other patient care expenses that are related to education.  Tr. 701:10–702:5 (Hurley).

203.    Mayo's net income from its clinical practice did not cover losses from Mayo's education and research missions.

204.    During each of the Refund Years, Mayo spent more on research and education then it made from patient care, on a net basis, without accounting for investment returns and contributions.  Tr. 687:5–14, 694:22–695:8, 707:18–23 (Hurley); P-154.

205.    Net basis means removing expenses from related revenue.  Tr. 686:24–687:1 (Hurley).

206.    The shortfall of patient care revenue over the losses from education and research during each of the Refund Years can be seen by removing contributions and investment returns from the increase or decrease in net assets.  Tr. 695:4–8 (Hurley).

207.    The annual increase or decrease in net assets is essentially an organization's net income for the year.  It represents the annual change in the net worth of the organization.  Tr. 689:21–690:4, 691:11–14 (Hurley).

208.    The annual increase or decrease in net assets is shown on the consolidated statements of activities page of Mayo's consolidated financial statements.  Tr. 690:7–691:8

(Hurley); *see, e.g.*, P-82 at 4 (showing the "Total" "Increase in net assets" for 2006 as $524.6 million); *see also* P-154.

209.    Mayo's contributions and investments can also be identified on the consolidated statements of activities page of Mayo's consolidated financial statements.  Tr. 692:7–694:13 (Hurley); *see, e.g.*, P-82 at 4 (showing the "Total" "Contributions available for current activities" for 2006 as $130.8 million; "Total" "Contributions not available for current activities, net" for 2006 as $84.9 million; "Total" "Investment return allocated to current activities" for 2006 as $93.1 million; "Total" "Unallocated investment return, net" as $335.4 million); *see also* P-154.

210.    Mayo's adjusted increase or decrease in net assets removes Mayo's contributions and investment returns from Mayo's total increase or decrease in net assets. Again, that number represents the approximate shortfall of patient care revenue over the losses from education and research.  Tr. 694:22–695:8 (Hurley); *see also* P-154.

211.    Mayo's adjusted net assets were negative during each of the Refund Years:

| 1994 | 1995 | 1996 | 2003 | 2005 | 2006 | 2007 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|
| ($117.1M) | ($142.7M) | ($150.9M) | ($87.6M) | ($17.6M) | ($119.6M) | ($523.3M) | ($57.2M) | ($530.3M) | ($739.1M) |

P-154.

212.    In each of the Refund Years, Mayo spent far more than 3.5% of the fair market value of its endowment on education.  Tr. 712:24–713:3, 730:19–731:5 (Hurley); P-153.

213.    There are three ways to calculate the total amount of Mayo's endowment. Tr. 710:25–712:3, 729:6–730:14 (Hurley).

214. First, Mayo's endowment could be calculated by identifying the permanently restricted net assets on its consolidated financial statements. This is the typical way to calculate an endowment because permanently restricted net assets are held in perpetuity. Tr. 711:18–20, 712:4–16, 725:16–726:7 (Hurley); Lohkamp Personal 82:12–15; *see* P-153; *see, e.g.*, P-84 at 21.

215. Second, Mayo's endowment could be calculated by combining the temporarily and permanently restricted net assets on its consolidated financial statements. Tr. 711:1–712:3, 724:21–725:8, 726:12–16 (Hurley); *see* P-153; *see, e.g.*, P-84 at 20–21.

216. Third, Mayo's endowment could be calculated by combining the temporarily and permanently restricted net assets with board-designated funds. Tr. 711:1–712:3, 726:17–727:21 (Hurley); *see* P-153; *see, e.g.*, P-84 at 23.

217. All three of these methods use the fair market value of Mayo's endowment. 731:8–732:5 (Hurley); *see, e.g.*, P-84 at 8.

218. Mayo's system-wide educational expenses are identified on its consolidated financial statements. Tr. 728:2–20 (Hurley); *see, e.g.*, P-84 at 25.

219. The following chart calculates the percentage of the fair market value of Mayo's endowment spent on education during each of the Refund Years under the three alternative definitions of Mayo's endowment:

| | 2003 | 2005 | 2006 | 2007 | 2010 | 2011 | 2012 | Total |
|---|---|---|---|---|---|---|---|---|
| **Education Expenses/ Permanently Restricted Net Assets** | 53.6% | 44.6% | 41.6% | 36.0% | 31.9% | 30.7% | 29.7% | 35.6% |
| **Education Expenses/ Restricted Net Assets** | 19.4% | 13.8% | 13.8% | 13.2% | 14.8% | 14.7% | 13.5% | 14.4% |
| **Education Expenses/ Restricted Net Assets and Board-Designated Funds** | N/A | N/A | N/A | N/A | 12.0% | 12.0% | 10.9% | N/A |

P-153; *see* Tr. 728:25–730:18 (Hurley).  Prior to 2009, Mayo did not identify board-designated endowment funds on its consolidated financial statements.  Tr. 726:20–727:2 (Hurley).

220.    Apart from Mayo's consolidated financial statements, Mayo filed IRS Form 990s that included financial information regarding its education expenditures.

221.    On the 2007 Form 990, Mayo Clinic Rochester reported the expenses associated with its "exempt purpose achievements" as follows:

| Achievement | Expense ($) |
|---|---|
| Patient Care | 2,000,000,000 |
| Research and Education | 420,000,000 |
| Community Contributions | 3,000,000 |
| Other Community Contributions and Achievements | 1,000,000 |

D-58 at 3 (amounts rounded).

222.   On Mayo Clinic's 2007 Form 990, Mayo Clinic described three "exempt purpose achievements": "Medical Education," "System-Wide Management" and "Development." D-51 at 3, 26–32.

223.   The table below reflects the amounts that Mayo Clinic reported as program service revenue in 2003, 2005, 2006, and 2007, including the revenue received for support services to its subsidiaries and all other sources of program service revenue.[4]

|  | 2007 | 2006 | 2005 | 2003 |
|---|---|---|---|---|
| Support services | 147,000,000 | 136,000,000 | 138,000,000 | 97,000,000 |
| Education | 12,000,000 | 9,000,000 | 8,000,000 | 7,000,000 |
| Research | 82,000 | 700,000 | 400,000 | 300,000 |
| Royalties | 400,000 | 100,000 | --- | 400,000 |
| Health information | 2,000,000 | 1,000,000 | 1,000,000 | --- |
| Insurance reports and medical records fees | --- | --- | 3,000 | 10,000 |
| Bookstore sales & interlibrary loans | --- | --- | --- | 900,000 |

D-48 at 41 (2003); D-49 at 49 (2005); D-50 at 8 (2006); D-51 at 8 (2007). (Amounts rounded).

224.   For example, the below table compares revenue and expenses reported by Mayo Clinic and Mayo Clinic Rochester on their 2007 Forms 990:

---

[4]   The table shows amounts that Mayo Clinic reported as program service revenue received in connection with its "related or exempt function." It does not show amounts that Mayo Clinic reported as unrelated business income or excluded from income under I.R.C. §§ 512, 513, or 514.

|  | Revenue ($) | Expenses ($) |
|---|---|---|
| Mayo Clinic | 777,000,000 | 855,000,000 |
| Mayo Clinic Rochester | 2,782,000,000 | 2,772,000,000 |

D-51 at 1; D-58 at 1 (amounts rounded to nearest million).

225.   On that Form 990, Mayo Clinic reported the expenses associated with its "exempt purpose achievements" as follows:

| Achievement | Expense ($) |
|---|---|
| System-wide Management | 123,000,000 |
| Development Program | 549,000,000 |
| Medical Education | 43,000,000 |

D-51 at 3. (amounts rounded).

*Relationship Between Mayo's Subsidiaries and Mayo's Educational Purpose*

226.   The chart below depicts the Mayo organization as of 2006.



P-122 at 64; Tr. 159:7–12 (Oviatt).

227.    Mayo Insurance Company, Ltd. is Mayo's offshore insurance company, providing professional and general liability insurance coverage for Mayo activities.  P-122 at 67; Tr. 160:14–161:6 (Oviatt).

228.    Mayo Insurance Company, Ltd. supports Mayo's educational purpose by providing malpractice coverage for all residents, fellows, and other students.  Tr. 160:18–21, 161:7–13, 189:1–6 (Oviatt).

229.    Mayo Collaborative Services, Inc. ("MCSI") coordinates with hospitals throughout the United States and abroad to provide Mayo laboratory testing services.  P-122 at 67; Tr. 243:1–10 (Oviatt).

230.    Mayo performs laboratory testing on patient specimens at its Rochester, Arizona, and Florida locations, along with one outreach laboratory in Massachusetts.  Tr. 243:8–12 (Oviatt).

231.    Many of the laboratory tests Mayo performs are complex and require the use of sophisticated equipment or the knowledge of how to employ complex chemical reagents.  Tr. 162:24–163:7 (Oviatt).

232.    MCSI also offers a consultation service, which allows physicians from outside the Mayo system to speak with a Mayo specialist or subspecialist, sometimes a Mayo resident, to obtain more information about test results.  Tr. 163:16–23 (Oviatt).

233.    Patients who have their samples sent to MSCI for testing might later be referred to Mayo for treatment.  Tr. 164:2–3, 245:18–24 (Oviatt).

234.   Thus, MCSI helps Mayo locate and attract patients with complex specialty and subspecialty conditions, which is necessary for its educational programs.  Tr. 245:18–24 (Oviatt).

235.   During the Refund Years, residents or other medical technician students would have been involved in virtually all of Mayo's laboratory testing services.  Tr. 164:10–18, 243:4–8, 244:16–17 (Oviatt); *see also* Lohkamp 30(b)(6) 198:18–199:6, 200:5–25.  In this way, Mayo's laboratory testing services directly relate to and support Mayo's educational purpose.

236.   Mayo also performs research related to the work of MCSI.  Tr. 164:10–23, 245:3–10 (Oviatt); Lohkamp 30(b)(6) 198:18–199:6.

237.   Gold Cross Entities contains three Mayo ambulance services: (1) ambulance services in Rochester, Minnesota; (2) ambulance services in Eau Claire, Wisconsin; and (3) helicopter ambulance services.  Tr. 165:13–21 (Oviatt).

238.   Gold Cross provides education at Mayo.  Mayo offers residency and fellowship programs that are specific to prehospital medicine.  The residents and fellows in those programs frequently receive clinical training through the Gold Cross Entities.  Tr. 165:25–166:4, 166:24–167:1, 248:7–15 (Oviatt).

239.   Mayo pediatrics residents and fellows also receive training through Gold Cross Entities.  Tr. 247:7–13 (Oviatt).

240.   Some Mayo Clinic School of Health Sciences students receive clinical training through the Gold Cross Entities, particularly emergency medical technician

students. In addition, Gold Cross Entities personnel provide training to paramedics and volunteer ambulance departments. Tr. 166:20–167:1, 247:14–20 (Oviatt).

241. Charterhouse, Inc., operates Charter House, a Mayo continuing care retirement center located in Rochester, Minnesota, which offers apartment and assisted living units and skilled nursing beds. P-122 at 67; Tr. 167:2–10 (Oviatt).

242. Mayo's geriatric medicine residents and fellows receive clinical training through Charter House. Tr. 167:21–22 (Oviatt).

243. Mayo's residents and fellows are involved in the care of Charter House patients through Charter House's skilled nursing facility. Tr. 250:1–14 (Oviatt).

244. In 1992, Mayo began affiliating with hospitals and clinics located within a 200-mile radius of Rochester, Minnesota, which comprise MCHS. Tr. 115:5–8, 168:5–170:1, 195:22–196:1 (Oviatt).

245. Approximately 50% of all of patients treated at Mayo's Rochester location reside within a 120 to 200-mile radius of Rochester, Minnesota. Tr. 115:5–10 (Oviatt), 501:13–18 (Warner).

246. As of December 31, 2005, MCHS was affiliated with primary and secondary care clinics in 62 communities in southern Minnesota, northern Iowa, and western Wisconsin. At this time, MCHS included 16 hospitals in this region. Tr. 196:8–15 (Oviatt); P-122 at 67, 78.

247. As of December 31, 2005, MCHS had 690 physicians. Putting that number into context, Mayo's Rochester, Florida, and Arizona locations employed 2,360

physicians.   Thus, as of December 31, 2005, MCHS accounted for 22.6% of Mayo's system-wide physicians.  P-122 at 65–67; Tr. 375:15–20 (Warner).

248.   As of 2012, MCHS was affiliated with primary and secondary care clinics in 70 communities in southern Minnesota, northern Iowa, and western Wisconsin.  At that time, MCHS included 17 hospitals.  Tr. 197:19–25 (Oviatt), 379:10–15 (Warner); D-8 at 11.

249.   Among the primary reasons Mayo started MCHS was to bolster its educational programs by enlarging its patient population and catchment area.  Tr. 266:3–13 (Oviatt); 345:9–347:3, 379:22–380:7 (Warner).

250.   A large catchment area creates more opportunities for patients with rare and complex diseases to receive treatment at Mayo, which, in turn, enhances Mayo's ability to train students in rare and complex diseases.  Tr. 321:9–14, 336:6–22, 381:15–24 (Warner).

251.   A large catchment area also increases Mayo's overall patient volume which allows Mayo to train more students on routine medical procedures.  For example, the population of newborn children is relatively low in the Rochester, Minnesota area.  Prior to starting MCHS, Mayo was close to not having enough expecting and new mothers, newborns, or young children for its obstetrics and pediatrics education programs.  MCHS allows Mayo obstetrics residents, family medicine residents, nurse midwife students, and medical students, among others, to obtain clinical experiences necessary to their training programs.  Tr. 345:9–347:3, 380:8–20, 381:25–382:15, 469:17–470:5 (Warner).

252.   From the time Mayo created MCHS, its goal was to fully integrate education, research, and clinical practice at all MCHS sites.  Tr. 170:7–12 (Oviatt); 379:10–19,

388:16–389:11 (Warner).  For instance, Mayo has endeavored to ensure all physicians have academic rank.  And today, some departments in MCHS have achieved that.  For example, all 43 MCHS anesthesiologists have academic rank.  Tr. 375:5–14 (Warner).

253.    During the Refund Years, almost all MCHS sites had student trainees.  Most students were attending one of Mayo's Schools, although some non-Mayo students received their clinical training at Mayo.  Tr. 386:21–388:4 (Warner); *see also* Lohkamp Personal 141:21–142:1.

254.    As of December 31, 2005, the three largest hospitals in MCHS were Franciscan Skemp Medical Center in LaCrosse, Wisconsin, Luther Hospital in Eau Claire, Wisconsin, and Immanuel St. Joseph's Hospital in Mankato, Minnesota.  At that time, those three hospitals collectively represented 65% of the licensed hospital bed capacity and staffed beds across all MCHS hospitals.  P-122 at 80; *see also* Tr. 383:3–16, 384:14–385:21 (Warner).

255.    Franciscan Skemp Medical Center in LaCrosse, Wisconsin, Luther Hospital in Eau Claire, Wisconsin, and Immanuel St. Joseph's Hospital in Mankato, Minnesota, each operated residency programs prior to, and after, affiliating with MCHS.  Thus, 65% of MCHS hospital sites had dedicated residency programs during the Refund Years.  P-122 at 80; Tr. 207:4–8, 210:1–4, 222:25–223:13 (Oviatt); 85:22–286:20, 465:20–22 (Warner).

256.    In addition to the residency programs at 65% of MCHS hospital sites, Mayo's Enhanced Med program trained non-emergency medicine residents to become competent in emergency medicine, including training relating to coordination with Mayo's trauma

49

center in Rochester.  Residents that partook in that program staffed emergency rooms at MCHS hospitals.  Tr. 170:17–171:5, 210:23–211:7, 232:8–21 (Oviatt).

257.   Moreover, Mayo residents would also accompany Mayo's physician specialists and subspecialists when they visited the smaller MCHS sites.  Tr. 171:10–12, 223:18–224:4, 227:1–10, 227:13–228:1, 228:8–19, 230:14–22 (Oviatt); Lohkamp Personal 144:11–13.

*Mayo Integrates Education, Research, and Clinical Practice*

258.   Enterprise-wide, Mayo integrates education, research, and clinical practice. Tr. 183:3–184:11 (Oviatt); 276:2–13, 278:2–10, 522:4–17 (Warner); 561:21–25, 640:12–17 (Noseworthy); 657:20–658:4 (Hurley); Lohkamp Personal 16:15–17:8, 111:13–16, 113:10–13.

259.   A large and diverse patient population is necessary to Mayo's education and research missions.  Tr. 183:20–184:6, 245:18–20, 266:3–13 (Oviatt); 321:5–9, 345:9–347:3 (Warner); Lohkamp Personal 16:6–14.

260.   Mayo's educational programs depend on a large volume of patients so that students may obtain clinical training experiences necessary to their programs.  Tr. 266:3–13 (Oviatt); 336:6–22, 345:9–347:3 (Warner).

261.   A large and diverse patient population brings with it meaningful numbers of patients who have complex or rare medical diseases, which are necessary to Mayo's education and research endeavors.  Tr. 321:9–14, 336:6–22 (Warner).

262.    For example, pheochromocytoma is a rare cancer of the adrenal gland that only occurs in about one in every 250,000 patients.  Mayo needs enough patients with this disease to study it and publish results.  Tr. 321:15–322:13 (Warner).

263.    Actual care of patients is necessary in order to provide appropriate instruction and training to medical residents.  P-5 at 4; ECF No. 275 at ¶ 31.

264.    Actual care in the service of patients is inherent to the process of educating medical residents.  P-5 at 4; ECF No. 275 at ¶ 32.

265.    Patient care is integral to the education of medical residents.  P-5 at 4.

266.    It would be unusual for a student from any of Mayo's Schools not to be involved in the care of a Mayo patient, system-wide.  Tr. 248:16–25 (Oviatt),  378:8–14 (Warner); Lohkamp Personal 144:1–18.

267.    Nearly all Mayo physicians who work in Rochester, Florida, and Arizona participate in research.  Tr. 316:12–21 (Warner).

268.    System-wide, during the Refund Years, most Mayo physicians participated in research.  Tr. 316:12–21 (Warner); P-128 at 50.

269.    Mayo physicians and scientists use research to improve clinical practice.  Tr. 318:20–21 (Warner).

270.    Mayo physicians and scientists mostly perform translational research, which involves the translation of basic science knowledge into improvements in clinical practice.  Tr. 319:19–320:22 (Warner).

271.    At its locations in Rochester, Florida, and Arizona, Mayo paid its physicians a fixed salary.  *See* Tr. 373:2–374:16 (Warner).

272.    Mayo's goal has always been to transition all MCHS physicians to its fixed salary compensation model and that continues to occur.  Tr. 374:2–16 (Warner).

273.    A fixed salary means that Mayo's physicians were not paid per health care procedure.  Tr. 373:5–374:1, 527:6–14 (Warner).

274.    Mayo's expert witness, Chip Hurley, relied on a study performed by the national consulting firm ECG to assess the level of integration at Mayo.  Tr. 658:19–659:2 (Hurley).

275.    The purpose of the ECG study was to determine if more integrated academic medical centers were more successful than less integrated academic medical centers.  Tr. 660:10–14 (Hurley).

276.    The study group contained 104 academic medical centers, which represented all academic medical centers associated with medical schools that grant M.D. degrees that have been operating for at least 12 years.  The study group excluded some smaller academic medical centers.  Tr. 660:15–661:15 (Hurley).

277.    The study identified five criteria by which it measured integration.  ECG considered an academic medical center more integrated if it satisfied just two of the five criteria.  Tr. 662:14–18 (Hurley).

278.    Mr. Hurley applied the five criteria to Mayo and determined that Mayo met all five criteria.  Tr. 663:9–11, 667:17–19 (Hurley).  In other words, Mayo is fully integrated according to the ECG Study's criteria.

279.   The first criteria is whether an academic medical center's faculty practice group is a separate legal entity or is owned or controlled by the hospital or health system. Tr. 663:12–20 (Hurley).

280.   Mayo meets the first criteria because in 1969, its faculty practice group ceased being a separate legal entity, and it has been fully integrated with the organization ever since.  Tr. 664:1–9 (Hurley).

281.   The second criteria is whether an academic medical center directly employs its physicians rather than simply giving them accreditation to practice at its hospitals or contracting with a group of physicians.   When physicians are directly employed, an academic medical center has much more control over them compared to physicians who simply have credentials to practice at a hospital.  Tr. 664:10–19, 665:1–6 (Hurley).

282.   Mayo meets the second criteria because it directly employs the vast majority of its physicians.  Tr. 664:20–25, 665:10–14 (Hurley).

283.   The third criteria is whether the hospital and faculty practice group report to the same leader or if they are led by different executives.  Tr. 665:15–20 (Hurley).

284.   Mayo meets the third criteria because there is one CEO that oversees all of its entities, system-wide.  Tr. 665:21–666:3 (Hurley).

285.   The fourth criteria is whether the hospital, school of medicine, and faculty practice group are separate or part of one organization.  Tr. 666:4–9 (Hurley).

286.   Mayo meets the fourth criteria because its hospitals, school of medicine, and faculty practice group are all integrated into the organization and the organization creates consolidated financial statements.  Tr. 666:10–14 (Hurley).

287.    The fifth criteria is whether the academic medical center is a virtual health system—that is, if the hospital and a university with a faculty practice group are completely separate legal entities with their own boards of directors, but they place an umbrella corporation over the top of the two entities to try to maintain a semblance of coordination. Tr. 666:15–667:10 (Hurley).

288.    Mayo meets the fifth criteria because Mayo does not have a virtual health system.  Mayo's organization is fully integrated.  Tr. 667:11–16 (Hurley).

289.    The study also had two figures, one of which depicted what a more integrated health system looked like and another depicted a less integrated health system.  Tr. 668:7–9 (Hurley).

290.    The more integrated depiction shows a teaching hospital and a faculty practice group within the same corporation.  It has a single board of directors and a single CEO.   Thus, all key functions, such as budgeting, strategic planning, and financial planning, are coordinated.   This more integrated depiction aligns with Mayo's organizational structure, which also has a single board of directors (i.e., Board of Trustees) and single CEO.  Tr. 668:12–669:8 (Hurley).

### Some Mayo Statements Emphasize Patient Care

*The 2020 Report*

291.    In the 1990s and early 2000s, health care spending was exceeding annual gross domestic product growth.  This led to a significant nationwide health care reform effort.  Tr. 543:14–20 (Noseworthy).

292.    At the same time, Mayo was underperforming financially.  It had narrow financial margins, which made it difficult to continue to serve humanity.  Tr. 543:21–25 (Noseworthy).

293.    Against this backdrop, in November 2007, the Mayo Board of Trustees determined that "Mayo Clinic's primary business model – destination medical care, where patients with complex conditions travel for diagnosis and treatment – [had] become dated and vulnerable."  The Board asked the then-CEO of Mayo to create a plan for what Mayo would need to look like in 2020 to remain strong, serve humanity, be relevant, affordable, accessible, and cutting-edge while continuing to invest in education and research.  D-2 at 8; Tr. 544:1–13 (Noseworthy).

294.    Dr. Noseworthy chaired the task force analyzing this issue and delivered a report to the Board of Trustees in August 2008, which was entitled Mayo Clinic 2020: The Unparalleled Patient Experience ("2020 Report").  Tr. 544:11–16 (Noseworthy); D-12.

295.    Mayo's Board approved the 2020 Report in November 2008.  Tr. 544:15–16 (Noseworthy).

296.    The 2020 Report's title, "The Unparalleled Patient Experience," was defined, in part, as "All aspects of quality experienced within the Mayo Clinic Model of Care underscoring our values and competencies in patient-focused, team-based integrated environment of practice, research, and education."   D-12 at 18; Tr. 552:24–553:23 (Noseworthy).

297. The first sentence of the Model of Care states, "Mayo Clinic will provide the best care to every patient every day through integrated clinical practice, education and research." Tr. 553:16–23 (Noseworthy); P-44 at 3.

298. The 2020 Report includes a discussion of a vision for Mayo Clinic. The Report's authors suggested that Mayo Clinic's vision statement be revised in a manner that would remove the word "academic" from it and which would emphasize its health-care services:

The current Mayo Clinic vision statement is:

*Mayo Clinic will be the premier patient centered academic medical organization*

The 2020 Facilitating Team feels that Mayo Clinic has already outgrown this statement, and that it no longer reflects the full range of Mayo's aspiration and intents. A possible vision statement more consistent with the direction of Mayo Clinic 2020 might be:

- *Mayo Clinic will broaden and strengthen its position as the world's premier integrated, patient-centered health care institution by providing an unparalleled patient experience for those it serves.*
- *Mayo Clinic will adapt to evolving patient needs through an innovative, comprehensive platform of services that can be scaled to individual needs and locations over time.*
- *Mayo Clinic will lead the world in compassionate care delivered through a variety of modalities, delivering value to patients and fulfilling Mayo Clinic's mission of contributing to the general good of humanity.*

This is meant as a stimulus for discussion and will no doubt need to be further vetted throughout the institution.

D-12 at 4.

299.   The Report goes on to describe the "2020 Construct" as follows:

**The 2020 Construct**

By 2020, Mayo Clinic will realize its vision, mission and primary value by providing a spectrum of health care services matched to the needs of individual patients depending upon the level of relationship they want with Mayo Clinic at different stages of their lives and illnesses. This spectrum of services will be available globally throughout the lifetime of the consumer, comprising actual and virtual delivery methods scaled depending upon medical need, distance, and the consumer's desire to pay for added value. In all cases Mayo Clinic will provide products and services of the highest quality consistent with Mayo Clinic's time-proven principles, actualizing the four strategic themes of Quality, Individualized Medicine, the Science of Health Care Delivery and Integration. By so doing Mayo Clinic will best serve the needs of its patients and enhance its status as the premier preferred global health care provider.

D-12 at 7.

300.   The 2020 Report contains the following illustration of what Mayo would need to look like by or before 2020 for Mayo to be successful and sustainable:



Tr. 556:1–7 (Noseworthy); D-12 at 10.

301.    Mayo's interconnected three shields logo, which represents the integration of education, research, and clinical practice, was intentionally placed at the center of the diagram that depicted how Mayo aspired to operate in 2020.    Tr. 556:8–558:2 (Noseworthy).

302.    The 2020 Report's Preamble states that its purpose was to create a strategic roadmap for what Mayo would need to look like for it to be successful, resilient, affordable, accessible, relevant to the world, and on a strong financial footing while still holding true to its commitment to continue to advance education and research.    Tr. 545:14–546:2 (Noseworthy); D-12 at 3.

303.    Dr. Noseworthy credibly testified that the Vision Statement was meant to be aspirational and that, in 2008, Mayo believed it had already achieved the status of being a premier patient-centered academic medical organization, so the Vision Statement was no longer aspirational for the organization.    Tr. 549:6–550:5 (Noseworthy); *see also* D-12 at 4.

*Statements by Mayo's Museum Director*

304.    Mayo Clinic's museum director, Matthew Dacy, participated in a video-recorded interview for the Yale School of Management, stating:

> Principally, the key innovation of Mayo Clinic goes back to our earliest days, and that's the integrated group practice of medicine. So you have here a collection of physicians, scientists, allied health professionals who unite all their different skills around one mission: serving patients. And that's supported by education and research. Unlike a typical university academic setting, research and education here support the patient-care mission. That really is our major contribution.

D-201; ECF No. 275 at 3 (emphasis added).

305.   In an article posted on a Mayo Clinic website, Mr. Dacy described Mayo Clinic's logo as follows:

> [T]he shields refer to our three main activities—patient care, research and education. Although they're not labeled, it's understood that the larger, center, shield refers to patient care, which is our main focus.

D-10.

### March 2012 Bond Issuance

306.   In a March 2012 presentation that Mayo Clinic gave to investors in connection with a proposed $200 million bond issuance, Mayo Clinic represented that "Mayo is a large multi-specialty group practice that provides team-oriented patient care" and that "Mayo's unique 'three shield' logo embodies its mission: integrated patient care supported by medical research and education."  D-8 at 5.

### Public Statements Specifically by Dr. Noseworthy

307.   In a video-recorded interview that Dr. Noseworthy gave to the Yale School of Management in 2010, Dr. Noseworthy described Mayo Clinic as follows:

> For over a 100 years Mayo Clinic has been a patient-centered integrated practice of medicine that also has a research arm and an education arm. But the unique thing about Mayo Clinic, and I believe the reason it's been successful, and it's filled a void, perhaps, in the medical field, is its patient centeredness. The patient is at the center of every decision we make. Every decision we make, and everything we do, we always try to say, where's the patient in this decision? And so we've integrated our entire healthcare-delivery system and knowledge-creation system around the patient. We've done that forever.

D-201; Tr. at 567:19–25 (emphasis added).

308.    Of the hundreds of presentations, talks, and interviews Dr. Noseworthy gave during his tenure as CEO, very few specifically focused on education or research.   Tr. 558:5–14 (Noseworthy).

309.    Dr. Noseworthy was often invited to speak on a specific newsworthy topic. Tr. 558:15–25 (Noseworthy).

310.    The media's general lack of interest in Mayo's education and research missions did not have any impact at all on the importance of education and research at Mayo.  Tr. 559:5–8 (Noseworthy).

311.    Dr. Noseworthy does not recall ever being asked by the media how Mayo was organized or operated.  Tr. 559:18–20 (Noseworthy).

312.    Dr. Noseworthy did not recall ever being asked by the media to define Mayo's Primary Value or its official Mission Statement or how they interrelate.  Tr. 560:6–12 (Noseworthy).

313.    More specifically, when Dr. Noseworthy made the statements that appear in D-201, D-203, D-205, D-206, D-207, D-208, D-213, and D-214 ("Defense Clips"), he was not explaining how Mayo was organized and operated during the Refund Years or during his tenure as CEO.  Tr. 639:10–16 (Noseworthy).

314.    Dr. Noseworthy's statements in the Defense Clips were not complete statements describing Mayo.  Tr. 639:17–19 (Noseworthy).

315.    Dr. Noseworthy was not excluding Mayo's education mission through his statements in the Defense Clips.  Tr. 639:20–22 (Noseworthy).

316.   According to Dr. Noseworthy, Mayo is organized and operated exclusively to integrate education, research, and clinical practice.   Tr. 561:21–25, 640:12–17 (Noseworthy).

317.   Dr. Noseworthy stated that "the practice is the main thing" in several staff meetings early in his tenure as CEO.  Tr. 567:3–5 (Noseworthy); *see also* D-2 at 15.

318.   Dr. Noseworthy explained that the statement did not mean that the clinical practice aspect of Mayo's Mission Statement was "the main thing."   Tr. 567:22–25, 569:14–570:3 (Noseworthy).

319.   At the beginning of Dr. Noseworthy's tenure as CEO, financial challenges posed a serious threat to the long-term sustainability of Mayo's model of care, which integrates education, research, and clinical practice.   Tr. 566:4–10, 570:18–24 (Noseworthy).

320.   In an effort to motivate Mayo's employees, Dr. Noseworthy used "the practice is the main thing" as a "call to action" that Mayo needed to reengineer how it delivered patient care so that it was affordable to patients, financially sustainable for Mayo, and remained cutting-edge.  Tr. 565:25–569:10, 625:8–15 (Noseworthy).

321.   Mayo's integration of education, research, and clinical practice, the product of which is the delivery of health care, was fundamental to that reengineering.  Tr. 567:9–25 (Noseworthy).

322.   In other words, the integration of education, research, and clinical practice was "the main thing."  Tr. 567:22–25 (Noseworthy).

323.    And, in fact, consistent with that integration, Mayo increased spending on education and research in the years that followed.   Tr. 547:9–548:15, 569:19–570:15 (Noseworthy); P-83 at 17.

*Other Statements*

324.    Both Dr. Noseworthy and Dr. Gianrico Farrugia, Mayo Clinic's current CEO, have co-authored books (or, in Dr. Noseworthy's case, a chapter of a book) in which they state that at Mayo Clinic, "the practice is the main thing."  D-2 at 15; D-3 at 30.

325.    According to Dr. Farrugia:

> Today's Mayo Clinic operates primarily as a "destination" medical center, gathering in patients from across the United States and 150 countries across the globe for highly specialized treatments for a wide assortment of diseases. Increasingly, Mayo has broadened its footprint by expanding into more local and regional geographies, and . . .  is also reaching out in a big way through innovations and technologies that allow remote patient visits with diagnosis, treatment, and monitoring. Mayo has also moved squarely into health and wellness, embracing a holistic shift from just sickness or health care to helping people optimize their well-being over their lifespan—the difference between "health" and "health care" . . . .  Increasingly, Mayo physicians collaborate with local physicians and staff to deliver health and health care, both in Mayo locations and, through partnerships, to non-Mayo locations. In this way, the Mayo brand is gradually growing beyond the idea of destination medicine.

D-3 at 8–9.

326.    Mayo Clinic's Office of Community Engagement, which was responsible for identifying and prioritizing opportunities for Mayo Clinic to support its local communities (Tr. at 630:10–631:01; D-18), repeatedly published statements that "Mayo Clinic is a not-

for-profit organization with the primary mission of patient care."  D-19 at 1; D-20 at 1; D-21 at 1.

327.    A range of Mayo Clinic executives or leaders—from its current and former CEOs to its Chief Administrative Officer to its museum director—have represented to audiences of all kinds that Mayo Clinic is the "the most trusted brand in healthcare": an "integrated medical group-practice" that specializes in treating "serious and complex" conditions and that Mayo Clinic's main focus is on treating patients.  D-3; D-201; D-206; D-216; D-221; D-222.

*Mayo's "Three Shields" Logo*

328.    Mayo's logo features three interlocking shields.  *See, e.g.*, P-15.

329.    The shields, as they were originally drawn, reflected William Worrall Mayo as the center shield, with his two sons, Will and Charlie, as the left and right shields.  Tr. 411:18–23 (Warner).

330.    Mayo's Board of Governors later stated that the shields represented clinical practice, education, and research.  Tr. 411:24–412:8 (Warner).

331.    Mayo has never officially identified which shield represents which part of its three-part mission.  Tr. 411:24–412:19 (Warner).

332.    Mayo's logo signifies Mayo's integration of education, research, and clinical practice to achieve its primary value.  Tr. 412:9–19 (Warner).

333.    In 2015, Dr. Sandhya Pruthi was the lead author on an article published in the *Patient Experience Journal* entitled "Vision, mission, and values: From concept to execution at Mayo Clinic."  D-9.

334.    Dr. Noseworthy was one of nine co-authors listed but does not remember reviewing the article.  Tr. 572:4–23 (Noseworthy); D-9 at 2.

335.    Dr. Pruthi's article states, "The 3 interlocking shields of the Mayo Clinic logo symbolize the multifaceted mission, with the center, and larger, shield representing patient care."  D-3 at 3.

336.    If Dr. Noseworthy was asked to edit that sentence, he would have kept the first half of the sentence ("The 3 interlocking shields of the Mayo Clinic logo symbolize the multifaceted mission") and removed the second half ("with the center, and larger, shield representing patient care").  Tr. 574:7–19 (Noseworthy).

337.    Mayo has never officially designated which mission activity is represented by the center or other two shields.  Together they represent three mission activities that are equal with none being more important than the other.  Tr. 574:20–24 (Noseworthy).

338.    Mayo's logo intends to convey how it is different from other organizations because of the integration of education, research, and clinical practice.  Thus, the key feature of the logo is that the shields are interlocking.  Tr. 573:9–24, 574:20–21 (Noseworthy).

339.    In addition to Dr. Pruthi's article, a blog post that appeared on Sharing Mayo Clinic, stated that Mayo's three "shields refer to our three main activities-patient care, research and education.  Although they are not labeled, it's understood that the larger, center shield refers to patient care, which is our main focus."  D-10.

340.   Dr. Noseworthy testified that he believed this statement to be inaccurate and inconsistent with how he views the shields and what they represent.   Tr. 638:11–639:7 (Noseworthy).

*Parent Entity Form 990s*

341.   The I.R.S. requires all tax-exempt entities to complete a tax form called a Form 990.   Tr. 182:10–17 (Oviatt).

342.   This one-size-fits-all approach created two primary difficulties for Mayo. First, the form requires tax exempt entities to list their program service accomplishments by revenue and expense.   Mayo did not believe that was an appropriate measure of the importance of its purpose.   Second, the form limited Mayo to choosing one reason why it was not a private foundation.   If it called itself a school on the form Mayo could not use the form to disclose critical information to its donors.   Tr. 150:4–154:3 (Oviatt); *see also* Section V(D)(i) of Mayo's Primary Findings of Fact [ECF No. 323 at 40].

343.   Schedule A of each of Mayo's Form 990s during the Refund Years limited Mayo to choosing one reason why it was not a private foundation.   P-53 at 8; P-56 at 10; P-58 at 12; P-60 at 12; P-64 at 16; P-65 at 16; P-67 at 16; Tr. 151:8–15 (Oviatt).

344.   In the Refund Years 2003, 2005, 2006, and 2007, Mayo selected the box associated with organizations that normally receive a substantial part of its support from a governmental unit or from the general public.   P-53 at 8; P-56 at 10; P-58 at 12; P-60 at 12; P-64 at 16; P-65 at 16; P-67 at 16; Tr. 151:21–24 (Oviatt); *see also, e.g.*, Lohkamp Personal 40:12–41:14, 41:16–24.

345.    However, on each of its Form 990s, Mayo later explained that it also qualifies as a school.  P-53 at 46; P-56 at 59; P-58 at 88; P-60 at 62; P-64 at 19; P-65 at 19; P-67 at 19; *see also, e.g.*, Lohkamp Personal 40:12–41:14, 41:16–24.

346.    Mayo selected the substantial support box rather than the school box because selecting substantial support allowed Mayo to report information on its Form 990 that its donors needed.    Lohkamp Personal 40:12–41:14, 49:14–50:3, 50:17–19, 126:3–17, 146:18–147:2, 160:10–21; Tr. 150:25–151:7, 152:9–19 (Oviatt).

347.    Checking the substantial support box allowed Mayo to provide its total gifts, grants, and contributions over a multi-year period so that donors could calculate the maximum size of a fully tax deductible gift to Mayo.  Lohkamp Personal 126:24–127:8; Tr. 150:25–151:7 (Oviatt).

## This Litigation

348.    Mayo brought this lawsuit in September 2016, seeking a refund for 2003, 2005–2007, and 2010–2012 for which it, or the prior parent entity, paid unrelated business income tax ("UBIT").  ECF No. 275 at ¶ 7.

349.    Mayo Clinic (EIN 41-6011702) is considered the Plaintiff for all Refund Years because it is the successor by merger of Mayo Clinic Rochester (EIN 41-6011702) and Mayo Clinic (f/k/a Mayo Foundation) (EIN 41-1937751).  ECF No. 275 at ¶ 6.

350.    Mayo is seeking a refund of $11,501,621, together with statutory interest and any other costs or fees provided by law.  This refund is broken down as follows for the Refund Years:

| Taxable Year | Refund Requested |
|---|---|
| 2003 | $31,365 |
| 2005 | $837,111 |
| 2006 | $9,390,781 |
| 2007 | $439,193 |
| 2010 | $51,395 |
| 2011 | $597,235 |
| 2012 | $154,541 |

ECF No. 275 at ¶ 8.

## CONCLUSIONS OF LAW

### Basic Issue and General Principles

1.      According to the Eighth Circuit's opinion on this matter, the task on remand is to evaluate whether Mayo is "organized and operated exclusively for . . . educational purposes," as the term "exclusively" is used for purposes of Section 501(c)(3) of the tax code.  *Mayo Clinic v. United States*, 997 F.3d 789, 800, 802 (8th Cir. 2021) (hereinafter, *"Mayo"*).

2.      "Educational" purpose is not limited to "formal instruction."  *Id.* at 799–800 (invalidating Treas. Reg. § 1.170A-9(c)(1)'s "requirement that the organization's 'primary function [must be] the presentation of formal instruction'" because that requirement "has no long history of congressional acceptance" and had "the earmarks of an agency interpretation intended to nullify a statutory benefit the Treasury Department unsuccessfully opposed").

3.      Instead, the inquiry is guided by the broad definition of "educational" found in Treasury Regulation § 1.501(c)(3)-1(a) and -1(d)(3)(i)–(ii).  Those regulations define "educational" as, *inter alia*, "the instruction or training of the individual for purposes of

improving or developing his capabilities." Examples of "educational" organizations include "professional or trade schools" that meet the faculty, students, curriculum, and place requirements of 26 U.S.C. § 170(b)(1)(A)(ii), museums, symphony orchestras, or zoos. 26 C.F.R. § 1.501(c)(3)-1(d)(3)(ii).

4.      To qualify as an "exclusively" educational organization, Mayo's "primary purpose" must "be 'educational'" and its "*noneducational* activities" must "be merely incidental to that primary purpose." *Mayo*, 997 F.3d at 800. Critically, "that some of [Mayo's] educational purposes and functions also fall within other charitable categories—and vice versa—would not disqualify it from being an educational organization." *Id.* at 802. However, "the presence of a single, non-educational purpose, if substantial in nature," would take Mayo outside of the unrelated business income tax ("UBIT") exemption. *Id.* (internal quotation marks omitted).

5.      In other words, it must be determined whether Mayo has any substantial and noneducational (i.e., unrelated to "the instruction or training of an individual for purposes of improving or developing his capabilities," Treas. Reg. § 1.501(c)(3)-1(a) and -1(d)(3)(i)–(ii)) activities. *See Mayo*, 997 F.3d at 802 (quoting *Better Bus. Bureau of Wash. D.C. v. United States*, 326 U.S. 279, 283 (1945)).

6.      Because this is a tax refund proceeding, Mayo bears the burden of proof. *See Helvering v. Taylor*, 293 U.S. 507, 514 (1935).

**Mayo's Primary Purpose Will Be Determined
By Reference to Mayo's System-Wide Activities**

7.      Mayo argues that its primary purpose should be determined by analyzing its system-wide activities, not just its own (parent) activities.  As support for this argument, Mayo relies on authorities applying the "integral part" doctrine.  *See* ECF No. 323 at 97–98 ¶¶ 7–11.

8.      The principal (and evidently seminal) authority for this doctrine is *Squire v. Students Book Corp.*, 191 F.2d 1018 (9th Cir. 1951).  There, the Ninth Circuit held that a corporation wholly owned by Washington State College—Students Book Corp.—was organized and operated exclusively for an educational purpose.  *Id.* at 1019–20.  The subsidiary corporation operated a student bookstore and restaurant on the college's campus.  *Id.* at 1019.  The corporation's bylaws "require[d] that all actions of its Board of Trustees be submitted to the president of the College for approval."  *Id.*  Most of the corporation's revenue went toward "a program for the construction of a student union building on or adjacent to the campus."  *Id.*  "Approximately four per cent of [the corporation's] business [was] done with persons not connected with the College."  *Id.*  The court determined that the corporation was organized and operated exclusively for an educational purpose by virtue of its relationship to the college.  As the court explained: "The business enterprise in which the taxpayer is engaged obviously bears a close and intimate relationship to the functioning of the College itself."  *Id.* at 1020.  In other words, the court determined that the corporation—regardless of its separate organizational status and the fact that bookstores and restaurants are not by their nature exclusively

educational—was organized and operated exclusively for an educational purpose because it was an integral part of a college.

9.     Mayo cites several other authorities reaching essentially this same holding in different factual contexts. *See, e.g.,* Rev. Rul. 78-41, 1978-1 C.B. 148, 1978 WL 41966 ("A trust created by an exempt hospital for the sole purpose of accumulating and holding funds to be used to satisfy malpractice claims against the hospital, and from which the hospital directs the bank-trustee to make payments to claimants, is operated exclusively for charitable purposes and is exempt from tax under section 501(c)(3) of the Code."); Rev. Rul. 81-19, 1981-1 C.B. 353, 1981 WL 165938 (concluding that an organization providing financial management assistance to academic departments, receiving donations and operating vending machines and laundry facilities operated on university campus was exempt as an integral part of university; "the basis for the organization's exemption is its purpose of furthering the university's educational program by aiding the university in performing its various administrative functions"); Rev. Rul. 76-336, 1976-2 C.B. 143, 1976 WL 36242 (concluding that an entity providing student housing for the benefit of a college was exempt; "Under these circumstances, the organization is both helping the college, which is unable to provide adequate student housing, to fulfill its educational purposes, and aiding the students to attain an education. Therefore, the activities of the organization are advancing education."); Rev. Rul. 75-282, 1975-2 C.B. 201, 1975 WL 34911 (concluding that an organization that lent money to churches was exempt; the IRS applied the integral part doctrine to the organization, noting that it "operates under the close supervision and control of the parent church conference" and that it was "considered to be

carrying out an integral part of the activities of the parent, i.e., aiding member churches in obtaining facilities for their religious purposes").

10.     Mayo also cites court rulings acknowledging the integrated structure of academic medical centers in analyzing exemption of components of those organizations. *See, e.g., Univ. of Md. Physicians, P.A. v. Comm'r*, 41 T.C.M. (CCH) 732 (T.C. 1981) ("In the course of instructing medical students, petitioner's employees generate fees for medical care services performed upon patients who are treated without regard to their ability to pay. The medical care delivered cannot be considered separately from the clinical instruction provided.  This income-producing activity clearly serves both charitable and educational purposes."); *B.H.W. Anesthesia Found., Inc. v. Comm'r*, 72 T.C. 681, 686 (1979) ("Petitioner is an integral part of the hospital and Harvard University Medical School, both of which are organizations described in section 501(c)(3)."); I.R.S. Priv. Ltr. Rul. 98-14-039, 1998 WL 151856 (Jan. 5, 1998) (concluding that the creation of a common parent over a faculty practice plan, teaching hospital, and medical school did not adversely affect the tax-exempt status of those entities because the new arrangement enhanced the relationship between the three entities' "education, research and clinical services").

11.     One aspect of Mayo's position deserves clarification.  In *Students Book Corp.* and the other authorities Mayo cites, the issue seems to have been whether the taxpayer may derive entitlement to exemption through an integrated relationship with an exempt affiliate.  I do not understand that is precisely what Mayo seeks to do here.  In other words, I do not understand Mayo to be arguing that it should derive or acquire exempt status from an exempt affiliate in precisely the same way the bookstore/restaurant acquired the

college's exempt status in *Students Book Corp.*, or the trust acquired the hospital's exempt status in Rev. Rul. 78-41.  To be precise, I understand Mayo in substance to be arguing that the proper approach is to consider the "totality of the circumstances" in determining Mayo's purpose, and that this totality of the circumstances should include consideration of Mayo's system-wide activities.  *See IHC Health Plans, Inc. v. Comm'r*, 325 F.3d 1188, 1202–03 (10th Cir. 2003).

12.     The Government does not address the line of authorities Mayo cites.  Instead, it argues that "as the Eighth Circuit has recognized, the Supreme Court has repeatedly made clear that taxpayers who organize themselves as corporations may not ask a court to disregard their corporate form for purposes of relieving them of tax consequences that follow from that form."  ECF No. 324 ¶ 228 (citing *Bennett Paper Co. v. Comm'r*, 699 F.2d 450 (8th Cir. 1983)).  In *Bennett Paper Co.*, the court affirmed a Tax Court decision disallowing business-expense deductions of the taxpayer (Bennett Paper) for business expenses of a subsidiary.  *Id.* at 451.  The relevant issue concerned whether Bennett Paper properly deducted expenses of a subsidiary corporation (CIYC) that Bennett Paper created to avoid the contingent liabilities of another unprofitable subsidiary corporation (KI).  *Id.* Bennett Paper evidently treated the expenses as if CIYC was a continuation of KI.  *Id.*  The Commissioner disallowed the deductions, saying in substance that the expenses would have to be allocated and capitalized to CIYC.  *Id.*  As the Eighth Circuit explained:

> Bennett in essence argues that the Commissioner had a legal duty to pierce the corporate veil with which Bennett had shrouded itself.  Bennett here wants the best of both worlds; it wants CIYC considered a separate entity for purposes of avoiding KI's liabilities but it wants CIYC and KI to be

considered one entity for tax purposes.  However, the Supreme Court has repeatedly made clear that a taxpayer who adopts a particular form of doing business cannot escape the tax consequences of that chosen form.  *Commissioner v. National Alfalfa Dehydrating & Milling Co.,* 417 U.S. 134, 149 (1974); *Moline Properties, Inc. v. Commissioner,* 319 U.S. 436, 438–39 (1943); *Higgins v. Smith,* 308 U.S. 473, 477 (1940); *Burnet v. Commonwealth Improvement Co.,* 287 U.S. 415, 418–19 (1932).  As the Supreme Court said in *Moline Properties,* "The choice of the advantages of incorporation . . . require[] the acceptance of the tax disadvantages[.]" 319 U.S. at 439, *citing Burnet v. Commonwealth Improvement Co.,* 287 U.S. 415.

*Id.* at 451–52 (citations omitted).  The Government cites no cases other than *Bennett Paper Co.* to support its position.

13.     The Government's position is not persuasive for four primary reasons. *First*, the integral-part doctrine seems to be an exception to the general rule that an organization is treated on its own merits for purposes of the tax laws.  In other words, citing the general rule does not answer the exception's merits or applicability to this case.  *Second*, *Bennett Paper Co.* addressed facts that are nothing like the facts we have here.  The case concerned the disallowance of expense deductions in a for-profit business's consolidated return.  *Third*, there is no suggestion that analyzing Mayo's primary purpose by reference to its system-wide activities would allow Mayo to receive some "best-of-both-worlds" benefit.  If Mayo is running with the hares by advancing this position, the Government has not identified in what way Mayo is also hunting with the hounds.  *Fourth*, *the Government does not adhere to its own position*.  In its proposed findings and conclusions, the Government repeatedly challenges whether Mayo's primary purpose is educational by referring to the activities of Mayo's affiliates.  *See, e.g.*, ECF No. 324 ¶¶ 46–67; 79–111.

The Government gives no indication that these arguments are advanced in the alternative. And at the July post-trial hearing, the Government focused much of its argument on the activities of Mayo's affiliates.

14.    Mayo's position—that its primary purpose should be determined by analyzing its system-wide activities—is more persuasive both legally and factually and will be adopted.

15.    Legally, in addition to the matters already discussed, the integral-part doctrine and the rule that an exemption-seeking organization's primary purpose should be ascertained by reference to the totality of its circumstances, including its system-wide activities, when there is system-wide integration and parent control seems uncontroverted. That is, no case has been cited or found rejecting the basic doctrine or these principles. Though it did not discuss the integral-part doctrine specifically in remanding the case for trial, the Eighth Circuit's opinion includes references at least implying—and perhaps suggesting—that it would be proper to determine Mayo's primary purpose by reference to its system-wide activities.  *See Mayo*, 997 F.3d at 802 (referring to the need to determine "Mayo's overall purpose" while recognizing that "Mayo's status as an academic medical center means that its medical and educational purposes – and the operations supporting those functions – are inextricably intertwined").

16.    Factually, Mayo's system-wide entities were highly integrated, both structurally and financially.  *See, e.g.*, Findings of Fact ¶¶ 50–60.  The parent entity's governing documents granted it broad affirmative powers over its subsidiaries, the subsidiaries' governing documents reserved all substantial decisions for the parent, Mayo

consolidated its financial statements, and Mayo's executives had system-wide responsibilities. *Id.* And Mayo's subsidiaries conducted activities that supported the organization's mission. *Id.* ¶¶ 226–57.

## Mayo's Primary Purpose is Educational

### *In This Context, "Primary" Means "Substantial"*

17.     The Eighth Circuit left open the legal question of whether to interpret the term "primary" to mean a "substantial purpose" of the organization or the "most important purpose" of the organization. *Mayo*, 997 F.3d at 802.

18.     For several reasons, I conclude that the better answer to this question for this case's purposes is that "primary" means "substantial."

19.     *First*, the Supreme Court has adopted this interpretation, albeit in a different context. In *Bd. of Governors of Fed. Rsrv. Sys. v. Agnew*, the court interpreted the word "primarily" as used in a statute regulating banks to mean "substantial." 329 U.S. 441, 446–47 (1947). The Court explained:

> It is true that "primary" when applied to a single subject often means first, chief, or principal. But that is not always the case. For other accepted and common meanings of "primarily" are "essentially" (Oxford English Dictionary) or "fundamentally" (Webster New International). An activity or function may be "primary" in that sense if it is substantial. If the underwriting business of a firm is substantial, the firm is engaged in the underwriting business in a primary way though by any qualitative test underwriting may not be its chief or principal activity.

*Id.* at 446.

20.     *Second*, the same general reasons that prompted the Supreme Court to adopt this statutory interpretation in *Agnew* apply here and lead to the same place. The Court

pointed out that "primary-means-substantial" was "the construction given the Act by the Board." *Id.* at 447. The Court also found this construction "more consonant with the legislative purpose." *Id.* To this end, the Court focused on "the evil at which the section was aimed," explaining that it "is not one likely to emerge only when the firm with which a bank director is connected has an underwriting business which exceeds 50 per cent of its total business." *Id.* Just as the Banking Act suggested in *Agnew*, the Treasury Regulations that are the "proper frame of reference" for the inquiry here, *Mayo,* 997 F.3d at 800, strongly suggest that "primary" means "substantial." 26 C.F.R. § 1.501(c)(3)-1(d)(3)(ii). These regulations codify the "broad view of a tax-exempt educational purpose" under Section 501(c)(3), and expressly note that "exclusively" educational organizations include zoos, museums, and symphony orchestras. *Id.*; *Mayo*, 997 F.3d at 800. This definition seems incompatible with the notion that an "exclusively" educational organization's "primary" or "most important" purpose must be educational. Symphonies, for example, are considered entertainment as much as they are considered educational. Indeed, like the financial services firm in *Agnew*, an organization like a zoo or symphony orchestra would "not be 'primarily engaged' in any" charitable function under the Government's definition, "though it specializes in at least two and does a substantial amount of each." *Agnew,* 329 U.S. at 446; *see also Helvering v. Bliss*, 293 U.S. 144, 150–51 (1934) ("The exemption of income devoted to charity and the reduction of the rate of tax on capital gains were liberalizations of the law in the taxpayer's favor, were begotten from motives of public policy, and are not to be narrowly construed.").

76

21.    *Third*, other, more recent cases support the Supreme Court's understanding articulated in *Agnew*.  For example, consider *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754 (D.C. Cir. 2014) (Kavanaugh, J.).  There, the court granted a mandamus petition and vacated a district court order requiring a corporate defendant in a False Claims Act case to produce documents regarding an internal investigation conducted by the corporation's in-house counsel.  *Id.* at 756, 763.  As part of its decision, the court applied the "'primary purpose' test" used by many courts "to resolve privilege disputes when attorney-client communications may have had both legal and business purposes."  *Id.* at 759.  The court rejected the district court's understanding of the test as requiring that a communication, to be privileged, "would not have been made 'but for' the fact that legal advice was sought."  *Id.*  Though the privilege issue addressed by the court is factually distinct, its core reasoning seems apt.  The court began by observing that, under the but-for test applied by the district court, "the attorney-client privilege apparently would not apply unless the sole purpose of the communication was to obtain or provide legal advice."  *Id.*  The court went on to reason that "trying to find *the* one primary purpose" for activities "motivated by two sometimes overlapping purposes . . . can be an inherently impossible task.  It is not useful or even feasible to try to determine whether the purpose was A or B when the purpose was A and B."  *Id.*  The court concluded by articulating the primary purpose test as: "Was obtaining or providing legal advice *a* primary purpose of the communication, meaning one of the significant purposes of the communication?"  *Id.* at 760.  There is also *Dumaine Farms v. Comm'r*, 73 T.C. 650 (1980).  There, the Tax Court found that the taxpayer, Dumaine Farms, was "exclusively" charitable under the *Better Business Bureau* standard even

though it raised crops which it sold for profit in the "usual markets." *Id.* at 668–69. Dumaine Farms was engaged in operating an experimental model demonstration farm and sold the crops and timber it produced; however, it was doing so for the purpose of demonstrating that certain farming techniques would be environmentally beneficial and commercially sustainable. *Id.* at 653. The organization "will not use its farmlands to raise established cash crops, but will plant and harvest on a commercial scale what are thought to be promising new strains." *Id.* at 656. The organization took the knowledge it learned from the demonstration farm and shared it with farmers in the county and the general public "to demonstrate to local farmers and the general public the economic feasibility of experimental farming practices which will conserve the area's ecology and native wildlife." *Id.* at 652. To resolve whether the farm was a taxable for-profit farming enterprise or tax-exempt charitable entity, the Tax Court did not conduct a searching inquiry into whether farming or conservation was a more important purpose at Dumaine Farms. Instead, the Tax Court framed its task as "determin[ing] whether each substantial activity that [the farm] carried on is directed towards the accomplishment of one or more exempt purposes." *Id.* at 663 (citations omitted). Because all substantial activities "directly further its purposes of testing and demonstrating the economic feasibility of practicing environmental conservation theories on a working farm," the entity met the *Better Business Bureau* standard. *Id.* at 664.

22.     *Fourth*, the legislative and judicial history cited in the Eighth Circuit's opinion in this case better support the conclusion that "primary" means "substantial." As the court pointed out, judicial "consensus" has been that "the word 'exclusively' [as used

in Section 501(c)(3)] should not be interpreted literally if the purposes underlying income tax exemptions and charitable deductions were to be achieved, because every organization has some noncharitable activities." *Mayo*, 997 F.3d at 796. Instead, the "general or predominate purpose is principally to be considered," and purposes "merely incidental to and [used as] a means of furthering the charitable and educational purposes for which the petitioner was organized" are not disqualifying. *Id.* (quoting *Turnure v. Comm'r,* 9 B.T.A. 871, 874 (1927); *Baker v. Comm'r*, 40 B.T.A. 555, 561 (1939)). That standard does not imply a rigid and precise weighing of which purpose an organization serves most, which purpose is second in the hierarchy, which is third, and so on. It implies a roomier standard designed to suss out whether an organization's substantial function is one the purposes enumerated in Section 501(c)(3).

23.     *Fifth*, this interpretation makes better sense when one considers that the next part of the test for whether an organization is "exclusively" charitable is whether the organization has another substantial function—in addition to the charitable function—that does not meet Rule 501(c)(3)'s requirements. There is no need to determine in step one of the analysis whether some other purpose outweighs the charitable purpose; it is only necessary to determine that the organization would qualify unless another substantial, non-charitable purpose is found. Any such substantial, non-charitable activity will mean that an organization is not "exclusively" charitable whether or not the substantial purpose is more or less important than the charitable purpose.

24.     *Sixth*, though the Supreme Court has held—in a case cited in the Eighth Circuit's opinion—that "primarily" can mean "of first importance," *Malat v. Riddell*, 383

U.S. 569, 572 (1966) (cited *in Mayo*, 997 F.3d at 802), that interpretation is not useful here. This is so for the reasons discussed above and because the purpose of "primarily" in the statute at issue in *Malat* was simply to distinguish between either of two taxpayer circumstances. *Id.* at 572 ("The purpose of the statutory provision with which we deal is to differentiate between the 'profits and losses arising from the everyday operation of a business' on the one hand and 'the realization of appreciation in value accrued over a substantial period of time' on the other." (citations omitted)). As the Supreme Court noted, interpreting "primarily" to mean "of first importance" makes sense in that binary legislative regime. *Id.* at 572. The issue here is not binary; it is considerably more nuanced.

25.     *Seventh*, and importantly, the Government has not seriously opposed this interpretation. It took no position on the issue in its proposed findings and conclusions. *See* ECF No. 324 ¶¶ 196–214. And it addressed the issue only in passing at the post-trial hearing, referencing an unspecified case cited at some unidentified earlier point in the litigation.

### System-Wide, Mayo's Substantial Purpose Is Education

26.     Mayo was founded with the purpose of providing quality medical education. *See* Findings of Fact ¶¶ 1–20. The Deed of Gift, which created Mayo's predecessor and was incorporated into its governance documents during the Refund Years, stated that the organization was founded, among other things, to "promot[e] medical, surgical[,] and scientific learning, skill, education and investigation," and required Mayo's founding gift to be transferred "to a Medical School or to a University or College maintaining one" if those conditions could not be met, and that the gift would revert to the Mayo brothers or

their heirs if the purpose of the gift was not met. *Id.* ¶¶ 13–19. Such transfer has never occurred, nor has the gift reverted to the Mayo heirs, because Mayo has consistently maintained its educational purpose over time. *Id.* ¶ 19.

27. Mayo's articles of incorporation, its bylaws, and its governance documents reflect its substantial educational purposes. *See id.* ¶¶ 61–76. Its modern mission statement similarly reflects this substantial educational purpose. *Id.* ¶¶ 82–87.

28. Mayo's educational purposes are also reflected in its day-to-day operations. From the highest levels of its corporate governance, *see id.* ¶¶ 69–81, to its daily operations, *see id.* ¶¶ 91–257, education is at the heart of what Mayo does every day. Mayo operates five accredited schools. *See id.* ¶¶ 91–134. In doing so, it maintains, manages, and pays the schools' faculty members. *See id.* ¶¶ 173–186. The vast majority of physicians at Mayo hold faculty appointments, thus demonstrating that they are not mere health care providers but educate through health care. *Id.* The facilities at Mayo are predominantly used for educational purposes, and the medical treatment and research at Mayo nearly always serves an educational purpose—even when involving students renders health care more expensive. *See id.* ¶¶ 187–195; 263–266.

29. Mayo's finances also illustrate that education is a substantial purpose of the organization. Each year, it conducted its educational activities at a loss. *Id.* ¶¶ 199–211. Mayo would not spend at least 11% of its endowment during each of the Refund Years on a purpose that was insubstantial to Mayo. *See id.* ¶¶ 212–219; *see also* 26 C.F.R. § 1.170A-9(d)(2)(v)(B) (defining an organization as "primarily" a research organization if it spends more than 3.5% of its endowment for research purposes).

30.     I conclude that giving meaningful weight to the Mayo parent entity's Form 990s, which set forth revenue and expense figures related to certain aspects of the parent's activities, would be unwise.  I have determined already that the proper universe of facts to consider in determining Mayo's primary purpose is its system-wide activities.  Focusing on the parent entity's Form 990s would be at odds with this determination.  The Form 990 revenue and expense figures are specific to the parent entity and do not represent Mayo's system-wide financials.  For example, for Refund Years 2010–2012, the Government has argued that Mayo's educational purposes were insubstantial because it earned more from patient care than it did from its educational offerings.  ECF No. 258 at 10–11.  By focusing on the parent's revenue, this argument misses the rest of the system-wide activities at Mayo.  Also, the Government has relied on the absolute revenue and expense numbers reported on Mayo's Form 990s, without considering them on a net basis.  ECF No. 258 at 8–11.  In this case's context, it seems significantly more appropriate to analyze Mayo's net income rather than its absolute revenue and expense figures.  *See United States v. Mayo Found. for Med. Educ. & Rsch.*, 282 F. Supp. 2d 997, 1013–14 (D. Minn. 2003) ("Mayo Foundation II").

31.     I am not persuaded by the Government's argument that *revenue* relating to patient care shows that education is not a substantial purpose of the organization.  That does not tell the full story.  As Mayo demonstrated at trial, the net income from patient care is not sufficient to cover the costs of education and research.  If Mayo's operations were focused on making a profit, it likely would not qualify as a 501(c)(3) organization at all.  *See, e.g.*, *B.S.W. Grp., Inc. v. Comm'r*, 70 T.C. 352, 357 (1978) ("[T]he critical inquiry is

whether petitioner's primary purpose for engaging in its sole activity is an exempt purpose, or whether its primary purpose is the nonexempt one of operating a commercial business producing net profits for petitioner.").  Facing similar evidence, Judge Kyle and the Minnesota Supreme Court both compared net income from patient care to the amount Mayo spent on education and research.  *Mayo Foundation II,* 282 F. Supp. 2d at 1014; *Mayo Found. v. Comm'r*, 236 N.W.2d 767, 769 (Minn. 1975) ("*Mayo Foundation I*").  In addition, the Tax Court has also rejected an income-only approach to determining whether a taxpayer is "exclusively" educational.  *See, e.g., Univ. of Md. Physicians*, 41 T.C.M. (CCH) 732 ("The medical care delivered [in the course of instructing medical students] cannot be considered separately from the clinical instruction provided. This income-producing activity clearly serves both charitable and educational purposes."); *Univ. of Mass. Med. Sch. Grp. Prac. v. Comm'r*, 74 T.C. 1299, 1305 (1980) ("It seems clear from the record, that petitioner's purpose is to serve as a component of the medical school and the university hospital in providing vital clinical training for medical students, interns, and residents.").

32.     Viewing Mayo's financial picture by weighing both expenses and revenue demonstrates Mayo's substantial educational purpose.  This totality-of-the-circumstances approach better reflects the reality of Mayo's activities and purposes.  *See Mayo*, 997 F.3d at 802 (leaving to the court to determine on remand "how to measure educational activity as opposed to noneducational activity," whether through "expenses and revenue" or "a totality of the circumstances approach").

33.     The Government concedes that Mayo meets the faculty, curriculum, students, and place requirements of 26 U.S.C. § 170(b)(1)(A)(ii).  *Mayo*, 997 F.3d at 801 (noting that "by virtue of the Mayo College, the Government also concedes" that Mayo "meets the statutory criteria of faculty, curriculum, students, and place"); *see also* P-5 at 1–2.  This, too, suggests substantial educational purposes, as an organization that did not have a substantial educational function would likely not go to the trouble of maintaining a faculty and a regular body of students, let alone a place for them to meet and a regular curriculum.

34.     This Court joins every court to have reviewed the issue in finding that Mayo's educational functions are inextricably intertwined with its other functions. *Mayo,* 997 F.3d at 802 ("Mayo's status as an academic medical center means that its medical and educational purposes—and the operations supporting those functions—are inextricably intertwined."); *Mayo Found. for Med. Educ. & Rsch. v. United States,* 568 F.3d 675, 683 (8th Cir. 2009) ("We do not doubt—indeed we applaud—the educational benefits of the medical residency programs offered by Mayo and by the University."); *Mayo Foundation II*, 282 F. Supp. 2d at 1014–15 ("Actual care in the service of patients is inherent in the educational process.  It really cannot be separated from that. . . . [I]t is impossible to separate 'education' from 'patient care.'"); *Mayo Foundation I*, 236 N.W.2d at 774 ("[P]atient care at the Mayo Clinic is inextricably interwoven with the educational and research functions of the Mayo entities.").  The above Findings of Fact demonstrate what each of these courts independently concluded: education, research, and clinical practice are inextricably intertwined.  In other words, health care, like Mayo's other functions, also

serves educational functions, and educational functions are intertwined with every other Mayo function. Far better to conclude that education is a substantial part of Mayo's reason to exist.[5]

### Mayo Has No Substantial Noneducational Purpose

35.    "That some of [Mayo's] educational purposes and functions also fall within other charitable categories – and vice versa – would not disqualify it from being an educational organization, but 'the presence of a single non-educational purpose, if substantial in nature, will destroy the [UBIT] exemption regardless of the number or importance of truly educational purposes.'" *Mayo*, 997 F.3d at 802 (first bracket added) (quoting *Better Bus. Bureau*, 326 U.S. at 283). A noneducational activity is insubstantial if it is "merely incidental" to educational purposes. *Id.* at 800. "The balance is educational against noneducational." *Id.* at 802. These rules are to be applied recognizing that "Mayo's status as an academic medical center means that its educational purposes – and the operations supporting those functions – are inextricably intertwined." *Id.*

36.    The Government focuses the bulk of its proposed findings and conclusions on this issue, arguing that the Eighth Circuit has foreclosed Mayo's integration theory, that the trial record shows Mayo has substantial, non-incidental activities in noneducational areas, including patient care and research, *see* ECF No. 258 at 4, and that Mayo has not carried (what the Government says is) its burden to show that several possibly

---

[5]    If "primary" meant "most important," I would still find that Mayo's most important or principal purpose is education, for the same facts and reasons that led me to conclude that education is Mayo's substantial purpose.

noneducational activities are merely incidental.  From this point, these legal conclusions attempt to understand and fairly convey the Government's arguments, sort the arguments into categories, and address them in succession.  This analysis shows that Mayo has no substantial noneducational purpose.

*The Eighth Circuit Opinion Did Not Foreclose*
*Mayo's Integration-Based Arguments*

37.    Mayo's essential position is that the trial record shows that its educational activities are completely integrated in its patient care and research activities in all of its substantial subsidiaries—that is, that education perfuses these purposes everywhere they occur—and that, as a result, Mayo has shown that it has no substantial activity that is not educational.  The Government in its proposed legal conclusions says that "the Eighth Circuit has expressly foreclosed Mayo's position."  ECF No. 324 ¶ 205.  To support this contention, the Government relies on a single sentence from the Eighth Circuit's opinion: "Separating out the wheat from the chaff – the educational from the noneducational – while difficult, is not impossible."  *Mayo*, 997 F.3d at 802 (cited in ECF No. 324 ¶ 205).  In other words, the Government understands the Eighth Circuit to have required me to evaluate every Mayo activity and either (a) decide that the activity is entirely educational or noneducational (*i.e.*, in the Government's view, an activity cannot be integrated), or (b) determine—by reference to time or some other measure—what portion is educational and what portion is noneducational.

38.    The Government's position on this question is not persuasive.  *First*, the Eighth Circuit plainly recognized that Mayo's status as an academic medical center means

its medical and educational purposes are inextricably intertwined to a significant degree. That is precisely what the court wrote in the sentence preceding the sentence on which the Government grounds its position. *Mayo*, 997 F.3d at 802. I do not see how the Government's position can be reconciled with that recognition. To put it another way, if the Eighth Circuit wanted to foreclose Mayo's integration-based arguments, it almost certainly would have said just that—plainly and directly. *Second*, the Government's position is at odds with the Eighth Circuit's citation to Judge Kyle's decision in *Mayo Foundation II*, 282 F. Supp. 2d at 1000–05, 1013–15. *See Mayo*, 997 F.3d at 802. There, Judge Kyle concluded essentially that it was not possible to separate education from patient care at Mayo. *Mayo Foundation II*, 282 F. Supp. 2d at 1013–15. Apparently recognizing this contradiction, the Government implies that the Eighth Circuit's citation to Judge Kyle's decision does not mean very much because the citation was introduced with a "*Cf.*" signal. Accepting this argument would read way too much into that signal. Regardless, as the Government acknowledges, a "*Cf.*" signal is often used to direct a reader to "another authority or section of the work in which contrasting, analogous, or explanatory statements may be found." ECF No. 324 ¶ 212 (citing Black's Law Dict. (11th ed. 2019)). Judge Kyle's decision seems plainly to fit the "analogous" and "explanatory" categories. *Third*, the Government's position is at odds with the following statement from the Eighth Circuit's opinion: "That some of [Mayo's] educational purposes and functions also fall within other charitable categories – and vice versa – would not disqualify it from being an educational organization." *Mayo*, 997 F.3d at 802.

39.     If a particular activity furthers *both* educational *and* noneducational purposes, that activity may still be "exclusively" educational for purposes of applying the UBIT exemption.   *Id.*   The relevant inquiry is not whether a particular activity has some purpose *in addition* to education, but whether a particular function has *no* educational purpose *and* is a substantial part of Mayo's organizational purpose.

*Mayo's Organizational Documents Do Not Show*
*That Mayo Had a Substantial Noneducational Purpose*

40.     The Government points out that that "Mayo Clinic's organizational documents reveal that, during the refund years, Mayo Clinic was authorized to engage in a wide range of activities, and not only educational activities."   ECF No. 324 ¶ 3; *see also id.* ¶¶ 5–8.  The intended inference seems to be that the mention of noneducational activities in Mayo's organizational documents shows a substantial noneducational purpose.

41.     This suggestion is not persuasive.   As a factual matter, the better understanding of Mayo's organizational documents is that they memorialize and reflect Mayo's educational purposes as primary.   *See* Findings of Fact ¶¶ 15–16; 61–76.   As a legal matter, and as noted in the preceding section, that Mayo has other purposes is not the dispositive issue.   The issue, put into the context of this Government argument, is whether the trial record shows that some specific activity described in Mayo's organizational documents has no educational purpose.   The Government's focus on these aspects of Mayo's organizational documents divorced from the trial evidence is not helpful.

*Statements By Mayo and Its Representatives Do Not Show*
*That Patient Care or Clinical Practice Were Substantial Noneducational*
*Purposes at Mayo*

42.     The Government relies on several documents and statements, including for example the 2020 Report and various quotes from executives, to suggest that either patient care, patient outcomes, or the practice of medicine are substantially important to Mayo. ECF No. 324 ¶¶ 9–24; 32; 37–38; 148–161.  I have found that these statements were made. Findings of Fact ¶¶ 291–347.  The Government's point seems to be that these statements show that patient care was a substantial noneducational purpose at Mayo.

43.     The Government's position with respect to these documents and statements is not persuasive.  To repeat, any purpose—including health care or patient care—will not render Mayo ineligible for the UBIT refund unless it is (1) substantial and (2) noneducational.  *Mayo*, 997 F.3d at 802.  While patient care is certainly substantial, it is not noneducational at Mayo.  In addition to the above Findings of Fact, *see, e.g.* ¶¶ 258–90, four other courts to consider this issue, including the Eighth Circuit in this case, have concluded that Mayo integrates education and clinical practice.  *See Mayo,* 997 F.3d at 802; *Mayo Found. for Med. Educ. & Rsch.*, 568 F.3d at 683; *Mayo Foundation II*, 282 F. Supp. 2d at 1014–15; *Mayo Foundation I*, 236 N.W.2d at 774.  In addition, in concluding that a physician group affiliated with the University of Maryland was tax exempt under 501(c)(3), the Tax Court stated that the "medical care delivered [by the physicians] cannot be considered separately from the clinical instruction provided." *Univ. of Md. Physicians*, 41 T.C.M. (CCH) 732.  Similarly, the Tax Court has recognized that observing and participating in patient care is integral to a medical education and part of the teaching

function.  *Univ. of Mass. Med. Sch. Grp. Prac.*, 74 T.C. at 1301–02 ("[B]ecause those in charge of the medical school consider the opportunity for students to observe and assist in the actual treatment of patients a vital and necessary part of their medical education, the faculty members' patient care activities at the hospital cannot be separated from their teaching function.  While treating patients in the university hospital, members of the group practice are generally accompanied by medical students, interns, or residents, and are simultaneously instructing students and demonstrating techniques of patient care.").  At trial, the evidence did not identify a "substantial" clinical practice function at Mayo that did not further the goal of providing training and education to the students at its colleges.  In other words, statements emphasizing the importance of high-quality patient care at Mayo do not show that patient care is a substantial *noneducational* purpose of Mayo.

44.  There are other beside-the-point problems with several of the Government-cited statements.  For example, the Government relies on statements to the effect that the center shield of Mayo's three-shields logo was intended to represent patient care, signaling (in the Government's view) patient care's primary importance at Mayo.  Given the conflicting testimony and evidence concerning this question, I am not persuaded that these statements deserve legal significance.  Other statements were made in settings and for purposes having nothing to do with Mayo's educational purposes or tax-exempt status.  In other words, giving these statements legal significance would require attributing meaning to the statements divorced from their context.  Other statements—like those made in connection with the 2020 Report and related documents and proceedings—benefitted greatly from clarifying trial testimony, including particularly Dr. Noseworthy's testimony.

Regardless, as explained in the preceding paragraph and as noted at the start of this paragraph, these issues are beside the point because patient care at Mayo—regardless of its importance—is not noneducational.

*Mayo's Ownership of the Mayo Clinic Health System Does Not Show
That Mayo Had a Substantial Noneducational Purpose*

45. The Government argues that Mayo's ownership of the MCHS shows a noneducational purpose. *See* ECF No. 324 ¶¶ 79–111. The gist of the Government's position seems to be that Mayo introduced non-specific and insufficient evidence at trial to show that Mayo's ownership of this system served its educational purpose. *See id.*

46. The better answer on the trial record is that Mayo's ownership of the MCHS served Mayo's educational purpose. *See* Findings of Fact ¶¶ 238–257. There was credible and persuasive testimony that the MCHS was started to bolster Mayo's educational programs by enlarging its patient population and catchment area. Witnesses explained that the geographic area from which Mayo draws its patients to Rochester lacked sufficient populations with respect to certain diseases and conditions to ensure sufficient educational opportunities and that a larger catchment area "creates more opportunities for patients with rare and complex diseases to receive treatment at Mayo, which, in turn, enhances Mayo's ability to train students in rare and complex diseases." *Id.* ¶ 250; *see also id.* ¶¶ 244–51. The evidence also showed that education occurred at almost all of the MCHS sites. *Id.* ¶¶ 244–51.

47. Against this record, the Government's criticisms of Mayo's evidence are not persuasive. The Government avers that "Mayo failed to call any witnesses who were

familiar with the operations of the MCHS locations." ECF No. 324 ¶ 97. Not so. Both Mr. Oviatt and Dr. Warner testified based on personal knowledge about the MCHS's organization, operations, and role in fulfilling Mayo's educational purposes. The Government did not show—through cross-examination or otherwise—that Mr. Oviatt or Dr. Warner lacked foundation to testify on these matters. The Government faults the specificity of Mayo's evidence, suggesting that it would have been better (or perhaps essential) for Mayo to show "how many residents practiced at the MCHS sites . . . or what percentage of healthcare at those locations was provided by a resident." ECF No. 324 ¶ 90; *see also id.* ¶¶ 94, 100, 101. The better answer is that Mayo's evidence was more than sufficient to meet its burden. The Government cites no legal authority supporting the conclusion that Mayo's evidence was not sufficient, and if there exists more specific evidence undermining Mayo's, then the Government was free to introduce that MCHS-specific evidence to undermine Mayo's case. It did not. In comparison to Mayo's evidence, the Government's proposed fact findings are fairly described as speculative. For example, the Government describes the following hypothetical:

> [Dr. Warner's] testimony leaves open the possibility that a patient could one day enter an MCHS hospital complaining of abdominal pain, undergo and appendectomy, and spend the next day or two recovering at a MCHS hospital without ever seeing a resident or a fellow. The patient's care could have been provided entirely by MCHS physicians who are not faculty, and not in connection with the training of any residents. But, on the last day of the patient's visit, an ancillary healthcare trainee, such as nurse trainee, might observe and assist the charge nurse in discharging the patient. In that instance, a trainee could be said to have been "involved somewhere" in the patient's care. But it is quite another thing

> to conclude, from this involvement, that the patient care
> delivered to that patient was entirely educational in nature.

*Id.* ¶ 96.  No evidence at trial shows such an encounter, or anything like it.  And the purpose of describing the encounter is not clear.  The possibility that a patient or patients might receive care at Mayo with little (or even no) student involvement does not undermine the overwhelming majority of evidence showing that Mayo integrates its education, patient care, and research functions.  It might be different had the Government introduced evidence showing some material number of such cases.  It did not.

*The Absence of Particular Time Records Does Not Show
That Mayo Had a Substantial Noneducational Purpose*

48.     The Government argues that "it appears that Mayo Clinic could have offered evidence – in summary form, it would seem – about" physician time allocation.  *Id.* ¶ 138.  This argument derives from Mr. Oviatt and Dr. Warner's testimony that Mayo physicians sometimes complete certification forms describing generally how their time was spent across clinical practice or education.  *Id.* ¶¶ 129–37.  The Government says that Mayo's failure to introduce this evidence justifies an inference that the evidence "would have been harmful to [Mayo]."  *Id.* ¶ 140.

49.     This contention is not persuasive.  The Government has neither identified legal authority nor described a legal theory that might have required Mayo to introduce this evidence at trial.  The Government has identified no discovery request on this topic that sought these materials and to which Mayo did not respond properly.  These issues aside, the trial testimony showed that the documents to which this argument is addressed were

quite general in nature and created for purposes that do not bear a direct connection to the primary issues at trial.

### Research Serves Mayo's Educational Purposes

50.     Mayo's research functions are "exclusively" educational for purposes of this analysis.  Much like any university's research, Mayo's research is designed to improve both knowledge and outcomes for patients.  But, as set out above, the research is a critical part of the education of many of Mayo's students and trainees.  *See* Findings of Fact ¶¶ 187–195.

51.     As detailed in the Findings of Fact, research is part of the curriculum at numerous of Mayo's schools.  Findings of Fact ¶¶ 188–90, 192.  It is integral to Mayo's graduate programs in particular.  *Id.* at ¶¶ 188–90.  And like at all major academic institutions, research and scientific publishing is critical for Mayo's faculty, who use it to stay at the cutting edge of and advance knowledge in their field.  *Id.* at ¶¶ 189–90.

52.     And in *Mayo Foundation II*, the court treated research activities as educational when determining whether Mayo was a school.  282 F. Supp. 2d at 1014.

### Mayo's Laboratory Testing Serves Mayo's Educational Purposes

53.     The Government also argues that Mayo's laboratory testing activities did not have an educational component.  This is not persuasive.  Students were heavily involved in laboratory testing, both for purposes of learning "real world" pathology and for purposes of conducting research to further their studies.  Findings of Fact ¶¶ 229–36.  It cannot, therefore, be said that the laboratories' purposes were noneducational.  *See St. Luke's Hosp. of Kan. City v. United States*, 494 F. Supp. 85, 90–91 (W.D. Mo. 1980) (concluding that

pathology laboratory "clearly contributes to the teaching function" of the hospital, because "[o]ne part of the teaching program is in pathology, the study of abnormal tissues," and because "a large volume  of . . . tests is essential for a high-quality medical education program in Pathology or Obstetrics and Gynecology" and that laboratory tests "contribute importantly to the teaching functions of the hospital" and the laboratory was therefore "substantially related" to the hospital's "exempt purpose" of education).  The IRS itself has recognized the need for pathology specimens as part of medical education by determining it would follow that portion of the *St. Luke's* decision over 35 years ago.  *See* Rev. Rul. 85-109, 1985-2 C.B. 165 (1985) ("The Internal Revenue Service will follow that part of the decision in *St. Luke's Hospital of Kansas City v. United States*, 494 F. Supp. 85 (W.D. Mo. 1980), holding that a teaching hospital which conducted nonpatient laboratory testing on specimens needed for the conduct of its teaching activities was not engaged in an unrelated trade or business where the outside testing services contributed importantly and substantially to the hospital's teaching program.").

54.     In addition, Mayo's laboratory testing operations contributed to efforts to attract patients with rare and complex diseases, which were essential to its educational programs.  Findings of Fact ¶¶ 250, 257.

55.     In any event, diagnostic testing is quite obviously incidental to the patient care necessary to render education to Mayo's residents.  It is only common sense that few patients would submit to diagnosis or treatment at a hospital where their physicians did not have access to up-to-date diagnostic testing.  Testing is not a "significant" function conducted for its own sake.  Thus, even if the Court found that diagnostic testing was

completely noneducational (and, again, the Court finds to the contrary), the activity would not be a reason to deny Mayo the UBIT exemption because it is merely incidental to Mayo's educational purpose.

*Mayo's Administrative Functions Are Incidental to Its Educational Mission and Serve Mayo's Educational Purposes*

56.     The Government argues that expenditures such as maintaining physical facilities, human resources, and other such administrative tasks, disqualify Mayo from the UBIT exemption.     Mayo's administrative functions were neither substantial nor noneducational.

57.     During the Refund Years, Mayo's administrative services expenses were 3.4% of Mayo's total system-wide expenses.  Tr. 753:14–17 (Hurley); *see also* Tr. 750:16–751:5 (Hurley).  That is hardly a substantial activity.

58.     If Mayo's administrative services could be considered substantial, they supported Mayo's educational purpose.  Administration is never conducted for its own sake.  No company exists only so that its human resources department, for example, can thrive.     Instead, such functions necessarily serve an organization's purposes. Administration is necessarily incidental to educational purposes if it supports those educational services.  *See, e.g.*, *Univ. of Mass. Med. Sch. Grp. Prac.*, 74 T.C. at 1305 ("The fact that money from the trust fund may be used for administrative costs and compensation for group practice members in addition to other medical school needs such as scholarships, research projects, and the acquisition of equipment, does not detract from petitioner's exempt purpose of enhancing the clinical education of the medical school.").

59.     Here, Mayo's administration supports its educational purpose.  Indeed, the Government does not seriously contend otherwise.  For example, if education is imparted at the bedside of the patient, the infrastructure necessary to provide that treatment and maintain the building where that occurs, are necessarily incidental to providing that education.  *See, e.g.*, *id.* at 1306 ("By organizing the clinical faculty of the medical school into a cohesive group, and by promoting an efficient mechanism for the collection of fees charged to the patients of the university hospital for services rendered by the clinical faculty, petitioner effectuates its exempt purpose of promoting and improving the education received by students of the medical school.").

60.     Moreover, if the Government's argument is correct, and organizations cannot have administrative functions if they are to remain "exclusively" educational, every college and university in this country would fail the test.  Such an absurd result illustrates why the Government's argument cannot be correct.

*

For all the foregoing reasons, Mayo is an "exclusively" educational organization. Therefore, it qualifies as an "educational organization" entitled to the UBIT exemption, and Mayo is entitled to judgment in its favor on its refund claim in the amount of $11,501,621, together with statutory interest.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED THAT:**

1.      Judgment shall be entered in favor of Plaintiff Mayo Clinic, with prejudice and on the merits, on its claims that it does not owe taxes on certain debt-financed income it received in years 2003, 2005–2007, and 2010–2012 because it is an "educational organization" under 26 U.S.C. § 170(b)(1)(A)(ii).

2.      Defendant United States shall pay Plaintiff Mayo Clinic $11,501,621 together with statutory interest.

3.      Defendant United States' motion in limine to exclude Melvin Hurley as an expert witness [ECF No. 261] is **DENIED**.

4.      Defendant United States' motion in limine to exclude evidence of IRS procedures, analyses, and conclusions [ECF No. 263] is **DENIED** to the extent evidence that was the subject of this motion was admitted at trial and relied on in these Findings of Fact and Conclusions of Law.

5.      Defendant United States' motion in limine to prevent Mayo from offering the testimony of an undisclosed records custodian [ECF No. 264] is **DENIED** as moot.

6.      Defendant United States' objection to Plaintiff Mayo Clinic's designation of deposition testimony of Mayo's Rule 30(b)(6) designee Christie Lohkamp [ECF No. 268] is **DENIED** to the extent that the Rule 30(b)(6) testimony of Ms. Lohkamp was considered or relied upon in these Findings of Fact and Conclusions of Law.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: November 22, 2022                    s/ Eric C. Tostrud
                                            Eric C. Tostrud
                                            United States District Court